629 P.2d 231

**UNITED NUCLEAR CORPORATION,**
Plaintiff–Appellee,

v.

**GENERAL ATOMIC COMPANY,**
Defendant–Appellant,

and

**Indiana & Michigan Electric Co.,**
Defendant–Appellee.

**UNITED NUCLEAR CORPORATION,**
Plaintiff–Appellee,

v.

**GENERAL ATOMIC COMPANY,**
Defendant–Appellant,

and

**Indiana & Michigan Electric Co.,**
Defendant–Appellee.

Nos. 11988, 12052.

Supreme Court of New Mexico.

Aug. 29, 1980.

Rehearing Denied Oct. 23, 1980.

Rodey, Dickason, Sloan, Akin & Robb, John D. Robb, Jack Eastham, Albuquerque, Montgomery, Andrews & Hannahs, Seth D. Montgomery, Santa Fe, Howrey & Simon, Washington, D.C., for defendant–appellant.

Bigbee, Stephenson, Carpenter & Crout, Donnan Stephenson; Harry L. Bigbee, Santa Fe, James T. Paulantis, Albuquerque, Charles D. Olmsted, Santa Fe, Simpson, Thacher & Bartlett, Rogers M. Doering, New York City, for plaintiff–appellee United Nuclear.

Jones, Gallegos, Snead & Wertherim, James E. Snead, Santa Fe, for defendant–appellee Indiana & Michigan Elec. Co.

## OPINION

PAYNE, Justice.

This is an appeal from a default judgment entered against General Atomic Company (GAC) in Santa Fe District Court for its alleged willful and bad faith failure to comply with the court's discovery orders.[1]

This case is by far the single largest litigation in the history of New Mexico, both in terms of the dollar value of the judgment, which approaches one billion dollars, and the sheer volume of the record, which contains more than 28,000 pages in the record proper, 13,000 pages of transcripts, thousands of documents, and over 100 depositions containing approximately 16,000 pages of testimony and 2,700 exhibits. The facts are largely disputed and are extremely complex. Although we begin with a general factual background and summary of the proceedings below, additional factual details are contained in the separate discussions of the issues raised on appeal.

This action was instituted by United Nuclear Corporation (United) against GAC, a partnership made up of Gulf Oil Corporation (Gulf) and Scallop Nuclear Corporation (Scallop).[2] Scallop is a wholly–owned subsidiary of Dutch–Shell Oil Company. As amended, United's complaint sought a declaratory judgment that two contracts under which United was to supply approxi-

---

[1] This case has been the subject of a number of previous decisions of this Court: *United Nuclear Corp. v. General Atomic Co.*, 93 N.M. 105, 597 P.2d 290 (1979) (upholding trial court's refusal to stay its proceedings pending arbitration), *cert. denied*, 444 U.S. 911, 100 S.Ct. 222, 62 L.Ed.2d 145 (1979); *United Nuclear Corp. v. General Atomic Co.*, 91 N.M. 41, 570 P.2d 305 (1977) (upholding personal jurisdiction of trial courts), *rev'd*, *General Atomic Co. v. Felter*, 434 Atomic Co. v. Felter, 90 N.M. 120, 560 P.2d 541 (1977) (upholding injunction prohibiting the parties from instituting related actions in other courts), *rev'd General Atomic Co. v. Felter*, 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199 (1977); and *United Nuclear Corp. v. General Atomic Co.*, 90 N.M. 97, 560 P.2d 161 (1976) (upholding personal jurisdiction of trial court over GAC). In addition, this Court refused to consider the issue of the disqualification of United's counsel as either an appeal from a final judgment or as a petition for an extraordinary writ (No. 11,469, June 29, 1977, and No. 11,484, July 1, 1977, respectively).

In addition to the two decisions mentioned above which were taken to the United States Supreme Court, that Court has had this case before it on at least three other occasions. On May 30, 1978, the Supreme Court held that the trial court could not enjoin GAC from proceeding with its right to arbitration against United. *General Atomic Co. v. Felter*, 436 U.S. 493, 98 S.Ct. 1939, 56 L.Ed.2d 480 (1978). GAC applied for a stay of all proceedings in the trial court on the basis that the threat of sanctions under Rule 37 violated the act of state doctrine. This application was denied. *General Atomic Co. v. Felter*, 435 U.S. 920, 98 S.Ct. 1481, 55 L.Ed.2d 514 (1978). After sanctions were imposed, GAC sought immediate review by the Supreme Court of the sanctions order and default judgment. This petition was also denied. *General Atomic Co. v. Felter*, 436 U.S. 904, 98 S.Ct. 2233, 56 L.Ed.2d 402 (1978).

[2] This action was originally filed on August 8, 1975 in Santa Fe District Court. Both GAC and its constituent partners, Gulf and Scallop, were named as defendants in that case. The case was removed to federal district court by gulf. On December 31, 1975, United voluntarily dismissed the case in federal court, and refiled it on the same day in Santa Fe State District Court, naming only the partnership as a defendant. It is this later case that is the subject of this appeal.

mately twenty–seven million pounds of uranium to GAC were void and unenforceable. The complaint alleged that GAC and Gulf committed fraud and economic coercion, breached their fiduciary duties to United, and violated the New Mexico Antitrust Act. United also contended that its performance under the contracts had been rendered commercially impracticable. GAC counterclaimed for actual and punitive damages for United's alleged violations of the New Mexico Antitrust Act, and for specific performance of the two contracts, or alternatively, for damages of almost eight hundred million dollars.

GAC impleaded Indiana and Michigan Electric Company (I&M), a public utility company which provides electrical service to customers in the states of Indiana and Michigan. GAC contended that if United's obligations to supply uranium to GAC were excused, GAC's obligations to supply uranium to I&M from the supplies United was to deliver should also be excused.[3] · I&M counterclaimed against GAC for specific performance and for other relief.

The trial of this case began on October 31, 1977. It was terminated on March 2, 1978, when the trial judge entered a sanctions order and default judgment against GAC. The court found that GAC had exercised "the utmost bad faith in all stages of the discovery process." The court entered forty–eight recitals relating to GAC's discovery failures, twelve findings of fact as sanctions pursuant to N.M.R. Civ. P. 37 (b)(2)(i), N.M.S.A. 1978, and a default judgment under N.M.R. Civ. P. 37(b)(2)(iii), N.M. S.A. 1978.[4] The judgment invalidated United's uranium supply contracts with GAC, declared that United had no other obligations to deliver uranium to GAC, and struck GAC's defenses, counterclaims and cross–claims.

A hearing on damages followed, after which the court entered a final judgment, amended final judgment, and second amended final judgment. In addition to invalidating the United–GAC contracts, the court awarded damages to United of $8,264,723 (reduced by an offset for prepayments that had been made) and to I&M of $15,950,752. The court also granted specific performance of I&M's contract for the supply of five million pounds of uranium from GAC.

GAC appeals from the default judgment, arguing ten main grounds for reversal. We have consolidated these points in this opinion into the following five sections: (1) The propriety of the court's discovery orders; (2) GAC's non–compliance with those orders and the propriety of the sanctions entered for noncompliance; (3) the court's failure to disqualify United's counsel; (4) the trial judge's refusal to disqualify himself; and (5) the propriety of the remedies.

Before turning to the examination of the issues on appeal, we think it appropriate to comment on the conduct of all parties in these appellate proceedings. We have been faced with the difficult task of wading through an avalanche of motions and papers, much of which has done little to add to our understanding of this case or to expedite the ultimate resolution of it. Perhaps because of the longevity of this litigation, the acrimony which marked the proceedings in the trial court, or the monetary value of the judgment at stake, the over six hundred pages of appellate briefs filed, as well as the arguments of the attorneys in the hearings in this Court, have been filled with unnecessary "invectives, maledictions, and denunciations which we ignore." *State of Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370, 1372 (10th Cir. 1978), *cert. denied*, 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978).

---

**3.** Detroit Edison Company, another electric utility company, was also impleaded by GAC, but was dismissed as a party in March 1978 after it reached a settlement with GAC.

**4.** In 1979, most of the specific New Mexico Rules of Civil Procedure with which we are

concerned were amended (e.g., Rules 26, 33, 34, 37). Because this case was decided in the court below prior to the adoption of these amendments, all citations in this opinion are to the former rules.

After having received the permission of this Court to file briefs which exceed by several times the length generally permitted by the Rules of Appellate Procedure, N.M.R. Civ. App. 9(k)(4), N.M.S.A. 1978, GAC and United resorted to the practice of adding additional argumentative material in a device called an appendix, without requesting or receiving permission from this Court. N.M.R. Civ. App. 9(b) and (k)(4). In addition to argument, the parties inserted other material from outside the record in these appendices, including a newspaper article and correspondence, contrary to the rules, N.M.R. Civ. App. 9(b), and to prior decisions of the Court. *General Services Corp. v. Board of, Com'rs*, 75 N.M. 550, 552, 408 P.2d 51, 53 (1965); *Porter v. Robert Porter & Sons, Inc.*, 68 N.M. 97, 101, 359 P.2d 134, 137 (1961). These we have also ignored.

■ Although the briefs of all three parties are articulate forensic efforts, each, in one form or another, has failed to fully comply with the rules of this Court. Neither the significance of the issues involved nor the magnitude of the dollars at stake excuses noncompliance with those rules. We take this opportunity to serve warning on the bar that this Court fully expects compliance with its rules of procedure in general and its specific orders in particular, and will not hesitate to impose the sanctions provided for in N.M.R. Civ. App. 31, N.M.S.A. 1978, in order to secure adherence to the rules and to our orders.

## I.

### FACTUAL BACKGROUND

To understand the issues in this appeal we must begin with a more detailed factual summary than is usual. Many entities have interacted to create the conditions from which this case arose.

### A.

### THE GULF URANIUM ORGANIZATION

The principal contract at issue here was entered into by Gulf and United. GAC's predecessor was at one time a wholly-owned subsidiary of Gulf. Most of United's allegations against GAC involve alleged wrongdoing by Gulf. Therefore, an understanding of the issues on appeal must begin with a background of Gulf's activities in the uranium market.

In 1967, Gulf entered the uranium business by purchasing a subsidiary of General Dynamics known as General Atomic. General Atomic, which was a manufacturer of nuclear reactors, was renamed Gulf General Atomic and was operated as a subsidiary of Gulf located in San Diego, California.

In 1970, Gulf formed a new division, called Gulf Energy and Environmental Systems (Gulf Energy). Gulf General Atomic became a part of Gulf Energy. Gulf Energy was the Gulf entity involved in the marketing of uranium and the manufacture of nuclear reactors. Gulf was the only manufacturer in the United States of high temperature gas cooled reactors.

Beginning in 1967, Gulf undertook the exploration and development of uranium ore bearing properties. A Gulf division located in Denver, Gulf Minerals Resources Company (Gulf Minerals), was charged with this, the production end, of Gulf's uranium business. One of Gulf's first substantial uranium discoveries was made in 1967 in the Rabbit Lake area of Canada. Another wholly–owned Gulf subsidiary, Gulf Minerals Canada Limited (Gulf Canada), was responsible for the development of the Rabbit Lake uranium project. Gulf Minerals had administrative responsibility in the Gulf organization for Gulf Canada's operations.

The following chart outlines the organization, as of 1971, of those aspects of Gulf's uranium business operations which are essential to an understanding of this case.

In addition to its Canadian uranium reserves, Gulf, through Gulf Minerals, began to acquire substantial uranium reserves in the United States. By 1971, it had acquired the Mt. Taylor reserves in New Mexico, which contain the largest body of uranium ore in the United States. Through Gulf Energy, Gulf also began to purchase substantial quantities of uranium on the open market from other uranium producers. Two of such purchase agreements, those Gulf and GAC entered into with United, are the principal subjects of this litigation.

## B.

## THE CONTRACTUAL RELATIONSHIPS OF THE PARTIES

United is a major New Mexico uranium producer. Much of the uranium it produces is used in the nuclear reactors of public utilities. In the 1960's, United entered into the fuel fabrication market. Fuel fabrication is the process by which enriched uranium is manufactured into fuel clusters to power nuclear reactors.

In 1966, United entered into a contract to sell nuclear fuel to Commonwealth Edison, a commercial utility. It later contracted to sell fuel to I&M, and signed letters of intent to deliver fuel to Detroit Edison, Duke Power, Yankee Atomic and Consolidated Edison, all of which are also commercial utility companies. United also signed a letter of intent with Commonwealth Edison to supply it with additional fuel.[5]

By 1970, United's commercial nuclear fuels business required more capital than United had or could obtain on its own. In that year, United entered into negotiations with Gulf, through Gulf Energy, to form a joint commercial light water reactor fuel fabrication business. For its part, Gulf was interested in such a business as an outlet for its uranium supply and as an opportunity to enter the fuel market for such reactors, which might provide a hedge for its high temperature reactor business.

The negotiations between Gulf and United culminated in July 1971, with the formation of a jointly owned corporation called Gulf United Nuclear Fuels Corporation (Gulf–United). The purpose of Gulf–United was to manufacture and sell nuclear fuel for commercial power reactors. United contributed its expertise in the business and some of its facilities and employees. Gulf was to contribute capital. United assigned its rights under the utility contracts to Gulf–United, thereby obligating the new corporation to supply the utilities with uranium. United in turn agreed to supply the new corporation with the uranium needed to fulfill the utility contracts. This latter agreement will be referred to as the 1971 Supply Agreement. Gulf was to supply Gulf–United with one–half of the uranium required for each existing order and letter of intent, but, upon the advice of United's counsel, this obligation was made an option. Gulf owned fifty–seven percent of the capital stock of Gulf–United, and United owned the remainder.

From 1971 to 1973, Gulf–United was jointly operated by Gulf and United. During this period Gulf–United formalized two of the letters of intent. For reasons that are disputed, Gulf–United's business did not prosper. In the summer of 1973, United agreed to sell its interest in Gulf–United to Gulf (the Buyout Agreement). United and Gulf then entered into a new contract, the 1973 Supply Agreement. Pursuant to this contract, which cancelled and rescinded the 1971 Supply Agreement, United agreed to sell Gulf–United the uranium needed to supply the utilities. Gulf–United continued to be obligated to supply the utilities with uranium. Thus, the 1973 Supply Agreement basically replaced the 1971 Agreement, with an upward adjustment in the price.

In November 1973, Gulf–United was merged into Gulf. Gulf then entered into a

---

5. One issue in this case is whether United's so–called letters of intent with the utilities were actually non–binding letters of intent, or rather, binding contracts. We will refer to them here as letters of intent, and discuss the legal nature of them in Section II B, *infra*, of this opinion. However, collectively, the formal contracts and the letters of intent will be referred to as the utility contracts.

partnership with Scallop. That partnership, known as General Atomic Company (GAC), is the defendant here. Gulf transferred Gulf Energy, including Gulf General Atomic to the new partnership. In the spring of 1974, Gulf transferred the Gulf–United business operation, including the utility contracts and the 1973 Supply Agreement, to GAC. GAC thus became obligated to perform the utility contracts and acquired the right to receive uranium from United. In essence, GAC simply took over the operations of Gulf Energy and Gulf–United.

Later in 1974, the new partnership, GAC, entered into another contract with United, the 1974 Supply Agreement, whereby United became obligated to supply GAC with an additional three million pounds of uranium.

United contends that Gulf entered into the formation of Gulf–United and the 1971 Supply Agreement as part of an attempt to monopolize the uranium market, and with the specific intent of eliminating United as a competitor in the fuel fabrication and uranium mining industries. United contends that Gulf fraudulently promised to supply Gulf–United with capital and one–half of the uranium needed for the utility contracts. United alleges that as part of this monopolistic scheme, Gulf refused to honor its obligations, refused to permit Gulf–United to buy uranium on the open market, and forced United to supply all of the uranium necessary to meet Gulf–United's needs. United argues that by deliberately mismanaging Gulf–United and withholding capital and uranium, Gulf successfully forced United to sell its interest in Gulf–United to Gulf at terms Gulf dictated and to execute the 1973 Supply Agreement. United also alleges that Gulf, acting through GAC, planned and attempted to negotiate out of its obligations to the utilities, and to then resell the uranium which United was obligated to supply at prices that Gulf had fixed. Knowing that United was in desperate financial straits, Gulf and GAC are alleged to have sought to secure a security interest on United's Churchrock, New Mexico mine–the largest underground uranium mine in the United States–and the right to control production from that mine. GAC allegedly refused to give United any price relief. This impasse led to the filing of this case.

All of the foregoing alleged actions are asserted to have been part of a larger conspiracy to control uranium reserves in the United States. United contends that Gulf sought to accomplish this feat by tying up vast quantities of uranium through the contracts it entered into between 1972 and 1974 with other American uranium producers, in addition to the 1973 and 1974 Supply Agreements with United, and by acquiring, and then delaying the production of, uranium from Gulf's enormous Mt. Taylor reserves.

## C.

### THE INTERNATIONAL URANIUM CARTEL

Several months after this case was filed, United raised a new allegation—that Gulf's and GAC's monopolistic efforts were part of a worldwide conspiracy of certain international uranium producers to fix the prices, allocate the markets, and control the production of uranium. United's efforts to secure discovery of records relating to this international uranium cartel became the major focus of this litigation, and GAC's failure to supply cartel–related information was the principal basis for the sanctions order and default judgment entered by the trial court.

The precise facts regarding the development and operation of the cartel are not completely clear, largely because full cartel–related discovery was not made in this case. However, several matters are well established.

First, as GAC concedes, there was a uranium cartel made up of various international uranium producers, which operated from at least 1972 to 1975. Foreign governments, including those of Canada, South Africa, France and Australia, played some role in the formation and operation of the cartel. The nature of the roles played by

those governments, particularly by the Canadian Government, is a disputed question in this case, the resolution of which is critical to the disposition of one of the major issues raised by GAC on appeal. We will examine this question in Section II C, *infra*, of this opinion.

Second, it is established that Gulf, acting through Gulf Canada, was a member of the cartel no later than June 1972. It is also clear that the top executives of Gulf Energy, the immediate predecessor of GAC, were aware of the cartel and received information concerning its activities. At least two high–level officials of Gulf Energy attended one or more cartel meetings. All of these executives later became key personnel of GAC.

Third, the basic purposes of the cartel are unquestionably clear. GAC's counsel stated to the trial court:

> The purpose of [the cartel] was to set terms and conditions of sale. It was to set floor prices. And it was to set quotas and divide up who could produce how much. They were going to restrict supply. *It was in its intention a cartel in every sense of the word.* (Emphasis added.)

One of the Gulf attorneys who had advised Gulf that it was legal for it to join the cartel later told a Congressional subcommittee impaneled to investigate cartel activities: "There, of course, was never any doubt about what the 'cartel' intended to accomplish. It was to completely frustrate free competition." *International Uranium Cartel: Hearings Before the Subcomm. on Oversight and Investigation of the House Comm. on Interstate and Foreign Commerce*, 95th Cong., 1st Sess., Serial No. 95–95, p. 89 (1977) [hereinafter cited as *Hearings on International Uranium Cartel*].

Fourth, between 1972, when the cartel apparently began, and 1975, when this suit was filed, the price of uranium in the United States increased from approximately $6.00 per pound to approximately $40.00 per pound.

Beyond these four established facts–the existence of the cartel, Gulf's active partici-pation therein, the cartel's anticompetitive purposes, and the dramatic increase in uranium prices during the cartel's existence— there is little about the cartel that is not disputed by the parties. One of the principal disputes is whether the cartel has any relevance to the contracts at issue in this litigation, which will be discussed in Section II B, *infra*, of this opinion.

## D.

### HISTORY OF THE PROCEEDINGS IN THE TRIAL COURT

In Section III A, *infra*, of this opinion we will discuss in detail the chronology of the proceedings in the court below in the context of analyzing GAC's efforts to comply with the court's discovery orders. At this point, however, it is necessary to provide a brief outline of those proceedings in order to facilitate an understanding of the overall posture of the case and the various issues on appeal.

On December 31, 1975, United filed this action in Sante Fe District Court. On the same day, United served lengthy interrogatories on GAC. This set of interrogatories will be referred to as the First Set of Interrogatories. The interrogatories called for detailed information concerning the uranium and fuel fabrication businesses of Gulf, Scallop and GAC. Many of the interrogatories specifically asked for information from "the partnership and the partners." Neither the complaint nor the interrogatories specifically mentioned the international uranium cartel.

On April 5, 1976, GAC filed the first of two sets of answers to the First Set of Interrogatories. The answers provided no information on the cartel and virtually no information on the separate uranium business activities of Gulf and Scallop. The trial court eventually found these answers to have been "wholly inadequate and evasive."

During the summer of 1976, extensive discovery efforts were conducted by United. GAC produced its business records, but it did not produce documents which were in

the separate possession of Gulf or Scallop. On September 23, 1976, the Canadian Government promulgated the Canadian Uranium Information Security Regulations, which prohibited the release of cartel information from Canada.[6] One week later, United pointed out for the first time that GAC had failed to produce documents from Gulf and Scallop. GAC then contended that it was not obligated to produce records which were in the separate possession of the partners. *See* Section II A, *infra.* The trial court rejected this argument on November 30, 1976. The court held that both the partnership and the partners were subject to its discovery orders, and it warned that sanctions would be imposed if either the partnership or the partners failed to comply with those orders.

United then moved to compel production of partner documents and supplemental answers to the First Set of Interrogatories. GAC continued to assert that partner documents were not discoverable, and the court again rejected this argument at three different hearings in January 1977. It ordered GAC to provide supplemental answers and to produce partner documents by April 15, 1977.

In February 1977, United moved to compel production of cartel–related documents Gulf had produced in other litigation. GAC resisted production of these documents, once again rearguing the question of partner discovery. GAC also suggested for the first time that United's counsel, who had represented Gulf until November 1976 on its operations at Mt. Taylor, might have to be disqualified in this case. *See* Section IV, *infra.* On March 1, 1977, for the first time GAC specifically asserted that the Uranium Information Security Regulations were a bar to the discovery of cartel information. At a hearing on March 7, the court reiterated its previous rulings that Gulf was subject to its discovery orders, granted United's motion to produce the cartel records, and again warned that sanctions, including

a default judgment, would be imposed if good faith discovery efforts were not made. GAC then formally moved to disqualify United's counsel. The court denied this motion. In March 1977, I&M, which had been joined as a party in January 1977, filed claims against GAC, specifically asserting Gulf's cartel activities as a basis for the relief it sought. GAC's supplemental answers were filed on April 15. They made no mention of the cartel.

In August 1977, United filed its Second Set of Interrogatories. This set was specifically addressed to the activities of the cartel. GAC filed objections to these interrogatories. The objections made no mention of the Uranium Information Security Regulations or any other Canadian secrecy laws. The court overruled most of the objections. GAC then filed answers to these interrogatories, which included the assertion that Canadian laws barred production of cartel documents.

United moved to compel further answers to the interrogatories and the production of cartel documents, and to have sanctions imposed. The trial court granted the request for further answers. The court found that GAC had not acted in good faith regarding the production of cartel documents up to that time. It ordered GAC to produce cartel records to the extent lawful, and to the extent that it was unlawful, to seek a waiver of Canadian nondisclosure laws. The court again warned that sanctions would be imposed if its order was not complied with.

GAC unsuccessfully sought permission from the Canadian Government to produce cartel documents located in Canada. GAC then submitted its second set of answers, which did not identify any cartel documents located in Canada or contain information from such documents.

Five days after the trial began, United again moved to compel the production of cartel documents and for sanctions for GAC's alleged discovery failures. At a hearing on November 8, 1977, the trial judge accused GAC of "stonewalling" infor-

---

**6.** Can.Stat.O. & R. 76–644 (1976). The Regulations were promulgated pursuant to the Canadian Atomic Energy Control Act, 1970, Can. Rev.Stat. c. A–19. Pertinent portions of the original Regulations are set forth in n. 41, *infra.*

mation. The following day, GAC moved to disqualify the judge. The motion was denied. *See* Section V, *infra*. The trial court, after a hearing, found that GAC had deliberately housed cartel documents in Canada in an attempt "to court legal impediments" to their production. It also found that GAC had violated its prior order to identify cartel documents, and it again ordered such identification.

In December 1977, United and I&M filed objections to GAC's second set of answers to the Second Set of Interrogatories and moved to compel further answers. The trial court granted this request. On February 1, 1978, GAC filed its third set of answers. Thereafter, United filed its fourth motion for a default judgment, in which I&M joined. The trial court granted the motion, and entered the sanctions order and default judgment which is the subject of this appeal. The trial court found all issues of liability against GAC and in favor of I&M and United. The court found that GAC had acted in bad faith throughout the discovery process, and had "willfully, intentionally and in bad faith covered up" "highly relevant" information concerning the cartel and Gulf's role therein. The court said that GAC's answers to the First Set of Interrogatories were "wholly inadequate and evasive," and that its series of answers to the Second Set of Interrogatories amounted to a willful, intentional, deliberate and bad faith failure and refusal to answer. *See* Section III, *infra*.

A lengthy trial on the question of damages was conducted following entry of the sanctions order and default judgment. *See* Section VI, *infra*. On May 16, 1978, the court entered a final judgment against GAC.

## II.

## PROPRIETY OF DISCOVERY ORDERS

The first area we examine is whether the trial court's discovery orders, which the

court found GAC had willfully failed to comply with, were within the court's authority to enter. If, as GAC contends, the court's orders were invalid from the outset, then GAC could not have been sanctioned for its failure to comply with them.[7]

The orders involve the production of documents or the furnishing of information regarding the international uranium cartel. GAC contends that they were invalid for four reasons: (1) information and documents in the possession of the partners cannot be the subject of discovery orders in a case in which only the partnership, and not the individual partners, is a party; (2) the cartel documents and information are not relevant to any issue in this case; (3) adjudication of any issues regarding the cartel, and therefore, discovery orders directed at cartel–related information and documents, are barred by the act of state doctrine and the exclusive federal power over the conduct of foreign relations; and (4) the New Mexico Antitrust Act cannot be applied to the 1973 and 1974 uranium supply agreements, and therefore, the court was without jurisdiction to enter discovery orders based on appellees' allegations of violations of that Act. Each of these contentions will be separately discussed in the sections that follow.

## A.

## DISCOVERY OF PARTNER DOCUMENTS

GAC contends that a partner, who is not itself a party in a case brought against the partnership, may not be ordered to answer interrogatories under N.M.R. Civ.P. 33, N.M.S.A. 1978, or to produce documents under N.M.R. Civ.P. 34, N.M.S.A. 1978.

This issue arose when United served its First Set of Interrogatories on GAC. The

---

7. "If sanctions are imposed under Rule 37(b), . . . on appeal from the order imposing sanctions the appellate court will consider the propriety of the prior order for discovery." C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 2289, at 791 (1970) (footnote

omitted). *See also Familias Unidas v. Briscoe*, 544 F.2d 182, 191 (5th Cir. 1976); *Gordon v. Federal Deposit Insurance Corporation*, 138 U.S.App.D.C. 308, 427 F.2d 578, 581 (D.C. Cir. 1970); *Hanley v. James McHugh Construction Company*, 419 F.2d 955, 957 (7th Cir. 1969).

interrogatories clearly called for information from "the partnership or partners." *See* Section III A, *infra,* and n. 80, *infra.* None of these interrogatories was objected to within the time provided by Rule 33.[8] GAC provided only limited information from the partners in its original answers to those interrogatories. During several months of document production that followed the filing of those answers, it did not produce any records from the partners' files. In September 1976, United brought GAC's failure to provide information from the partners to the attention of the trial court. In November 1976, the court ruled that the right to discovery extends to "a party partnership and the individual partners comprising the partnership, and the agents, servants, employees, directors and officers of a party or partner," and the court warned that sanctions would be imposed "for the failure of the defendant partnership *or either partner thereof* to comply with specific orders of the Court directing discovery." (Emphasis added.)

The court reiterated this ruling on at least five separate occasions in early 1977. It held that the partners "have the same obligation in relationship to discovery as the partnership," because "[t]he partnership is not an entity in and of the cognizable law." The court stated: "GAC has no substantive separate existence in law. It is not a separate legal entity." GAC then argued that even if the court could order production of

partnership–related documents in the possession of the partners, it could not require the partners to produce "non–partnership documents." The court rejected this contention on at least two occasions.[9] Finally, in early March 1977, GAC began to produce documents which were in the possession of the partners. A year later, the default judgment was entered after GAC failed to produce all of Gulf's cartel records.

GAC's argument is based on the principle that discovery under Rules 33 and 34 is limited to parties to the case. GAC argues that a partnership is a separate legal entity, and as such, only it, the named defendant in this suit, rather than the non–party constituent partners, is subject to discovery under Rules 33 and 34.

We find it unnecessary to consider the extent to which a partnership is a separate legal entity as a matter of substantive partnership law, because we conclude that under Rules 33 and 34 the trial court properly ordered GAC to produce partner documents and to furnish information from the partners.

■ In construing Rules 33 and 34, we must begin with the notion that discovery is designed to "make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Procter & Gamble,* 356 U.S. 677, 682, 78 S.Ct. 983, 986–87, 2 L.Ed.2d 1077 (1958) (citation omitted). In light of that

---

**8.** As we discuss in Section III, *infra,* the failure to raise a timely objection to an interrogatory operates as a waiver of any objection a party might have. However, we address GAC's objection to the production of partner documents notwithstanding its failure to raise a timely objection both because the trial court did not rely on the principle of waiver and because it is a question that has apparently never before been specifically decided by any court in the United States. Our decision to decide the question on its merits in no way detracts from the significance to the issues discussed in Section III, *infra,* of GAC's failure to comply with the express provisions of Rule 33.

**9.** The distinction between partnership and non–partnership documents confuses the relevancy of the information under Rule 26(b) with its availability under Rules 33 and 34. It is one

thing to say that non–partnership–related documents are not relevant, but quite another to say that they are incapable of being obtained. The trial court repeatedly made this crucial distinction. If the partnership business was conducted as part of a coordinated Gulf effort to monopolize the uranium market, as United contends it was, then various Gulf documents pertaining to production and marketing of uranium might be relevant, even though they did not directly pertain to what was ostensibly the partnership business. To permit the parties to determine what is related to the partnership business is to allow that party to make its own unilateral determination of the scope of discovery, which, of course, it may not do. *See United States v. Board of Trade of the City of Chicago, Inc.,* 18 F.R.Serv.2d 318, 319 (N.D. Ill. 1973).

policy, Rules 33 and 34 must be liberally construed in order to insure that a litigant's right to discovery is "broad and flexible." *Davis v. Westland Development Company*, 81 N.M. 296, 299–300, 466 P.2d 862, 865–66 (1970). *See also Goldman v. Checker Taxi Company*, 325 F.2d 853, 855 (7th Cir. 1963); *In Re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D. Ill. 1977); *Hart v. Wolff*, 489 P.2d 114, 117 (Alaska 1971).

Rule 33 provides that interrogatories may be served only on a party, but it states that the interrogatories must be answered by the party served, or *"if the party served is . . . a partnership, . . . by any* officer *or agent*, who shall furnish such information as is *available to the party*." (Emphasis added.) In an earlier opinion concerning this litigation, we noted that Gulf is a general agent of the GAC partnership. We stated: "The agency of a partner is the hallmark of that particular form of business or professional association." *United Nuclear Corp. v. General Atomic Co.*, *supra*, 90 N.M. at 100, 560 P.2d at 164. *See* § 54–1–9A, N.M.S.A. 1978. If, under Rule 33, Gulf is obliged as an agent of GAC, to furnish answers to interrogatories directed at the partnership, it would be incongruous to hold that information in the possession of Gulf is not "available" to GAC for the purpose of giving complete and accurate answers to those interrogatories. Indeed, the rule that "all information available to the interrogated party must be supplied . . . includes information possessed by, or within the knowledge of, . . . agents or representatives of the party." *Wycoff v. Nichols*, 32 F.R.D. 370, 372 (W.D. Mo. 1963) (citations omitted).

Although Rule 34 requires production of documents in the "possession, custody or control" of a party, and, unlike Rule 33, it does not specifically refer to the discovery obligations of the agents of a partnership, the principle is well established that Rules 33 and 34 are "equally inclusive in their scope." *Wilson v. Volkswagen of America,*

*Inc.*, 561 F.2d 494, 513 (4th Cir. 1977), *cert. denied*, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978). *See also Davis v. Westland Development Company, supra*, 81 N.M. at 299, 466 P.2d at 865.[10]

GAC concedes that the two rules should be similarly construed, but it argues that the focus should be on the concept of "control" under Rule 34, rather than on the phrase "available" in Rule 33. However, the proper focus is not so much on one phrase or on the other, as it is on the purposes underlying each limitation on the scope of discovery under those rules. In each instance, the purposes are relatively apparent and very pragmatic. Each phrase embodies only two limitations. First, a party obviously cannot be required to produce materials which he is incapable of procuring. Second, in general a party should not be required to obtain, collect or turn over materials which the opposing party is equally capable of obtaining on its own. *Konczakowski v. Paramount Pictures*, 20 F.R.D. 588, 593 (S.D.N.Y. 1957); *Cinema Amusements v. Loew's, Inc.*, 7 F.R.D. 318, 321 (D. Del. 1947).

▆ It is undisputed that neither United nor I&M was capable of procuring on its own the information and documents sought from the partners. Thus, the critical inquiry concerns only the first of the above mentioned principles—whether the party from whom the materials are sought has the practical ability to obtain those materials. Because the inquiry is a pragmatic one, the phrases "available" and "possession, custody or control" should not be subjected to formalistic strictures which ignore the policy of liberal discovery and the practical realities of the particular situation at issue. *See Hart v. Wolff, supra*, 489 P.2d at 117. Thus, it is immaterial under Rules 33 and 34 that the party subject to the discovery orders does not own the docu-

---

**10.** For cases construing the term "control" to be synonymous with the term "available," *see Sol S. Turnoff Drug Dist. v. N.V. Nederlandsche C.V.C. Ind.*, 55 F.R.D. 347, 349 (E.D. Pa. 1972); *Erone Corporation v. Skouras Theatres Corporation*, 22 F.R.D. 494, 498 (S.D.N.Y. 1958).

ments,[11] or that it did not prepare or direct the production of the documents,[12] or that it does not have actual physical possession of them.[13] It is also clear that the mere fact that the documents are in the possession of an individual or entity which is different or separate from that of the named party is not determinative of the question of availability or control.[14]

In light of the fact that partner documents were ultimately produced in this case, there can be little doubt that, as a practical matter, those documents were "available" to GAC.[15] Therefore, they were subject to discovery orders entered under Rules 33 and 34.

Our holding in this regard is not only supported by the language and underlying purposes of Rules 33 and 34, but also, it is mandated by two practical considerations. The first concerns the nature of a partnership; the second involves the business relationships of the entities involved in this case.

A partnership is composed of and can only act through its constituent partners. As the trial judge pointed out in this case, if the discovery obligations of a partnership do not extend to the individual partners, then the partners could avoid all meaningful discovery by the simple expedient of maintaining the information and documents related to the partnership business in the separately located files of the partners, rather than in the partnership offices. Cf. C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2208, at 616 (1970) ("[A] party cannot immunize a document from inspection by turning it over to a nonparty so long as it remains in the party's control." (Footnote omitted.))

The second practical consideration which compels the conclusion that documents in the separate possession of the partners should be subject to production concerns the nature of Gulf uranium activities and the history of the General Atomic business operation as they relate to the issues raised in this case.

Although GAC is a partnership rather than a subsidiary of Gulf, it simply took over the business of Gulf Energy including that of Gulf General Atomic. Gulf Energy was planned to be and was operated by Gulf as one part of a coordinated, comprehensive uranium business. Thus, through Gulf Minerals, Gulf Canada and Gulf Energy, Gulf was involved in the production of

---

**11.** *See Ghandi v. Police Department of the City of Detroit*, 23 F.R.Serv.2d 35 (E.D. Mich. 1977); *United States v. National Broadcasting Company, Inc.*, 65 F.R.D. 415, 419–20 (C.D. Cal. 1974), *appeal dismissed*, 421 U.S. 940, 95 S.Ct. 1668, 44 L.Ed.2d 97 (1975); *Advance Labor Serv., Inc. v. Hartford Accident & Ind. Co.*, 60 F.R.D. 632, 633–34 (N.D. Ill. 1973).

**12.** *See Herbst v. Able*, 63 F.R.D. 135, 138 (S.D. N.Y. 1972).

**13.** *See e. g., In Re Folding Carton Antitrust Litigation, supra*, 76 F.R.D. at 423; *Buckley v. Vidal*, 50 F.R.D. 271, 274 (S.D.N.Y. 1970); *Smith v. Maryland Casualty Company*, 42 F.R.D. 587, 589 (E.D. La. 1967); *Schwartz v. Travelers Insurance Company*, 17 F.R.D. 330 (S.D.N.Y. 1954); *Tollefsen v. Phillips*, 16 F.R.D. 348 (D. Mass. 1954); *Reeves v. Pennsylvania R. Co.*, 80 F.Supp. 107, 108–09 (D. Del. 1948); *Williams v. Consolidated Investors, Inc.*, 205 Kan. 728, 472 P.2d 248, 252 (1970).

**14.** *See e. g., Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 257, 263 (D. Del. 1979); *Advance Labor Serv., Inc. v. Hartford Accident & Ind. Co., supra*, 60 F.R.D. at 633–34; *Sol S. Turnoff*

*Drug Dist. v. N.V. Nederlandsche C.V.C. Ind., supra*, 55 F.R.D. at 349; *Erone Corporation v. Skouras Theatres Corporation, supra*, 22 F.R.D. at 498 (S.D.N.Y. 1958).

**15.** Indeed, in its Reply Brief in this appeal, GAC conceded that Gulf's records were "available" to it. GAC stated:

> *GAC did not contend in the trial court that it would be unable to persuade Gulf to produce its domestic records if they came within a judicial order to produce.* Obviously, Gulf had—and continues to have—a very significant interest in this litigation. As one of GAC's constituent partners, it stands to gain or lose immediately from any decision.

> . . . *GAC did not represent to the trial court that Gulf would refuse to produce its documents if an order directing it to do so were entered.* (Emphasis added.)

However, GAC *had* stated to the trial court that it had "no obligation *or ability* to furnish . . . documents from Gulf Oil Corporation or Scallop Nuclear, Inc." (Emphasis added.)

uranium, the purchase and sale of uranium supplies, the fabrication of uranium fuel and the manufacture of nuclear reactors. Prior to the creation of GAC, these various Gulf' divisions or subsidiaries were clearly not operationally divorced from one another.[16]

The transformation of Gulf Energy from a Gulf division to a partnership with Scallop changed the form of the business organization, but not the nature of the business it conducted. There was a substantial continuity of identity in the top levels of management.[17] GAC succeeded to the business records of Gulf General Atomic, Gulf Energy and Gulf–United. The evidence does not indicate that when GAC took over Gulf Energy—operating an identical business, in identical offices, with the same records, and with largely the same personnel in essentially unchanged reporting relationships—it suddenly became totally divorced from the uranium activities of the partners comprising it.[18] The flow of information and the transfer of key personnel from one entity to

16. The record is replete with evidence of the interconnection of the various aspects of Gulf's uranium business. In addition to other examples discussed elsewhere in this opinion with respect to other issues raised on appeal, are the following examples, which should suffice to illustrate the point made here: When the cartel was formed, Gulf Canada informed Gulf's executives in Pittsburgh and Gulf Energy officials in San Diego. Over the next six months, officials from Gulf Oil in Pittsburgh (O'Hara, Jackson, Ramsey), Gulf Minerals in Denver (Zagnoli, Allen) and Gulf Energy in San Diego (Hunter, Hoffman) were sent to Canada, Europe and Africa for cartel meetings. Gregg of Gulf Energy was transferred to Gulf Canada, but remained in contact with officials of Gulf Energy (Hunter, Fowler) for at least several months. Officials in Gulf Oil, Gulf Minerals and Gulf Energy participated in the decision to transfer Gregg. In March 1972, Hoffman of Gulf Energy briefed the Gulf Minerals board on Gulf Energy's marketing activities. In August 1972, Hunter briefed Gulf Oil executives in New York City. Rolander of Gulf General Atomic, Gulf Energy, and later GAC, also sat on the boards of Gulf Canada and Gulf Minerals and was chairman of the board of Gulf–United. Gulf Minerals had administrative responsibility for Gulf Canada, and Gulf Minerals' uranium marketing function was handled by Gulf General Atomic. Gulf Energy's larger supply contracts were approved by Gulf's Pittsburgh executives. Gulf Energy and Gulf Minerals worked together on plans for the development of Gulf's Mt. Taylor uranium reserves. In March 1973, Hunter stated that Gulf Energy would "work with GMCL [Gulf Canada] . . . to block" a Westinghouse effort to secure uranium from Australia.

17. The president of Gulf Energy, Mr. Rolander, became the president of GAC pursuant to the terms of the partnership agreement. Mr. Gallaway, the executive vice–president of Gulf Energy, Mr. Johnston, Gulf General Atomic's vice–president for marketing, and Mr. Dieter, Gulf Energy's chief legal adviser, all continued to perform the same duties for GAC. Mr.

Hunter, who had attended the cartel's May 1972 meeting in Johannesburg as an executive of Gulf Energy, worked in a similar capacity for GAC, as did Mr. Fowler. As executives of GAC, Gallaway and Dieter remained on the payroll of Gulf, not GAC.

Most of these individuals played some role in the formation and operation of Gulf–United and in the acquisition of uranium by Gulf Energy and GAC. (Rolander, Gallaway and Hunter negotiated the formation of Gulf–United and the execution of the 1971 Supply Agreement with United. All three were members of the Gulf–United board.) All of these individuals at one time or another were either involved in or aware of Gulf's participation in the cartel.

Four months after the formation of GAC, Rolander rejoined the Gulf organization in Pittsburgh, where he remained until after this case was filed. Mr. Gregg, the Gulf Energy employee who was transferred to Gulf Canada in Toronto and became a member of the cartel operating committee, returned to the United States in 1974 to work for GAC, where he remained until the month this case was filed.

18. One of the more extreme examples of the extent to which GAC has sought to differentiate into distinct compartments the interrelated activities of the various aspects of Gulf's uranium activities is the following: When Hunter and Hoffman flew from Gulf Energy's San Diego headquarters to the cartel meeting in Johannesburg in May 1972, they went, according to GAC, as representatives of Gulf Canada in Canada, and not Gulf Energy, despite the fact that immediately prior to and after their week–long trip they were top officials with Gulf Energy, and despite the fact that they apparently continued to receive cartel information in their San Diego offices for several more months in order to coordinate Gulf's foreign and domestic uranium marketing efforts. The absurdity of GAC's position is highlighted by Hoffman's deposition in the *Westinghouse* litigation, where he testified that he went to Johannesburg "as an advisor to—I don't recall the name of the Canadian company. What was it? GMCL? Was that their initials?"

another; the past history of close coordination of activities between GAC's predecessor and other Gulf companies; and the continuity of business purpose—all substantially refute any such implication. We fail to see how what was apparently interrelated for purposes of corporate profit became totally separate and distinct when it became the subject of discovery in litigation.

◼ Other decisions involving discovery from distinct, though related, corporations in cases in which only one corporation is named as a party, support our conclusion that the coordinated nature of the business enterprises of separate entities may justify the imposition of discovery obligations on those entities which are not parties to the action.

In *Societe Internationale, Etc. v. McGranery*, 111 F.Supp. 435 (D.D.C. 1953), *modified on other grounds sub nom., Societe Internationale, Etc. v. Brownell*, 96 U.S.App.D.C. 232, 225 F.2d 532 (D.C. Cir. 1955), *rev'd on other grounds sub nom., Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), the court ordered production of documents in the possession of a corporation, which, although related to the corporate–plaintiff, was not itself a party. The court said:

> Certain it is that the court can pierce the corporate veil to determine the true character of the interests making up its composition. Subtle relationships are necessarily to be contemplated. Through the interlocked web of corporate organization, management and finance there runs the thread of a fundamental identity of individuals in the pattern of control.

111 F.Supp. at 441–42 (citations omitted). *See also In Re Uranium Antitrust Litigation*, 480 F.Supp. 1138, 1153 (N.D. Ill. 1979) ("The formalities separating the two corporations cannot be used as a screen to disguise the coordinated nature of their uranium enterprise").

◼ These two decisions are consistent with our own in recognizing not only the practical managerial connections between the various entities, but also, the identity of financial interest in the outcome of the litigation. As GAC pointed out on this appeal, Gulf has "a very significant interest in this litigation," and "stands to gain or lose immediately from any decision." It should not be very startling then that we demand as the price of possible legal victory full participation in the disclosure of relevant information by those who stand to profit from the ultimate outcome. Therefore, we hold that the trial court properly concluded that documents and information in the separate possession of the partners were subject to production in a suit in which only the partnership was named as a party.[19]

## B.

## RELEVANCY OF THE INTERNATIONAL URANIUM CARTEL

The trial court found that information concerning the international uranium cartel was "highly relevant" to United's antitrust, fraud, and breach of fiduciary duty allegations against GAC. GAC contests this finding, asserting that the cartel, which became the principal focus of discovery, is completely unrelated to the injury allegedly suffered by United. Therefore, GAC urges that its failure to produce documents and other information regarding the cartel could not be the basis for sanctions under N.M.R.Civ.P. 37(b)(2), N.M.S.A. 1978. *See Roberson v. Christoferson*, 65 F.R.D. 615, 620 (D.N.D. 1975); Annot., 6 A.L.R.3d 713, § 6 (1966). We analyze this question in light of the scope of discovery as defined by N.M.R. Civ.P. 26(b), N.M.S.A. 1978, the nature of United's and I&M's allegations against GAC, and the light shed on those allega-

---

19. The fact that Gulf and Scallop were named as parties in the original suit, which United voluntarily dismissed after its removal to federal court (*see* n. 2, *supra*), is completely immaterial to the question of the proper scope of Rules 33 and 34. The scope of discovery under those rules does not expand or contract depending on whether or not the individual partners once were or now could be named as parties.

tions by the presently available cartel evidence.

### 1. *The Legal Standard of Relevancy*

Rule 26(b) states, in pertinent part, that a deponent

> may be examined regarding any matter, not privileged, *which is relevant to the subject matter involved in the pending action*, whether it relates to the claim or defense of the examining party or to the claim or defense of any other party . . . It is not ground for objection that the testimony will be inadmissible at the trial if the testimony sought appears *reasonably calculated to lead to the discovery of admissible evidence.* (Emphasis added.) [20]

 This language is subject to a broad interpretation. *Fort v. Neal*, 79 N.M. 479, 481, 444 P.2d 990, 992 (1968). "Objections based on alleged irrelevancy must, therefore, be viewed in light of the broad and liberal discovery principle consciously built into" the rules of civil procedure. *Independent Productions Corp. v. Loew's, Incorporated*, 22 F.R.D. 266, 271 (S.D.N.Y. 1958). "The boundaries defining information relevant to the subject matter involved in an action are necessarily vague, making it practically impossible to formulate a general rule by which they can be drawn." *La Chemise Lacoste v. Alligator Company, Inc.*, 60 F.R.D. 164, 170 (D.Del.1973).[21] Because courts "are not shackled with strict interpretations of relevancy," *Cox v. E. I. Du Pont de Nemours and Company*, 38 F.R.D. 396, 398 (D.S.C.1965), discovery is permitted as to matters that "are or may become relevant"[22] or "might conceivably have a bearing" on the subject matter of the action,[23] or where there is "any possibility" or "some possibility" that the matters inquired into will contain relevant information.[24] Conversely, courts have said that discovery will be permitted unless the matters inquired into can have "no possible bearing upon,"[25] or are "clearly irrelevant" to the subject matter of the action.[26] Not only is the term "relevant" subject to a broad interpretation as it is generally used in the discovery context, but also it is given a particularly liberal interpretation for purposes of discovery in antitrust cases.[27]

**20.** Although Rule 26(b) refers only to depositions, the scope of discovery permitted under Rules 33 (interrogatories) and 34 (production of documents) is defined in terms of the relevancy standard established in Rule 26(b). *See Davis v. Westland Development Company, supra*, 81 N.M. at 299–300, 466 P.2d at 865–66.

**21.** *See also Mallinckrodt Chemical Works v. Goldman, Sachs & Co.*, 58 F.R.D. 348, 353 (S.D. N.Y.1973); C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2008, at 45 (1970); J. Moore, *Federal Practice*, ¶26.56[1], at 26–131 (2d ed. 1979).

**22.** *Payer Hewitt & Company v. Bellanca Corporation*, 26 F.R.D. 219, 221 (D.Del.1960).

**23.** *Triangle Mfg. Co. v. Paramount Bag Mfg. Co.*, 35 F.R.D. 540, 542 (E.D.N.Y.1964); *Bloomer v. Sirian Lamp Co.*, 4 F.R.D. 167, 169 (D.Del. 1944).

**24.** *In Re Wheat Farmers Antitrust Class Action*, 440 F.Supp. 1022, 1025 (D.D.C.1977); *In Re Folding Carton Antitrust Litigation, supra*, 76 F.R.D at 431 (N.D.Ill.1977); *Detweiler Bros., Inc. v. John Graham & Co.*, 412 F.Supp. 416, 422 (E.D.Wash.1976); *Nichols v. Philadelphia Tribune Company*, 22 F.R.D. 89, 90 (E.D.Pa. 1958); C. Wright, *Law of Federal Courts* § 81, at 403 n. 47 (3d ed. 1976).

**25.** *E. I. duPont de Nemours v. Deering Milliken Res.*, 72 F.R.D. 440, 443 (D.Del.1976); *Marshall v. Electric Hose and Rubber Company*, 68 F.R.D. 287, 295 (D.Del.1975); *LaChemise Lacoste v. Alligator Company, Inc., supra*, 60 F.R.D. at 171; *Dart Industries, Inc. v. Liquid Nitrogen Proc. Corp. of Cal.*, 50 F.R.D. 286, 292 (D.Del.1970.)

**26.** *Bailey v. Meister Brau, Inc.*, 55 F.R.D. 211, 214 (N.D.Ill.1972); *Independent Productions Corp. v. Loew's, Incorporated, supra*, 22 F.R.D. at 271; *Steamship Co. of 1949 v. China Union Lines, Hong Kong*, 123 F.Supp. 802, 805 (S.D.N. Y.1954); *Bloomer v. Sirian Lamp Co., supra*, 4 F.R.D. at 169.

**27.** *Cf. United States v. International Business Machines, Corp.*, 66 F.R.D. 186, 189 (S.D.N.Y. 1974) ("discovery in antitrust litigation is most broadly permitted"). *See also Bass v. Gulf Oil Corporation*, 304 F.Supp. 1041, 1046–47 (S.D. Miss.1969); *Alexander's Department Stores, Inc. v. E. J. Korvette, Inc*, 198 F.Supp. 28, 29 (S.D.N.Y.1961); *Leonia Amusement Corporation v. Loew's, Incorporated*, 16 F.R.D. 583, 584 (S.D.N.Y.1954).

## 2. *Summary of Evidence on the Gulf Uranium Business and the Cartel*

The allegations of appellees give great weight to the claim that the cartel is relevant to the subject matter of this litigation. As amended, United's complaint named a number of distinct legal bases for the relief it sought—the invalidation of the 1973 and 1974 Supply Agreements. The complaint alleged that (1) in violation of their fiduciary duties, Gulf and GAC withheld material facts which, if disclosed, would have had a bearing on United's decision to enter into Gulf–United and the 1971, 1973 and 1974 Supply Agreements; (2) the 1971, 1973 and 1974 Agreements were illegal and void because they had been procured through Gulf's and GAC's fraud; (3) Gulf mismanaged Gulf–United, refused to provide Gulf–United with uranium and capital, and economically coerced United into a position where it had no viable alternative to accepting Gulf's requirement of the 1973 Supply Agreement; (4) Gulf tried to eliminate United as a competitor in the nuclear fuels industry and to restrict its ability to compete in the uranium business; (5) the sudden increase in the cost of producing uranium, unforeseen to all but GAC and Gulf, rendered United's performance under the 1973 and 1974 Agreements commercially impracticable; and (6) the 1971, 1973 and 1974 Supply Agreements were void because they were in violation of New Mexico's antitrust laws prohibiting price–fixing attempts and conspiracies to monopolize, and actual monopolization of, trade and commerce.

I&M's counterclaim specifically alleged that by their participation in the cartel, GAC and Gulf had violated the New Mexico Antitrust Act, thereby injuring I&M. I&M also defended against GAC's claim that performance of its obligation to supply I&M with uranium had been rendered commercially impracticable by contending that the cartel was responsible for increases in the price of uranium, and therefore, such price increases were not unforeseen by GAC and Gulf.

The evidence which has been produced in this case demonstrates that information on the cartel could be crucial to the proper resolution of this litigation. The following review of some of that evidence should not be considered to reflect a view as to the merits of appellees' substantive claims, but rather, as support for their contention that the cartel is relevant to those claims.

In 1967, Gulf entered the uranium market by purchasing the General Atomic business. Over the next five years, Gulf purchased and began to develop various uranium ore bearing properties in the United States and Canada, including the large Mt. Taylor reserves in New Mexico. Thus, by the early 1970's Gulf was in a position to be a leading producer of uranium, nuclear fuel fabricator, and manufacturer of nuclear reactors. *See* Section I A, *supra.* It was therefore directly in competition with United.

However, in 1971 Gulf and United formed the jointly owned company, Gulf–United, to fabricate fuel for commercial nuclear reactors, and executed the 1971 Supply Agreement. Independently of Gulf–United, Gulf also began to purchase large quantities of uranium from other American producers.

Contemporaneously with these activities, Gulf began to participate in early meetings of the cartel. Top officials of Gulf Energy (Rolander, Gallaway, Gregg, Hunter and Hoffman) were informed of the cartel's creation and Gulf's participation in it. Hunter, Gallaway and Rolander were the Gulf officials who negotiated the formation of Gulf–United and the execution of the 1971 Supply Agreement with United. All of these individuals later held key positions in GAC. *See* Section II A, *supra*, especially n. 16 and 17, *supra.* All but Gregg served on the Gulf-United board.

One document reflects that Hoffman, along with Zagnoli of Gulf Minerals in Denver, was participating in cartel discussions in Canada as early as February 1972. The same month Hunter informed Hoffman that Gulf Energy would "proceed to tie up" an additional ten million pounds of ura-

nium. Within weeks, Gulf Energy signed agreements with two American producers to purchase in excess of that amount of uranium. In March, according to Hunter's account, Hoffman informed the board of directors of Gulf Minerals: "We've taken low cost supplies now on market. . . . We've cleaned out cheap material available now." Another document dated in the spring of 1972, which reviewed Gulf–United's financial condition, stated that Gulf's objective was to "minimize UNC's [United's] book income."

Throughout the spring of 1972, various Gulf officials from the United States attended meetings of the cartel. In late May, Hoffman and Hunter from Gulf Energy, Allen from Gulf Minerals, and Ediger from Gulf Canada, flew to Johannesburg, South Africa for a meeting of the cartel. The available cartel evidence shows that in Johannesburg, the cartelists adopted a set of rules to govern their organization. The rules allocated markets among the participating nations, set minimum prices for uranium, and established a rigged bidding system with a lead bidder and a runner-up bidder. Under a heading labeled "Attitude Towards Competitors," the Rules stated:

It was agreed that if a supplier not associated with the organization should quote under the minimum price, the leader will not match that quotation and the [cartel's] Operating Committee will review the situation and decide on a course of action as soon as possible.

The Rules also provided that all quotations to fuel fabricators and nuclear reactor manufacturers "should be made on the basis of the minimum prices."

Although the Johannesburg Rules provided for the exclusion of the United States domestic uranium market, one week after the Johannesburg meeting, Hunter, in referring to "the agreements which we have reached in the last couple of days with respect to action which we will be taking," told Hoffman that Gulf's "overall strategy must reflect the interrelationship existing between foreign and domestic markets." He went on to say that "foreign and domestic marketing activities are inseparable and indeed should be treated integrally if we are to optimize the company position." In the following paragraph, Hunter stated: "Based on input provided by Gulf Minerals, we conclude that corporation profit is greater if New Mexican production begins in 1978 rather than 1976." Hunter then noted that "[i]n order for us to realistically appraise our $U_3O_8$ competitive position as well as to effectively sell foreign uranium, it is necessary for us to sell uranium directly to the U.S. utilities."

The minutes of a September 5, 1972 cartel meeting indicate that the cartel was considering the prospect of taking anticompetitive actions against the foreign uranium operations of American corporations. The minutes reported:

There followed a general discussion of the impact of Westinghouse bidding in Europe. . . . Some members thought that Westinghouse should be approached directly, whereas other views were that it would be a dangerous move. *The consensus finally reached was that if the club was to survive as a viable entity, it would be necessary to delineate where the competition was and the nature of its strength, as a prelude to eliminating it once and for all.* (Emphasis added.)

In September 1972, a Gulf attorney observed that "it is improbable that either the cartel structure or operation will remain static," and warned that "the instinctive reaction of the cartel's Operating Committee will likely be to exert pressure to suppress the new competition one way or another." He said:

It could well be that the governments involved would tacitly approve (or effectively direct) predatory actions by the cartel producer members *to suppress outside competition from any source.* . . (Emphasis added.)

In March 1973, Hunter, of Gulf Energy, reported that Westinghouse was trying to buy uranium to cover its "substantial foreign shortage." Hunter stated that, if successful, the purchase "would provide Westinghouse with a potential source for U.S.

reactor sales." He said that Gulf Energy would "work with GMCL [Gulf Canada] to try to put pressure on the Australians to block the proposed arrangement." [28]

Gregg, the Gulf Energy employee who became Gulf's representative on the cartel's Operating Committee, testified in a deposition taken in the *Westinghouse* uranium litigation that

> Westinghouse was not necessarily singled out for discussion each and every time. There were others who were discussed from time to time, also; GE [General Electric], KWU in Germany, ASEA in Sweden, other reactor manufacturers, Exxon as a fuel fabricator, *Gulf–United as a fuel fabricator*, so perhaps Westinghouse was discussed more than any of the others. (Emphasis added.) [29]

Beginning in early 1973, United and Gulf entered into negotiations concerning the disposition of Gulf–United. On January 23, 1973, Mr. Henry, the executive vice–president of Gulf Oil in Pittsburgh, informed the president of United:

> It is our intention that any sale of the shares of Gulf [in Gulf–United], of course, will be done entirely in good faith, on a fair basis, and free of any secret or undisclosed arrangements.

GAC alleges that United had independent knowledge of the cartel, but it does not contend that in the negotiations that followed Gulf informed United of its role in the cartel.

In June 1973, Gulf executed the 1973 Supply Agreement with United; and in September it bought United's interest in Gulf–United. In November 1973, the GAC partnership was formed, and along with the operations of Gulf Energy, the Gulf–United business was transferred to GAC.

Within nine months of the execution of the 1973 Supply Agreement and the buyout of United's interest in Gulf–United, Gulf also purchased several million pounds of uranium from two other American producers. During the same period, it signed definitive contracts with two utilities to formalize the letters of intent United had previously signed and assigned to Gulf–United.

By March 1974, Mr. Fowler, a GAC employee reported:

> What appears to be happening is that the international producers are in effect setting the world price via
>
> a) establishing a "floor" that is higher than the U.S. offers to buy.
>
> b) the U.S. producers refuse to sell at any price that doesn't give them a substantial margin above the "floor" being quoted by the non–U.S. producers.
>
> c) Thus, in essence, the international producers can stop any transactions by constantly nudging the floor upward.
>
> In the interim, the U.S. buyer becomes increasingly frustrated, offers a higher price in order to get some response and the cycle starts over again.

**28.** Both Westinghouse and General Electric were major manufacturers in the United States of nuclear reactors; as such they were competitors of Gulf Energy.

**29.** In his deposition in this case, Gregg first testified that United and Gulf–United were never discussed at any cartel meetings. He later qualified that answer by stating that he could not recall those companies being discussed at meetings at which he was present. When specifically questioned regarding the foregoing passage from his *Westinghouse* deposition, Gregg conceded that he had made the statement, but he said he could not recall "who or who was not discussed other than Westinghouse." He stated that Gulf–United and General Electric were "representative of who might have been discussed"; but he could not remember whether or not Gulf–United was ever discussed.

Hunter testified in his deposition in this case that Gulf–United was discussed by Gulf officials at the cartel meeting he attended in Johannesburg in 1972. He stated:

> I raised the point that from my standpoint and understanding in what we were trying to do in the uranium supply, the [cartel's] middleman restriction would affect our ability to buy uranium to serve Gulf–United and HTGR [high temperature gas cooled reactors].

He went on to say that by virtue of the cartel's rules, Gulf–United "would have to pay the same higher price that . . . Westinghouse would have to pay." But he said that this matter "wasn't of concern" to the other Gulf participants.

It seems likely that at some point, the mechanism will break down and if it does, there will again be price competition. However, it doesn't appear likely the break will come in the immediate future.

Three months later, GAC signed the 1974 Supply Agreement, committing United to supply an additional three million pounds of uranium.

We accept none of the available cartel evidence as conclusive. However, where business records such as these are produced from the files of GAC and Gulf, and where it is undisputed that a uranium cartel existed and that Gulf was a member of it, we are satisfied that cartel information is relevant to the subject matter of this litigation in general, and to the specific allegations of the parties. We look with a jaundiced eye upon any claim of irrelevancy made in the background of (1) the common identity of the individuals who negotiated the contracts at issue here and the information of Gulf–United; who participated in meetings of the cartel on behalf of Gulf or were privy to cartel information; and who later formed the top level of management of GAC; (2) the temporal proximity of cartel activities to the purchase by Gulf and GAC of substantial quantities of uranium from several major American producers—including the 1971, 1973 and 1974 Supply Agreements with United; to the formation, the buyout and the dissolution of Gulf–United; and to the creation of GAC; and (3) references to "cleaning out" and "tying up" "cheap material"; to objectives of "minimizing UNC's [United's] book income"; to the "inseparability of domestic and foreign uranium marketing"; to Gulf's need to sell uranium "directly to the U.S. utilities"; to working with Gulf Canada to "block" a Westinghouse uranium purchase; to the likely need to suppress new competition "one way or another"; and most striking of all, to "the consensus," reached by the cartel in the context of discussing an American corporation, "to delineate where the competition was and the nature of its strength as a prelude to eliminating it once and for all." These things are not the stuff of which antitrust irrelevancy is made.

Finally, we cannot accept GAC's argument that the cartel is irrelevant to the commercial impracticability issues in this case.[30] We cannot say that such evidence has no possible bearing on United's claim that the cartel itself was responsible for the enormous price increases in uranium that took place contemporaneously with the operation of the cartel. If the cartel is relevant to that claim, it is no less relevant to I&M's defense that GAC is in no position to claim commercial impracticability because, along with Gulf and the other cartelists, it was responsible for, and thus foresaw, those price increases.

### 3. GAC's Arguments as to the Cartel's Irrelevance

■ GAC argues that the cartel was irrelevant because United "has been unable to adduce any evidence whatsoever that the 1973 and 1974 contracts were in any way connected with the activities of the cartel." Obviously this proposition is untenable. United sought cartel evidence in order to establish that the 1973 and 1974 Supply Agreements were connected to cartel activi-

---

**30.** GAC asserts that United's commercial impracticability claim is a "patent make–weight" because United's forty page trial brief on the subject contained only six sentences concerning the cartel. Relevancy for purposes of discovery is not measured by such a sentence–to–page ratio. As to I&M's defense to GAC's claim of commercial impracticability, GAC's counsel told the trial court at a hearing on August 26, 1977:

We can understand the people like Indiana–Michigan or Detroit–Edison feeling some sort of misery caused by the present prices of uranium, and we suspect that they will be completely unable to establish anything to do with the cartel leading to the existence of the price levels. . . .

Obviously, the cartel is not made irrelevant to I&M's claims simply because GAC's counsel "suspects" that those claims would ultimately not be proved. Cf. American Mfrs. M. I. Co. v. American Broadcasting—Para. Th., 388 F.2d 272, 279 n.9 (2d Cir. 1967) (" '[T]hat it might be surmised that the adverse party is unlikely to prevail at the trial is not sufficient to authorize summary judgment against him' ") (citation omitted).

ties in one manner or another. It makes no sense whatsoever to say that the cartel is not relevant, and therefore cartel information will not be produced, because the plaintiff who seeks such discovery has failed to produce, from what has been withheld from it, evidence to conclusively establish its case. As the court said in *Beler v. Savarona Ship Corporation*, 26 F.Supp. 599 (E.D.N.Y.1939):

> The requirement of materiality does not . . . compel the person seeking discovery definitely to prove materiality before being entitled to a discovery. Such an interpretation of the rule would place upon it a narrow construction which would severely limit the bounds of the discovery procedure. It might compel a party to know what was in the documents before he had seen them. One of the basic purposes of the new Rules is to enable a full disclosure of the facts so that justice might not move blindly.

*See also Radio Corporation of America v. Rauland Corporation*, 18 F.R.D. 440, 444–45 (N.D.Ill.1955).

GAC further argues that the cartel cannot conceivably be relevant because by May 1971, United had "locked up" the uranium covered by the 1973 Supply Agreement through supply contracts it had directly entered into with the utilities; and second, that the cartel came into existence in 1972. Because United allegedly had committed the uranium previous to the formation of the cartel, GAC concludes that cartel activities could not possibly have been the cause of any competitive injury United might have suffered.

There are a number of reasons why this argument must be rejected. In the first place, there is a dispute in this case over the question of whether the uranium covered by the 1973 Supply Agreement was in fact "locked up" prior to the formation of the cartel, or even prior to the execution of the 1971 Supply Agreement. Over one–half of the uranium at issue here involves the utility agreements with Detroit Edison and Duke Power. Originally, this uranium was covered by letters of intent United signed with the two utilities in 1969 and 1970, respectively. United's contention that these were merely non–binding agreements finds some support in the record.[31] But even if we were to assume that they were binding contracts at the time of the formation of Gulf–United in 1971, and that the cartel was not formed prior to 1972, it would not necessarily follow that cartel evidence has no bearing on the issues in this case.

United contends that Gulf did not disclose a slippage in the construction of a Commonwealth Edison reactor which allegedly would have waived Gulf–United's obligation to supply the utility with fuel, and that Gulf signed a secret "side–letter" with Duke waiving conditions which also allegedly would have denied Duke uranium. These actions were allegedly taken in order that GAC could resell the uranium covered by the 1971 and 1973 Supply Agreements at higher prices. Other allegations which would have a bearing on the case, even if the uranium had all been previously committed by United, are that Gulf wrongfully

---

**31.** The Detroit Edison letter of intent, which is dated September 25, 1969, reads in part:

> Please be advised that The Detroit Edison Company has determined and *intends to enter into a contract* with the United Nuclear Corporation for the nuclear materials, fabrication, and services therein defined.
>
> United Nuclear Corporation and Detroit Edison *will proceed reasonably toward the negotiation, drafting, and execution of a formal written contract* which will reflect the pertinent rights and obligations of each party *as generally set forth* in the referenced documents *and as discussed and to be discussed* during the various meetings of representa-

tives of our two companies. *It is also subject to the receipt of all necessary approvals of regulatory authorities.* (Emphasis added.)

Formal definitive contracts were signed on the basis of this letter of intent and a letter of intent of December 30, 1970 with Duke Power, on March 19, 1973 by Gulf–United, and on November 7, 1973 by Gulf, respectively. United signed two additional letters of intent with Yankee Atomic and Consolidated Edison. The latter two letters were also assigned to Gulf–United in 1971, but formal contracts were never signed, and the uranium covered by these letters is not included in the 1973 Supply Agreement.

refused to supply Gulf–United with the uranium needed to fulfill the requirements of the utility contracts, wrongfully blocked Gulf–United's efforts to purchase uranium on the open market, and wrongfully interfered with United's efforts to independently negotiate directly with the utilities for price relief and other conditions of sale. Cartel information is relevant to United's claim that Gulf tied up the cheap material on the market, thus denying United alternative sources of uranium to fulfill its commitments to Gulf–United and driving up uranium prices. United argues that the price increases encouraged new exploration and mining, which increased the competition for limited mining supplies and labor, and in turn caused United to incur far greater uranium production costs than it otherwise would have.

We also consider it material to GAC's relevancy argument that Gulf apparently considered it necessary "to sell uranium directly to the U.S. utilities" in order to maintain its competitive position; and that GAC now contends that although it is not obligated to supply uranium to I&M or the other utilities,[32] United nonetheless remains obligated to supply GAC with at least a substantial portion of the uranium covered by the 1973 Supply Agreement.

Finally, even were GAC's position sound as to United's allegations of fraud, breach of fiduciary duty, economic coercion and antitrust violations concerning the 1973 Supply Agreement, it would have no bearing on United's allegations concerning the 1974 Supply Agreement, or on United's and I&M's claims based on commercial impracticability. As to the former, GAC contends that it involved a blind transaction, and since it therefore did not know the seller, neither GAC nor Gulf could have entered into that agreement with illicit intentions towards United. However, that fact does not alone dispose of United's claims, for even such a blind agreement could conceivably have been part of a scheme to achieve monopoly control over United States uranium reserves. As to the commercial impracticability questions, we have previously noted that even GAC does not advance a persuasive argument of irrelevancy. *See* n. 30, *supra.*

■ GAC vehemently contests the merits of each of the foregoing allegations, contending that all are unsubstantiated.[33] But in the discovery context, it is not the function of the trial court or of this Court to try every issue prior to the full disclosure of all relevant information.[34] Nor is it

> the function of . . . counsel to rule with finality on the relevancy or irrelevancy of documents in their exclusive possession and thereby to deprive both Court and opposing counsel of an opportunity to evaluate their contentions.

*Radio Corporation of America v. Rauland Corporation, supra,* 18 F.R.D. at 444. The rules call for something quite different:

---

**32.** Notes of a GAC–Gulf litigation strategy meeting held on January 13, 1976 in San Diego, which were inadvertently produced to United in this case, reflect a GAC "plan to welch on *all* utility contracts." (Emphasis in original.)

**33.** GAC's arguments are contained in a forty-six page appendix entitled "Review of Historical Facts." This appendix was filed along with GAC's reply brief. It apparently was not included in that brief because GAC had already met the 150 page limit on that brief which this Court had specifically set at GAC's request. We note that GAC did not seek leave of the Court to exceed that page limitation in order to include these additional arguments in its reply brief, nor did it seek or receive permission from the Court to file such an argument in an appendix, rather than in a brief. "[W]e disapprove of and

will in the future disregard attempts by counsel to supplement their briefs in a manner not authorized by the rules." *Lance v. New Mexico Military Institute,* 70 N.M. 158, 164, 371 P.2d 995, 999 (1962).

**34.** "Ordinarily, in ruling on a discovery motion, the Court will not determine whether a claim in the complaint, if proved, would have a bearing on the ultimate outcome of the action, it being sufficient that the matter to be explored is relevant to the issues made by the pleading." *Apel v. Murphy,* 70 F.R.D. 651, 654 (D.R.I.1976) (citation omitted). *See also Humphreys Exterminating Company, Inc. v. Poulter,* 62 F.R.D. 392, 393 (D.Md.1974); *V. D. Anderson Co. v. Helena Cotton Oil Co.,* 117 F.Supp. 932, 945 n. 9 (E.D.Ark.1953).

Unless it is palpable that the evidence sought can have no possible bearing upon the issues, the spirit of the new rules calls for every relevant fact, however, remote, to be brought out for the inspection not only of the opposing party but for the benefit of the court which in due course can eliminate those facts which are not to be considered in determining the ultimate issues.

*Hercules Powder Co. v. Rohm & Haas Co.*, 3 F.R.D. 302, 304 (D.Del.1943). *See also La Chemise Lacoste v. Alligator Company, Inc.*, *supra*, 60 F.R.D. at 171.

■ At the present stage of the litigation, we are unable to say that information concerning an international uranium cartel, which had as its avowed purpose the fixing of prices for and the allocation of markets in uranium, and which counted a constituent partner of GAC as one of its members, palpably can have no possible bearing upon the subject matter of this action. Therefore, cartel information satisfies the test of relevancy for purposes of discovery under Rule 26(b).

## C,

### ACT OF STATE DOCTRINE AND EXCLUSIVE FEDERAL POWER OVER FOREIGN RELATIONS

GAC's second basis for challenging the validity of the trial court's discovery orders involves two distinct legal principles–the act of state doctrine and the exclusive power of the federal government over the conduct of foreign relations. Although distinct, each principle is alleged to be applicable to this case because of two actions of the Canadian Government–first, the role that Government played in the international uranium cartel; and second, the Canadian Uranium Information Security Regulations. GAC contends that both principles, as applied to these actions of Canada, precluded the trial court from considering any claims concerning the cartel or Gulf's role

therein, and therefore, from entering discovery orders directed at cartel documents or information. The applicability of each of these principles will be separately examined.

### 1. The Canadian Government's Role in the Cartel a. The Act of State Doctrine

The classic definition of the act of state doctrine is found in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.

The act of state doctrine, which has " 'constitutional' underpinnings," reflects "the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423, 427–28, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964). The doctrine "derives from the judiciary's concern for its possible interference with the conduct of foreign affairs by the political branches of the government." *Timberlane Lbr. Co. v. Bank of America, N. T. & S. A.*, 549 F.2d 597, 605 (9th Cir. 1976). The doctrine is a matter of federal law which is binding on state courts. *Banco Nacional de Cuba v. Sabbatino, supra*, 376 U.S. at 427, 84 S.Ct. at 939; *Republic of Iraq v. First National City Bank*, 353 F.2d 47, 50–51 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966).

GAC contends that the act of state doctrine is applicable because the Canadian Government participated in the cartel and effectively compelled Gulf, through its Canadian subsidiary, Gulf Canada, to join the cartel, transforming the cartel itself and all actions Gulf or Gulf Canada may have taken pursuant to it into the acts of a foreign state.[35] GAC asserts that judicial inquiry

---

**35.** In the findings it entered as sanctions against GAC for GAC's failure to comply with its discovery orders, the trial court found that

the cartel was made up of uranium producers. Although the court did not mention government participation in the cartel, it did find that

into the cartel and Gulf's role therein is precluded by the act of state doctrine because such an inquiry would necessarily place in question the legitimacy of the Canadian Government's actions.

The Canadian Government has repeatedly stated that it "initiated" the discussions which led to the formation of the cartel, and that it thereafter "participated" in that organization. It has also stated that it "approved" of the participation of Canadian uranium producers in the cartel and that Gulf participated at the Government's "specific written request." [36]

■ We accept these representations of the Canadian Government. However, the initiation of the cartel and the participation therein by that Government are not sufficient alone to transform the cartel–related activities of a wholly–owned subsidiary of a corporation based in the United States into the sovereign acts of a foreign nation, and thus to immunize those activities from challenge in American courts.

■ It is well settled that the mere fact that a foreign government approved, authorized, tolerated, encouraged, aided, or participated in the anti–competitive actions of a private individual or corporation does not necessarily provide an act of state defense. *See Cantor v. Detroit Edison Co.*, 428 U.S. 579, 592–93, 96 S.Ct. 3110, 3118, 49 L.Ed.2d 1141 (1976); [37] *Continental Co. v. Union Carbide*, 370 U.S. 690, 706–07, 82 S.Ct. 1404, 1414, 8 L.Ed.2d 777 (1962); *U. S. v. Sisal Sales Corp.*, 274 U.S. 268, 276, 47 S.Ct. 592, 593, 71 L.Ed. 1042 (1927); *Mannington*

*Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir. 1979); *Timberlane Lbr. Co. v. Bank of America, N. T. & S. A., supra*, 549 F.2d at 606; *Linseman v. World Hockey Ass'n, supra*, 439 F.Supp. at 1324; *United States v. The Watchmakers of Switzerland Information Center, Inc.*, 1963 Trade Cas. ¶ 70,600 (S.D.N.Y.1963), *order modified*, 1965 Trade Cas. ¶ 70,352 (S.D.N.Y.1965); Annot., 40 A.L.R. Fed. 343, 379–80, § 15 (1978); Baker, *Antitrust Conflicts Between Friends: Canada and the United States in the Mid–1970's*, 11 Cornell Int'l L. J. 165, 177–78 (1978). In the recent case of *Industrial Inv. Development v. Mitsui & Co., Ltd.*, 594 F.2d 48 (5th Cir. 1979), *cert. denied*, 445 U.S. 963, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980), the court said that "the instigation of foreign governmental involvement does not mechanically protect conduct otherwise illegal in this country from scrutiny by the American courts." *Id.* at 52.

It is not sufficient merely to say the Government of Canada played a role in the cartel. The critical inquiry is into the nature of the role played by the foreign government, for "the very assertion of an act of state defense requires the court to examine into the nature of the conduct complained of and its relationship to the foreign sovereign." *Hunt v. Mobil Oil Corp., supra*, 550 F.2d at 79 (citations omitted) (Van Graafeiland, J., dissenting). Unless a court can examine this initial issue— "whether the acts complained of are in reality the acts of the defendants or the acts of a foreign government" [38]—it cannot deter-

---

the Canadian Government had "encouraged," but neither "required," "mandated," nor "compelled" Gulf or Gulf Canada to participate in the cartel.

**36.** According to that Government, the cartel was created in order to protect the uranium mining industries of the participating nations from the adverse consequences of an embargo the United States Government had established in 1964 on the importation of foreign uranium into this country. *See* Act of August 26, 1964, P.L. 88–489, 78 Stat. 602.

**37.** Although this case dealt with the doctrine as it applies to an act of one of the states of the United States, the Court's ruling in *Cantor* ap-

plies to acts of foreign governments as well. *See Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 80 (2d Cir. 1977) (Van Graafeiland, J., dissenting), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54 L.Ed.2d 477 (1977); *Linseman v. World Hockey Ass'n*, 439 F.Supp. 1315, 1324 (D.Conn.1977).

**38.** W. Fugate, *Foreign Commerce and the Antitrust Laws* 49–50 (1958). *See also* Fugate, *Antitrust Jurisdiction and Foreign Sovereignty*, 49 Va.L.Rev. 925, 932 (1963):

The real question is *whose* acts are the subject of inquiry. If the acts are those of the foreign government within its own jurisdiction, then the antitrust exception applies. The situation is the same if the foreign

mine whether the act of state doctrine applies, for that doctrine requires the act in question to be "the public act of those with authority to exercise sovereign powers." *Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 694, 96 S.Ct. 1854, 1861, 48 L.Ed.2d 301 (1976).

In each of the act of state decisions cited above, there appeared to be little doubt as to the nature of the role played by the foreign government. However, in this case, the absence of cartel discovery has made it impossible for our courts to determine the preliminary question—whether the *challenged* acts involve *any* action by the Government of Canada. There are two aspects to this dilemma.

First, neither the official statements of the Canadian Government nor the available cartel evidence fully describes the acts of the cartel or the situs of those acts. More specifically, without the cartel records, it is impossible to determine precisely what cartel–inspired actions Gulf Canada, Gulf or GAC may have taken, at whom such actions may have been directed, or where they occurred.

Second, the absence of cartel information has made it impossible to fully delineate the precise role played by the Government of Canada in the cartel; and more importantly, what specific actions, if any, Gulf was "compelled" by that Government to perform, or where those activities took place.

Without this vital information we cannot determine if the act of state doctrine is applicable, as the following hypotheticals demonstrate. First, if we assume that the cartel, as the Canadian Government has

government through its laws, regulations, or orders, *requires* private parties to perform the anticompetitive acts. If, on the other hand, the acts complained of are in reality those of private parties who seek to hide behind the cloak of foreign law, the courts will attach antitrust liability.

**39.** "Sherman Act jurisdiction now depends upon a showing of anticompetitive effects within the United States." *Industrial Inv. Development v. Mitsui & Company, Ltd., supra,* 594 F.2d at 52 (citations omitted). *See also* K. Brewster, Jr., Antitrust and American Business

described it, was not intended to, and did not have, an adverse impact on the domestic market of the United States, then cartel activities might well be beyond the scope of American antitrust laws,[39] and shielded by the act of state doctrine.

However, we could also assume—because the absence of cartel records makes it impossible to negate the possibility—that Gulf, with the knowledge of such anti–competitive, non–United States activities and of the potential business opportunities such activities presented, went beyond the scope of the cartel as the Canadian Government defined it, and took predatory actions in the United States designed to eliminate competitors and to monopolize uranium reserves.[40] If this were the case, GAC and Gulf would not be shielded by the act of state doctrine, since the Canadian Government would have played no role in the *specific* anti–competitive conduct challenged in our courts. *See Continental Co. v. Union Carbide, supra,* 370 U.S. at 706–07, 82 S.Ct. at 1414; W. Fugate, *supra,* at 148.

The Canadian Government has repeatedly stated that the United States was excluded from the cartel's operations. However, Prime Minister Trudeau stated in October 1977 that although the exclusion of the domestic markets of the United States and Canada was his government's policy, he did not rule out the possibility that some producers may have gone beyond that policy. He stated: "We have no knowledge what some companies may have done under the pretext or cover of government policy." *Official Report of House of Commons Debates,* Vol. 121, No. 6, p. 224, 3rd Sess., 30th Parliament (Oct. 25, 1977).

Abroad 65–75 (1958); W. Fugate, *supra,* at 29–34.

**40.** GAC itself made this very distinction to the court below. In its opening statement at the trial, GAC's counsel stated:

[T]he 1973 and 1974 supply agreements were not the part, product, or in any way connected with an agreement of the cartel.

*Now, it may be that Gulf was motivated to go into the agreements because of the cartel, or its knowledge of the cartel.* There may be a lot of things. And all of those "maybes" may come out at trial. (Emphasis added.)

Without the withheld cartel documents it is impossible to determine whether the limited territorial scope of that policy was adhered to by the cartel or by Gulf. Although the Canadian Government has said that the cartel did not include the United States market, the broad proscriptions of the Canadian Uranium Information Security Regulations are not similarly limited. The language of those Regulations is broad enough to encompass *any* documents or information concerning the uranium activities of an American corporation in the United States.[41] Thus, the breadth of the regulations effectively precludes our courts from determining whether GAC or Gulf took predatory actions against their competitors in the United States, either as part of the cartel conspiracy or completely independently of it.

It is clear that the Canadian Government does not wish to permit the courts of this country to inquire into whether Gulf exceeded the original scope of the cartel. However, whether Gulf adhered to the limited territorial scope of the cartel as Canada defined it is an inquiry that the act of state doctrine cannot preclude an American court from making. It is for the courts of this

country, and not for the government of a foreign state, to determine whether *our* nationals took actions in *our* nation in violation of *our* laws.[42] The existence of cartel evidence indicating that the cartel might have exceeded its original non–United States scope makes it imperative that our courts be free to conduct such an inquiry in this case.[43]

GAC argues on appeal that United has "failed to show that the cartel either sought to or did harm United"; has "failed to show that the cartel even considered uranium producers"; and has not cited "any competent evidence that the cartel engaged in any predatory activity against anyone." These assertions are entirely beside the point. It is inconsistent for a party to fail to produce records and to then contend that the opposing party has failed to point to any records to support its allegations. We will not accept the proposition that the broad and vague outlines of a foreign government's activities automatically activate a doctrine which provides a total eclipse of the judicial search for the truth.

The absence of cartel records makes the second aspect of Canada's alleged involve-

---

**41.** The Regulations read in pertinent part:

No person who has in his possession or under his control any note, document or other written or printed material in any way related to conversations, discussions or meetings that took place between January 1, 1972 and December 31, 1975 involving that person or any other person or any government, crown corporation, agency or other organization in respect of the production, import, export, transportation, refining, possession, ownership, use or sale of uranium or its derivatives or compounds shall (a) release any such note, document or material, or disclose or communicate the contents thereof to any person, government, crown corporation, agency or other organization unless (i) he is required to do so by or under a law of Canada, or (ii) he does so with the consent of the Minister of Energy, Mines and Resources; or (b) fail to guard against or take reasonable care to prevent the unauthorized release of any such note, document or material or the disclosure or communication of the contents thereof.

The Regulations were amended in October 1977, but the amendments are not pertinent to the issues in this case.

**42.** On appeal, GAC has contended that a court cannot, without violating the act of state doctrine, "inquire into what was the real scope of the Canadian policy," nor "judge what was the entire contour of the Canadian policy and was anything done outside the contours of that policy."

That that proposition is untenable should be evident. *See* Baker, *supra*, 11 Cornell Int'l L. J. at 177 n. 67. If GAC's position was adopted, then an act of state or sovereign compulsion defense could be irrefutably established by the mere assertion of it by the party seeking its protection.

**43.** The chairman of the Congressional subcommittee which investigated cartel activities concluded that there could not be "any serious doubt . . . that cartel activities did in fact affect domestic American commerce." *Hearings on International Uranium Cartel, supra*, Vol. 1, Serial No. 95–39, p. 247. *See also* the evidence reviewed in Section II B, *supra*, and *Duquesne Light Co., et al. v. Westinghouse Electric Corporation*, (No. G. D. 75–23978) (Pa. Ct. of Comm. Pleas, March 30, 1977) (approving settlement).

ment in the cartel—its compulsion of Gulf Canada—equally unavailing to GAC under the rubric of the act of state doctrine.

In *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.*, 307 F.Supp. 1291, 1297–98 (D.Del.1970), the court held that where an American corporation is compelled by a foreign government to commit anti—competitive practices, such compulsion constitutes a complete defense to an antitrust action based on those practices. *See also United States v. The Watchmakers of Switzerland Information Center, Inc., supra*; K. Brewster, *supra*, at 92–94; W. Fugate, *supra*, at 148–49; Annot., 12 A.L.R. Fed. 329, 340–43, § 4 (1972); Annot., 40 A.L.R. Fed. 343, 377–79, § 14 (1978). However, "[o]ne asserting the [sovereign compulsion] defense must establish that the foreign decree was basic and fundamental to the alleged antitrust behavior and more than merely peripheral to the overall illegal course of conduct." *Mannington Mills, Inc. v. Congoleum Corp., supra*, 595 F.2d at 1293.

The reason why the sovereign compulsion defense cannot be invoked here is because the absence of cartel records makes it impossible to determine precisely what acts, if any, were compelled, and where those acts were performed.[44]

The available cartel evidence bearing on the question of government compulsion is ambiguous and conflicting. The Canadian Government has stated that the participation of all Canadian uranium producers in the cartel was "a matter of Canadian Government policy," which was "imple-mented through the [Canadian] Atomic Energy Control Act and Regulations." The Government also stated it had "secured compliance with the terms of the [cartel] arrangement." However, Prime Minister Pierre Trudeau stated in response to a question in the Canadian Parliament that the contention "about the government forcing companies into [the cartel] . . . is obviously a spurious argument." He said that "the government had a policy which authorized" the cartel and that the Government had "requested" Canadian uranium producers to act within that policy. *Official Report of House of Commons Debates*, Vol. 121, No. 6, p. 224, 3rd Sess., 30th Parliament (Oct. 25, 1977).

The cartel records that have been produced do not substantially clarify this issue. Initially, Gulf described its attendance at early cartel meetings as a response to "a very strong invitation" from the Government to participate in the cartel; Gulf Canada had been "forcefully invited" to attend. From the outset, however, Gulf apparently conditioned its participation upon a determination that it would not result in violations of the United States antitrust laws.

In April 1972, an associate general counsel for Gulf wrote to Gulf's general counsel in Pittsburgh concerning "an agreement" in the making "among producers of uranium." He stated that the producers would present their agreement to the Canadian Cabinet "for approval," and that the Cabinet would thereafter direct the producers to participate in the agreement.[45] He concluded that

---

**44.** In his opinion in *In Re Uranium Antitrust Litigation, supra*, 480 F.Supp. at 1154, Judge Marshall indicated that cartel records could have a vital bearing on the defendants' defenses of sovereign compulsion. Thus, he indicated that merely by raising the sovereign compulsion defense, a defendant could not preclude a court from seeking documents located in a foreign country which might be relevant to the merits of that defense. *Compare* GAC's position at n. 42, *supra*.

**45.** On August 17, 1972, the Canadian Minister of Energy, Mines and Resources wrote to the President of the Canadian Atomic Energy Control Board, informing him that the Canadian Government had approved a regulation govern-ing the export of uranium from Canada "[i]n order to enforce compliance with the terms of the marketing arrangements." The letter began by stating that "[o]n June 29, 1972, [the Canadian] Cabinet approved the terms of a uranium export marketing arrangement [the cartel] *proposed by producers* in Canada and several other countries." (Emphasis added.) One writer suggested that "this document reveals an approval by government of a privately proposed arrangement, which was in turn implemented by government orders." Baker, *supra*, 11 Cornell Int'l L.J. at 183 n. 94. *Compare* W. Fugate, *supra*, at 148 ("[I]f private parties . . . influence foreign government legislation as part of a conspiracy to restrain United States foreign trade, the foreign government

a decision by Gulf to participate in the cartel was necessary before the cartel's Paris meeting on April 20–21, because "there is no point in our attending the meeting unless we have decided to go along."

Gulf apparently decided "to go along." Roger Allen, an attorney for Gulf Minerals in Denver, attended the cartel's Paris meeting, along with Gulf Minerals' president, S. A. Zagnoli. However, Gulf was nevertheless still concerned about its possible liability under United States antitrust laws. Allen told the other cartel members that "Gulf management was unwilling to take such a risk and, consequently, any participation by Gulf in the arrangement was conditioned upon receiving an expression from the U. S. Department of Justice satisfactory to Gulf."

The following month, Gulf indicated that although it remained concerned about United States antitrust laws, it otherwise agreed "in principle with the desirability of establishing a marketing arrangement." By June 1972, Allen was reporting that Gulf had decided that it "should not even file a White Paper with the Department of Justice. Gulf Minerals *had agreed to take a business risk.* . . ." (Emphasis added.)

Although by early June 1972, Gulf had established "compulsion" as the "fountainhead" of its antitrust defense, in July 1972, Gulf officials were nevertheless describing "the nature of the Canadian Government activity in fostering the Organization" as "still a bit fuzzy." As late as September 1972, a Gulf attorney stated that Gulf's antitrust problem was aggravated by the "ambiguous role played by the cartel governments." The following month, the same attorney referred to the "interchanging and ambiguous capacities in which the Canadian Government had acted." Thus, six months after the government "compulsion" allegedly occurred, Gulf officials were still having difficulty delineating the role played by the Government.

The evidence suggests that Gulf officials took steps designed to bolster the sovereign compulsion defense by encouraging Canada to take a more explicit and less flexible position. As early as May 1972, Mr. Ediger, Gulf Canada's president, advised Mr. Hoffman, a member of the Gulf–United board of directors and a vice–president of Gulf Energy, the predecessor of GAC, that Gulf intended

> to suggest amendments [to the proposed producers' agreement] which will emphasize the fact that our participation is a result of direction from the Canadian government. Therefore, we will likely suggest [adding language] to indicate that Gulf and UCL [Uranez Canada Limited, a German corporation] are complying at the request of the Canadian government. . . .

In September 1972, a Gulf attorney complimented Mr. Ediger for telling the other cartel members that "it was very important for continuity to reside in the [Canadian] Department of E.M.& R. [Energy, Mines, and Resources]." The attorney went on to say:

> Whatever the occasion for expression of this position, Gulf representatives should take advantage of the occasion *and recognize it as the party line.* The more intricately involved the Canadian Government and any of its agencies or Departments becomes and remains in this uranium matter, the better the degree of protection for Gulf. (Emphasis added.)

One reasonable inference that can be drawn from this evidence is that Gulf wanted to be compelled by the Government of Canada; it is not particularly consistent with the notion that Gulf reacted, "in innocence and good faith, to governmental threats and pressures." Graziano, *Foreign Governmental Compulsion as a Defense in*

---

sanction of some of their activities will not justify their conspiracy" (Footnotes omitted)) *with Cal. Retail Liquor Dealers Ass'n v. Midcal Alum.*, 445 U.S. 97, 104–108, 100 S.Ct. 937, 943–44, 63 L.Ed.2d 233 (1980) ("The State simply authorizes price–setting and enforces the

prices established by private parties. . . . The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price–fixing arrangement.")

*United States Antitrust Law,* 7 Va.J.Int'l L. 100, 117 (1967). The evidence does not establish to our satisfaction that Gulf–acting without the intent to restrain competition–innocently responded to foreign governmental pressure. Rather, it would appear that Gulf simply decided "to take a business risk," and thereafter did all it could to minimize that risk by establishing "the effective Canadian Government direction" that it join the cartel as "the fountainhead" of its antitrust defense.

Even if we were to assume, however, that Gulf had been effectively compelled to join and participate in the cartel operations, such compulsion might not provide an all–encompassing defense in this case, for the critical questions upon which application of the act of state doctrine turns would remain unresolved–what *specific* acts were compelled and where did they take place.[46]

United has alleged that GAC and Gulf sought to eliminate it as a competitor in the United States and to monopolize American uranium reserves. It further contends that the 1973 and 1974 Supply Agreements were part of that anti–competitive effort. Even if such actions were "compelled" by a foreign government, the act of state doctrine would provide no protection to Gulf or GAC. By definition, the act of state doctrine applies only to the acts of a foreign state "done within its own territory." *Underhill v. Hernandez, supra,* 168 U.S. at 252, 18 S.Ct. at 84. *See also Republic of Iraq v. First National City Bank, supra,* 353 F.2d at 51. "The doctrine cannot be used to excuse the commission of illegal acts within the territorial boundaries of the United States." *Linseman v. World Hockey Ass'n, supra,* 439 F.Supp. at 1324 (citations omitted). Although the "compulsion" may have occurred in Canada, it is the acts that are compelled, rather than the compulsion itself, that are at issue in the present litigation. The act of state doctrine must apply to those acts if it is to apply at all.

■ We cannot agree with the proposition that if a foreign state compels an American corporation to take actions in the United States which are intended to and do have severe adverse consequences to free and fair trade in the United States, the American corporation is thereby immunized from the full force of the laws of its own sovereign.[47] To hold otherwise would render asunder the "cornerstones of this nation's economic policies"–the antitrust laws. *United States v. First National City Bank,* 396 F.2d 897, 903 (2d Cir. 1968).

Our conclusion that the act of state doctrine is inapplicable is supported by the position taken towards the cartel by those branches of the federal government that are responsible for the formulation and execution of foreign policy.

The Proposition that the act of state doctrine should not be applied where the executive or legislative branches of the federal government have indicated that the act of a foreign state is not entitled to recognition under that doctrine was first set forth in *Bernstein v. N.V. Nederlandsche–Amerikaansche, Etc.,* 210 F.2d 375, 376 (2d Cir. 1954). *See generally* Annot., 12 A.L.R.Fed. 707, § 2[b] (1972). The Bernstein exception to the act of state doctrine was subsequently adopted by three members of the United States Supreme Court in *First Nat. City Bk. v. Banco Nacional de Cuba,* 406 U.S. 759, 767–70, 92 S.Ct. 1808, 1813, 32 L.Ed.2d 466 (1972). Although the Bernstein exception has never gained the support of a majority of the Supreme Court,[48] neither in *First*

---

**46.** "Today it is clear that a businessman may do no more than what is required by foreign legislative mandate if he is to claim antitrust immunity." 7 Va.J.Int'l L. at 133. *See also* W. Fugate, *supra,* at 148.

**47.** For authorities supporting the position that the sovereign compulsion defense should be limited to activities conducted solely within the foreign sovereign's territory, *see* Fugate, 49 Va. L.Rev. at 934; Note, *Development of the De-*

*fense of Sovereign Compulsion,* 69 Mich.L. Rev. 888, 901–02 (1971); 7 Va.J.Int'l L. at 140–42; *United States Department of Justice Antitrust Guide for International Operations,* T.Reg. Rep. (CCH) No. 266, Part II (Feb. 1, 1977).

**48.** Six members of the Supreme Court in *First Nat. City Bk.* rejected the notion that the position of the executive branch is dispositive of the question of the applicability of the act of state doctrine in a particular case.

*Nat. City Bk.* nor in any other case has the Court held that the position taken by the executive and legislative branches regarding the subject matter of the particular litigation in which the doctrine is sought to be invoked is irrelevant. The fact that those branches of the federal government which are responsible for the formulation and execution of foreign policy do not consider a certain subject to involve act of state implications is relevant to, but not dispositive of, the question of the applicability of that doctrine.

Both the executive and legislative branches have taken actions with respect to the uranium cartel which are clearly inconsistent with the notion that judicial examination of Gulf's participation in the cartel is precluded by the act of state doctrine.

The United States Government declined to state that this litigation involves "a breach of friendly relations" between the United States and Canada. In a letter transmitting communications from the Canadian Government to the trial court, the State Department stated that it was taking "no position with regard to any of the issues raised" by those letters, and that transmittal of the letters "should not be understood as having implications with respect to the foreign affairs of the United States." [49]

More significantly, the federal government has affirmatively sought to apply the

---

**49.** GAC has brought to our attention two letters written by the Justice Department to the Seventh Circuit Court of Appeals and to Judge Marshall in the *Westinghouse* uranium litigation now pending before those courts. *See In Re Uranium Antitrust Litigation*, 617 F.2d 1248 (7th Cir. 1980) and D.C., 480 F.Supp. 1138, *supra.* On March 18, 1980, the Justice Department sent the Seventh Circuit a letter from the State Department which referred to criticism of foreign governments in a recent decision of that court (*see* 617 F.2d at 1256). The State Department said that this criticism had "caused serious embarrassment to the United States in its relations with some of our closest allies." It stated that "the foreign governments concerned have substantial interest not only in [the *Westinghouse*] litigation, but also in certain broader issues which it raises." It said that although "the United States Government does not share some of the views presented by the foreign governments," it recognized "the genuineness of their concerns," and believed that their views should be considered by the courts because they "may assist the judiciary . . . in making the necessary accommodations between the laws and policies of various sovereign nations."

In May of this year, Associate Attorney General John Shennefield asked Judge Marshall to give "appropriate deference and weight" to the views and representations of the foreign governments. He stated that because the *Westinghouse* case "implicates foreign policy concerns of both the United States and foreign governments," "it would be inappropriate, *in the absence of bad faith*, to inflict punishment against a defendant . . . for inability to comply with the discovery order of the court because of a contrary foreign criminal law." (Emphasis added.) He urged the court to consider "the consequences of the absence of complete discovery" by reference to the factors identified in *Societe Internationale v. Rogers*, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958).

Unlike the Seventh Circuit's recent decision, nothing either this Court or the trial court below has said in this case was critical of the Government of Canada. In May of this year, the Government of Canada sought leave of this Court to file an amicus curiae brief in this appeal. The motion was filed over two years after entry of the sanctions order and default judgment, and one year after the case had been argued to this Court. No reason was given for the delay in filing the motion, and accordingly, it was denied. In any case, the views of the Canadian Government were presented to the trial court, and are part of the record on appeal. We have fully considered them in reaching our decision. Like the State Department, however, we do not share some of the Canadian Government's views, though we have given full credence to their representations. The State Department's statement that the views of the foreign governments involved "may assist the judiciary . . . in making the necessary accommodations between the laws and policies of the various sovereign nations," is inconsistent with the notion that judicial examination of the matters at issue is precluded by the act of state doctrine. It is worth noting that neither the State nor the Justice Department has communicated similar concerns either to the court below or to this Court over the course of this litigation. Finally, the default judgment imposed in this case was based on findings that GAC acted in bad faith. Those findings are supported by the record; and they are consistent with the requirements of *Societe Internationale* (*see* Section III A, *infra*), and the concerns the Justice Department expressed in its most recent letter concerning the *Westinghouse* litigation.

laws of this country to Gulf's cartel activities. A Congressional subcommittee held hearings on the cartel. *See Hearings on International Uranium Cartel, supra.* A federal grand jury was impaneled to investigate the cartel. *In Re Grand Jury Investigation of Uranium Industry,* Misc. 78–0173, F.S. 78–0166 (D.D.C.1978). In May 1978 the Justice Department filed a criminal information against Gulf, charging it with violations of the Sherman Antitrust Act, to which Gulf pled *nolo contendere. United States v. Gulf Oil Corp.,* Cr.No. 78–123 (W.D.Pa.1978).[50]

The actions taken by both the legislative and executive branches regarding the cartel, and the detailed position the Justice Department has adopted in the general area of the extraterritorial application of United States antitrust laws (*see* n. 50, *supra*), are persuasive evidence that the branches of the federal government having responsibility for the conduct of foreign affairs do not consider the cartel activities of a major United States corporation to be immune from examination by the courts of this country.

These actions are more than a simple statement that the United States Government does not consider the act of state doctrine to be applicable to specific litigation involving private parties. The Government's position is also not merely an isolated instance involving a single corporation and a specific cartel. *See* n. 50, *supra.* Therefore, there is little danger that judicial deference to the executive branch's position will make the judiciary "a mere errand boy for the Executive Branch which

may choose to pick some people's chestnuts from the fire, but not others." *First Nat. City Bk. v. Banco Nacional de Cuba, supra,* 406 U.S. at 773, 92 S.Ct. at 1816 (footnote omitted) (Douglas, J., concurring).

The fact that these actions involved the public enforcement of the antitrust laws, rather than a civil antitrust action by a private litigant, is immaterial. Recognition of such a distinction would further no national interest. As one commentator noted:

It would seem that where the branches responsible for formulation of foreign policy have subordinated the sensitivity of foreign governments to having their acts of a particular sort explored in American courts that, at least after a successful prosecution of the American concern, the act of state doctrine should not stand in the way of the injured competitor's antitrust claim. In such a case, the act of state doctrine would thwart antitrust enforcement policies without furthering any separation of powers (judicial non–interference with foreign policy) values. . . . [T]he decision to review a foreign sovereign's act has already been contemplated by the statute and . . . already occurred in a prosecution.

Note, *Sherman Act Jurisdiction and the Acts of Foreign Sovereigns,* 77 Colum.L. Rev. 1247, 1261 (1977) (footnote omitted).

The antitrust laws of this State and nation contemplate both public and private actions against those who may have violated them.[51] They do not envision, nor should they be applied in such a way as to bring about, the anomalous situation in which the

**50.** The Antitrust Division of the Justice Department has an established policy regarding the application of American antitrust laws to the international activities of American corporations which is consistent with the actions taken by the Division regarding this cartel and with the discovery orders entered in this case. In the *Antitrust Guide for International Operations,* (*see* n. 47, *supra*), the Justice Department discusses its position concerning the application of the act of state doctrine to two hypothetical situations (cases "K" and "L") that have a direct bearing on the allegations against GAC and Gulf in this case.

**51.** *United States v. Borden Co.,* 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954); *Battle v. Liberty National Life Insurance Company,* 493 F.2d 39, 52 (5th Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *In Re Uranium Antitrust Litigation, supra,* 480 F.Supp. at 1154.

Sections 57–1–1 and 57–1–2, N.M.S.A.1978, make certain anti–competitive trade practices a crime in New Mexico. Section 57–1–3, N.M.S. A.1978, provides a private party with a cause of action for damages it suffers by reason of the same practices.

public interest is vindicated by the imposition of a fine of several thousand dollars, but in which the private interest is frustrated by enforcement of a multi—million dollar judgment against what may have been a harmed competitor. To permit such a situation to exist could further the very anti-competitive and monopolistic goals which the multi—national corporation is alleged to have sought to achieve and which the antitrust laws were designed to prevent.[52]

### b. *Exclusive Federal Power Over Foreign Relations*

GAC claims that even if the act of state doctrines does not bar an American court from examining Gulf's cartel—related actions, the principle of exclusive federal power over the conduct of foreign relations nevertheless precludes an American *state* court from conducting such an examination.[53]

GAC relies on *Zschernig v. Miller*, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968), in which the United States Supreme Court struck down an Oregon intestacy statute as it had been applied by the Oregon Supreme Court. 243 Or. 567, 412 P.2d 781 (1966). The Oregon statute required that, in order to take property belonging to an Oregon resident by succession or testamentary disposition, a non—resident alien had to prove that (1) American residents had a reciprocal right to inherit in the alien's country; and (2) the non—resident alien would be able to receive "the benefit, use or control" of the proceeds of the Oregon estate "without confiscation" by his government.

In *Zschernig*, the Court held that, as applied, the statute constituted an impermissible intrusion by the state into foreign affairs, an area which the Court said was entrusted by the United States Constitution solely to the President and Congress. The Court said that the statute required local probate courts to launch "minute inquiries" into the nature of foreign governments, the quality of rights which those governments accorded to both American citizens and their own citizens, the credibility of the representations of officials of foreign governments, and the actual administration of foreign legal systems. 389 U.S. at 433–35, 88 S.Ct. at 666–667.

GAC contends that the *Zschernig* decision precludes state courts from exercising jurisdiction over issues relating to the foreign cartel because of the Canadian Government's relationship to the cartel. GAC argues that because the trial court was without jurisdiction to consider the cartel—related issues, it could not enter discovery orders directing the production of cartel documents.

The *Zschernig* decision, which has not been applied by the United States Supreme Court outside of the limited context of the alien inheritance statutes at issue in that case, has nothing to do with this case. Unlike the statute at issue in *Zschernig*, the causes of action involved in this case are universally accepted by American jurisdictions—fraud, breach of fiduciary duty, commercial impracticability, economic coercion and antitrust. The effective enforcement of the antitrust laws is essential to the maintenance of free and fair business competition.[54] Unlike the alien inheritance

---

**52.** "Private litigation under the antitrust laws plays an important role in the enforcement of antitrust violations. It supplements public enforcement, 'increases the likelihood that a violator will be found out, greatly enlarges his penalties, and thereby helps discourage illegal conduct.'" Wechsler, *New Mexico Restraint of Trade Statutes–A Legislative Proposal*, 9 N.M.L.Rev. 1, 20 (1979) (footnote omitted).

**53.** Although similar to the act of state doctrine, this second principle is distinct in that the former looks to the power of American courts in general, whereas the latter is concerned with the power of an American *state* court. The act

of state doctrine rests on the principle of separation of powers between branches of the federal government; the principle of exclusive federal power over the conduct of foreign relations is based on the concept of federalism.

**54.** "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Associates*, 405 U.S. 596, 610, 92 S.Ct. 1126, 1135, 31 L.Ed.2d 515 (1972).

statutes in *Zschernig*,[55] the causes of action in this case do not involve questionable attempts by states to directly affect the rights of citizens in foreign nations, nor are they related to the foreign policy attitudes of this or any other state court.

In this litigation the courts of this State have not undertaken the type of analysis that *Zschernig* prohibits. No pejorative criticism has been directed at Canada or any other foreign government. No minute inquiry has been made into the actual administration of foreign law by a foreign government, or into the rights that such a government affords to its own citizens. The veracity of the representations of its diplomats has not been questioned. This case involves nothing more than an inquiry into what an *American* corporation has done *in America*, a situation which finds no appropriate analogy in *Zschernig* or its exceedingly limited progeny.

▇▇▇ The states of this country have little interest in how a foreign government treats its own citizens, but they have every conceivable interest in anti–competitive conduct by American corporations occurring within their own borders. Likewise, foreign governments have a legitimate interest in the rights they choose to afford their own citizens; but they have no legitimate interest in whether a state court in this country will lend its judicial processes to the enforcement of contracts entered into in the United States by corporations based in this country for the supply of a resource to be mined and milled in the United States. Our courts have done no more than seek to enforce state laws which are consistent with federal laws, and with actions of the United States Congress [56] and the United States Justice Department concerning Gulf's cartel activities. We therefore hold that neither *Zschernig* nor the act of state doctrine precludes the courts of New Mexico from litigating the cartel–related issues present in this case, or from seeking the production of documents which will facilitate the resolution of such litigation.

## 2. *Canada's Uranium Information Security Regulations*

GAC also contends that the trial court's discovery orders commanded conduct in violation of the Canadian Uranium Information Security Regulations, and were therefore prohibited by the act of state doctrine and the *Zschernig* decision.

### a. *Act of State Doctrine*

Clearly, the Uranium Information Security Regulations were an act of state. They were promulgated by the Canadian Government pursuant to the Canadian Atomic Energy Control Act. They have been upheld by Canadian courts. The Regulations have been considered by both the Canadian executive and judicial branches to be in the public interest of Canada. However, it does not follow that because the Regulations were an act of state, the discovery orders were precluded by the act of state doctrine.

---

"So crucial are antitrust laws to the economy of the state that the New Mexico Constitution [Art. IV, § 38] mandates the enactment of laws 'to prevent trusts, monopolies and combinations in restraint of trade.'" Wechsler, 9 N.M. L.Rev. at 22.

**55.** These statutes had largely been applied to communist countries. In the years following their passage, the statutes were subject to widespread criticism by legal scholars for being unsound legislation which had been both ineffective and prejudicially applied. *See e.g.,* the authorities cited in 32 Alb.L.Rev. 646, 649 n.15 (1968). In applying these statutes, state courts had on occasion criticized foreign governments in strong and intemperate language. *See* examples cited in *Zschernig, supra,* 389 U.S. at 437–39 n.8, 88 S.Ct. at 669 n.8 and in 82 Harv.L.Rev. at 239, n.8. Commentators were virtually unanimous in condemning these statutes and in applauding the *Zschernig* decision. One said: "[C]learly the state has no interest in inquiries of the sort which [*Zschernig*] condemned." 82 Harv.L.Rev. at 245. *See also* 32 Alb.L.Rev. at 653–54.

**56.** It is worth noting that the Congressional subcommittee investigating the cartel held several of its hearings in unprecedented joint sessions with a committee of the New York State Assembly in order to assist that state's independent investigation of the cartel. *Hearings on International Uranium Cartel, supra,* Vol. I, Serial Nos. 95–39, p. 130 and No. 95–95, p. 1.

192

The trial court never ordered GAC, Gulf, or Gulf Canada to violate the Regulations, and never questioned the validity of those Regulations. In October 1977, the court ordered GAC to produce all non–privileged cartel records, "*[i]nsofar as it is lawful so to do.*" (Emphasis added.) The court went on to say that "to the extent that it might be a violation of Canadian law to produce . . [cartel] documents housed in Canada," GAC had an obligation to "make an immediate diligent and good faith effort to obtain a *lawful* waiver of or dispensation from such Canadian prohibitions and to the extent thereafter *lawful* at the earliest possible date, actually produce for inspection and copying of such documents." (Emphasis added.) In subsequent orders the trial court expressly refused to order identification or production of cartel documents in violation of Canadian law. Instead, it relied on Rule 37 sanctions to redress the dilemma resulting from the absence of the documents or the identification thereof.[57]

Further, the act of state doctrine is inapplicable insofar as the Regulations are concerned under the decision of the United States Supreme Court in *Societe Internationale v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). In that case the plaintiff, a Swiss holding company, had assets seized by the Alien Property Custodian during the Second World War pursuant to the Trading With The Enemy Act. After the War, the plaintiff filed suit against the Attorney General of the United States seeking to recover the property on the ground that it had not been an enemy within the meaning of the Act. The Government sought production of records which were in the possession of a Swiss banking company controlled by the plaintiff, which it claimed were relevant to the issue of the plaintiff's alleged "enemy taint." The plaintiff failed to produce the documents

because Swiss law prohibited production of the records. The district court dismissed the plaintiff's complaint, *Societe Internationale, Etc. v. McGranery,* 111 F.Supp. 435 (D.D.C.1953). The Court of Appeals affirmed. *Societe Internationale v. Brownell,* 95 U.S.App.D.C. 232, 225 F.2d 532 (D.C.Cir. 1955). The Supreme Court unanimously reversed the two lower courts.

Two aspects of the Supreme Court's decision are pertinent to this case–first, the propriety of a court's order to produce records located in a foreign country whose laws prohibit disclosure of the records; and second, the appropriateness of the sanctions imposed for a party's failure to comply with such an order where the failure is due to the proscriptions of foreign law. In this section of the opinion we are concerned only with the first question; the latter aspect is considered in Section III A, *infra.*

In *Societe Internationale,* the Court stated:

> Whatever its reasons, petitioner did not comply with the production order. Such reasons, and the willfulness or good faith of petitioner, can hardly affect the fact of noncompliance and are relevant *only* to the path which the District Court might follow in dealing with petitioner's failure to comply.

357 U.S. at 208, 78 S.Ct. at 1094 (emphasis added). This passage implies that foreign nondisclosure laws are not relevant to the propriety of production orders. Rather, it states that the reason for nonproduction is relevant *only* to the question of appropriate sanctions for noncompliance with the order. This distinction is significant. *In Re Westinghouse Elec. Corp. Uranium, Etc.,* 563 F.2d 992, 997, 999 (10th Cir. 1977); *Arthur Andersen & Co. v. Finesilver,* 546 F.2d 338, 341 (10th Cir. 1976), *cert. denied,* 429 U.S. 1096, 97 S.Ct. 1113, 51 L.Ed.2d 543 (1977); *In Re Uranium Antitrust Litigation, supra,*

---

57. In ordering production of Gulf's Canadian cartel documents in the Westinghouse litigation, Judge Marshall rejected the very same act of state argument GAC advances here. He stated:

> Plaintiffs have not challenged the validity of any of the foreign nondisclosure laws which

are relied on by defendants. The issue is not whether those laws are valid, but rather, conceding their validity, whether they excuse defendants from complying with a production order.

*In Re Uranium Antitrust Litigation, supra,* 480 F.Supp. at 1149.

480 F.Supp. at 1144–48; Wright, "Discovery," 35 F.R.D. 39, 81 (1963); Note, *Discovery of Documents Located Abroad in U.S. Antitrust Litigation: Recent Developments in the Law Concerning the Foreign Illegality Excuse for Non–production,* 14 Va.J.Int.L. 747, 753 (1974).

In *Societe Internationale* the Court did not refer to the act of state doctrine or to principles of international comity. The reason for that lack of reference to these principles is simple. Neither in *Societe* nor in this case did the trial court order a litigant to violate the nondisclosure laws of the foreign sovereign. Neither court criticized the foreign sovereign or its laws, or engaged in.an examination of such laws or the motivations which gave rise to them. Both courts sought only to maintain the integrity of the judicial process and the efficacy of the laws upon which the cause of action in each case was based. In both cases, those laws reflected very significant policies of this country.[58]

b. *Exclusive Federal Power Over Foreign Relations*

▰ The principles set forth in *Zschernig v. Miller, supra,* are inapplicable to the

Uranium Information Security Regulations for largely the same reasons that the act of state doctrine does not apply. The discovery orders in this case which sought cartel document production involved none of the problems the Supreme Court was confronted with in *Zschernig. See e. g.,* n.55, *supra,* and accompanying text.

D.

## APPLICABILITY OF NEW MEXICO ANTITRUST ACT

The last issue we consider concerning the propriety of the trial court's discovery orders involves the applicability of the New Mexico Antitrust Act, Sections 57–1–1 to 57–1–3, N.M.S.A.1978.[59] Although GAC filed a counterclaim alleging that United had violated the New Mexico Antitrust Act, it now contends that that Act may not be applied to the specific commerce at issue in this case (the 1973 and 1974 Supply Agreements and the I&M contract) and to the activities of the international uranium cartel. GAC argues that if the Act does not apply, discovery orders pertaining to allegations of violations of the Act could not be

---

**58.** In his recent decision ordering Gulf and other parties in the *Westinghouse* litigation to produce cartel records located in Canada and elsewhere, United States District Judge Marshall stated that "the policies supporting an inquiry into corporate activities and structure are at least as weighty, and probably stronger, with the antitrust statutes here than they were with the Trading with the Enemy Act in *Societe Internationale." In Re Uranium Antitrust Litigation, supra,* 480 F.Supp. at 1154 (citation omitted).

In a decision rendered on March 18 of this year, the Supreme Court of Canada denied an application of Gulf Oil for letters rogatory to secure cartel documents located in Canada. *Gulf Oil Corp. v. Gulf Canada Ltd.* (Slip Op. March 18, 1980). Gulf sought the letters in order to comply with discovery orders entered by Judge Marshall in the *Westinghouse* litigation. *See In Re Uranium Antitrust Litigation, supra,* 480 F.Supp. 1138. The Canadian high court stated that the Canadian Government's "resistance to disclosure was not so much a matter of the maintenance of secrecy as it was of an assertion of Canadian sovereignty to resist the extra–territorial application of United States anti–trust laws." The court stated that it failed to see how such a policy "can be

ignored in the interests of comity towards a foreign court, as if the policy was essentially a reflection of private considerations without any public, governmental interest." But it stated: "It may be that different considerations will operate where a Canadian court is concerned with Canadian litigation arising out of issues turning on Canadian law."

The antitrust issues in this litigation reflect more than "private considerations without any public, governmental interest." *See* n.54, *supra.* We cannot subscribe to the idea that the fundamental public policy which the antitrust laws embody must be ignored in the interests of comity towards the policy of a foreign state, particularly where the highest court of that state intimates that it would not necessarily be bound by the same policy of its own government in litigation "turning on Canadian law."

**59.** In 1979, the New Mexico Legislature substantially revised the Antitrust Act. *See* N.M. Laws 1979, ch. 374, §§ 1–18 (codified as Sections 57–1–1 to 57–1–15, N.M.S.A.1978 (Supp. 1979)). In this case, we are concerned with the prior act, Sections 57–1–1 to 57–1–3, N.M.S.A. 1978.

entered, and therefore, sanctions could not be imposed for a failure to comply with such orders.[60]

### 1. *The Commerce Clause*

GAC's first contention is that the Commerce Clause of the United States Constitution[61] bars the application of state antitrust laws to activities which occur exclusively or overwhelmingly in interstate and foreign commerce. GAC argues that the supply and utility contracts in this case have no immediate relationship to the State of New Mexico, and therefore, that they involve only interstate commerce. Further, GAC argues that the cartel's operations were concerned solely with foreign commerce.

■ It is well settled that the federal power to regulate commerce is not exclusive, and that states have the inherent police power to regulate commerce within their borders, even though such activities may include or affect interstate and foreign commerce. *Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 140, 94 S.Ct. 383, 396, 38 L.Ed.2d 348 (1973); *Cities Service Co. v. Peerless Co.*, 340 U.S. 179, 186, 71 S.Ct. 215, 219, 95 L.Ed. 190 (1950); *Southern Pacific Co. v. Arizona*, 325 U.S. 761, 766–67, 65 S.Ct. 1515, 1518–19, 89 L.Ed. 1915 (1945); *K. S. B. Tech. Sales v. North Jersey, Etc.*, 75 N.J. 272, 381 A.2d 774, 784 (1977). Specifically, a state may exercise its power by removing restraints on the trade and commerce of that state even though interstate commerce may thereby be affected. *Giboney v. Empire Storage Co.*, 336 U.S. 490, 495, 69 S.Ct. 684, 687, 93 L.Ed. 834 (1949); *Watson v. Buck*, 313 U.S. 387, 403–04, 61 S.Ct. 962, 967, 85 L.Ed. 1416 (1941); J. Flynn, Federalism and State Antitrust Regulation 63 (1964).

The following standards for the states' power to regulate commerce were established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970):

> Where the [state] statute regulates even–handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. . .
>
> If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*See also Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2536, 57 L.Ed.2d 475 (1978).

Thus, the first inquiry is whether the state regulation effectuates "a legitimate local public interest." There are two aspects to this requirement. First, the type of regulation–here antitrust–must be one within the state's inherent police powers. Second, the specific activity to which the state regulation is applied in a particular case must involve a matter of local concern which is "local in character and effect." *Southern Pacific Co. v. Arizona, supra*, 325 U.S. at 767, 65 S.Ct. at 1519.

It has consistently been held that the type of regulation at issue here–the prevention of anti–competitive, monopolistic and predatory trade practices–is a legitimate exercise of the state's inherent police powers. *See United Nuclear Corp. v. General Atomic Co., supra*, 93 N.M. at 124–27, 597 P.2d at 309–12; *Giboney v. Empire Stor-*

---

**60.** GAC's argument as to the inapplicability of the New Mexico Antitrust Act relates only to the antitrust issues in this case. However, as we have already held, the information and documents sought were also relevant to United's claims of fraud, breach of fiduciary duty, economic coercion and commercial impracticability. The judgment for I&M was based on commercial impracticability under Section 55–2–

615, N.M.S.A.1978. GAC makes no claim that trial of these issues was precluded by the Commerce Clause or the Sherman Antitrust Act.

**61.** U.S.Const., Art. I, § 8, cl. 3 provides:

"The Congress shall have Power . . . to regulate Commerce with the foreign Nations, and among the several States, and with the Indian Tribes. . . ."

*age Co., supra; German Alliance Ins. Co. v. Hale,* 219 U.S. 307, 316–17, 31 S.Ct. 246, 55 L.Ed. 229 (1911); J. Flynn, *supra,* at 76–77.

GAC's principal argument is that the second element of "a legitimate local public interest" is not present in this case because the specific contracts at issue and the uranium cartel are not "local in character and effect." GAC relies on four points to support its position. First, the cartel had "no immediate relationship" to New Mexico and never conducted meetings in this state. GAC contends that cartel operations were "plainly in foreign commerce outside the United States." Second, none of the entities involved in this case are incorporated in New Mexico. Third, the 1973 Supply Agreement was not executed in and does not require the performance of any act in New Mexico. Fourth, the uranium market is national in scope.

We are not persuaded that the matters at issue in this case occurred exclusively in interstate and foreign commerce and had no significant local aspects. It has been recognized that state antitrust laws may reach up to include the regulation of interstate commerce. *See R. E. Spriggs Co. v. Adolph Coors Company,* 37 Cal.App.3d 653, 112 Cal. Rptr. 585, 589 (1974); J. Flynn, *supra,* at 71, and cases cited therein at n. 251; Wechsler, *supra,* 9 N.M.L.Rev. at 3. As the Massachusetts Supreme Judicial Court stated:

> If State laws have no force as soon as interstate commerce begins to be affected, a very large area will be fenced off in which the States will be practically helpless to protect their citizens without, so

far as we can perceive, any corresponding contribution to the national welfare.

*Commonwealth v. McHugh,* 326 Mass. 249, 93 N.E.2d 751, 762 (1950) (citation omitted).[62]

We cannot agree that the outer limit of the exercise of that power–activity of a wholly interstate nature–has been exceeded in this case. The contracts at issue may be regarded as having no immediate relationship to New Mexico only by relying upon the formalities–the domicile of the parties to the contracts, the place of performance, and the place the contracts were entered into–and ignoring the practical realities.

United alleges that the 1973 and 1974 Supply Agreements were part of a conspiracy to monopolize uranium reserves in the United States and to eliminate it as a competitor in the uranium market. As of 1975, over one–half of the uranium reserves of the United States were located in New Mexico. In all but one year from 1966 to 1976, in excess of forty percent of the annual production of uranium in the United States came from New Mexico mines. As of 1976, over fifty percent of the uranium mining work force in this country and nearly forty percent of the uranium milling work force were located in New Mexico. Nearly one–half of the capacity of American uranium production mills is in this State. Gulf's New Mexico Mt. Taylor uranium reserves constitute the largest uranium ore body in the United States. United's mine at Churchrock, New Mexico, which GAC is alleged to have attempted to

**62.** GAC relies on the case of *Kosuga v. Kelly,* 257 F.2d 48 (7th Cir. 1958), *aff'd on other grounds,* 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959), in which the court held that the Illinois Antitrust Act did not apply to a contract for the sale of onions in interstate commerce. That decision indicated that the scope of the Illinois Act extended solely to intrastate commerce. *See Henry G. Meigs, Inc. v. Empire Petroleum Company,* 273 F.2d 424, 430 (7th Cir. 1960); *R. E. Spriggs Co. v. Adolph Coors Company, supra,* 112 Cal.Rptr. at 591. To the extent that *Kosuga* held state antitrust laws to be generally inapplicable to transactions involving interstate commerce, we decline to follow it.

The language in *Kosuga* which supports such a holding has been criticized for its lack of authority and reasoning. *See R. E. Spriggs Co. v. Adolph Coors Company, supra,* 112 Cal.Rptr. at 591; J. Flynn, *supra,* at 74–75; Pollack, *Federal Preemption and State Antitrust Enforcement,* 43 Chi. Bar Record 145 (1961). *Kosuga* relied on a reference to *Corpus Juris Secundum,* but the cases cited by *C.J.S.* do not stand for the proposition stated in the text. Two years after *Kosuga,* the Seventh Circuit applied a Wisconsin antitrust law to a transaction involving interstate commerce. *Henry G. Meigs, Inc. v. Empire Petroleum Company, supra.*

gain control of as part of the monopolistic conspiracy, is the largest underground uranium mine in the United States. Therefore, it would be impossible to monopolize the American uranium market without having an immediate relationship to, and a substantial effect on, the trade and commerce of this State.

Although the 1973 Supply Agreement does not formally require any activity to take place here, almost all of United's uranium production is from New Mexico mines. New Mexico is also the site of its only uranium mill, which is the place of delivery under the terms of the 1974 Supply Agreement. In its brief on appeal, GAC conceded that New Mexico is "the state in which [United's] operation is located." The uranium sales efforts of GAC and its predecessors were based on Gulf production in New Mexico, foreign uranium imports, and purchases on the open market. Those purchases also included substantial amounts of New Mexico uranium. *See* Section II B, *supra*.

 It is simply not the case that this litigation involves exclusively interstate commerce and that this State has no interest in its adjudication. *United Nuclear Corp. v. General Atomic Co., supra*, 90 N.M. at 101–02, 560 P.2d at 165–66. Therefore, we hold that the State of New Mexico has "a legitimate local public interest" in the application of its antitrust laws to this case.

The remaining inquiries are whether the state law as applied here (1) "regulates evenhandedly" and (2) has only "incidental" effects on interstate commerce. There is clearly nothing in the New Mexico Antitrust Act or in its application to this case which entails any discrimination against interstate goods or which favors local com-

merce over the commerce of sister states. *Compare Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125–26, 98 S.Ct. 2207, 2213–14, 57 L.Ed.2d 91 (1978) *with Dean Milk Co. v. Madison*, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951). GAC makes no contention to the contrary.[63] Further, GAC has made no showing whatsoever that the application of state antitrust laws to this case will have *any* adverse effects on "the free flow of commerce across state lines." *Southern Pacific Co. v. Arizona, supra*, 325 U.S. at 770, 65 S.Ct. at 1521. The very purpose of these laws is to remove privately created restraints on free trade.

> Consequently, it would be difficult to prove that a policy which removes privately instituted interferences, delays, interruptions, and inconveniences with interstate commerce, is itself a delay, interference, interruption, and inconvenience to interstate commerce when enforced at the local level by the states.

J. Flynn, *supra*, at 84.

GAC nevertheless contends that because the uranium market is "national in scope," and because uranium is "vital to the military posture of the United States" and to federal energy policy, "legal and policy questions involving uranium and the uranium industry must be addressed uniformly by the federal government." GAC argues that application of state antitrust laws to such matters "is too fraught with a potential for inconsistent results, lack of uniformity, and consequent burdens upon interstate commerce."

GAC places principal reliance on *Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972), *aff'g*, 443 F.2d 264 (2d Cir. 1971), *aff'g* 316 F.Supp. 271 (S.D.N.Y. 1970), in which the Supreme Court upheld lower court rulings that the reserve clause

---

**63.** GAC does suggest New Mexico will be benefited by invalidation of the contracts because United will be permitted to sell the uranium at higher prices, thus increasing local tax revenues and forcing out-of-state consumers to pay higher utility rates. However, any such consequences are entirely indirect results of the application of laws which, on their face, have no discriminatory aspects. GAC, of course, seeks to avoid its obligations to I&M, which, if successful, would have precisely the same effect on I&M's customers. Furthermore, if United were to sell any of this uranium for use inside New Mexico, New Mexico consumers would pay the same higher price. It is also interesting to note that GAC's argument that higher uranium prices will result in higher tax revenues in this State is based on GAC's recognition that the uranium would have been supplied from New Mexico sources.

in professional baseball contracts was not subject to challenge under state antitrust laws. Previous decisions of the Supreme Court had held that professional baseball was not subject to federal antitrust laws. *Toolson v. New York Yankees*, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953); *Federal Club v. National League*, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). In *Flood* the lower courts had held that "the nationwide character of organized baseball combined with the necessary interdependence of the teams requires that there be uniformity in any regulation of baseball and its reserve system." 316 F.Supp. at 279–80. *See* 443 F.2d at 267–68.

In affirming the lower courts' decisions, the Supreme Court did not adopt any broad or rigid limitations on the applicability of state antitrust laws to transactions involving interstate commerce. The Court upheld those holdings "[a]s applied to organized baseball, and in the light of this Court's observations and holdings in *Federal Baseball*, [and] in *Toolson* . . . ." 407 U.S. at 284, 92 S.Ct. at 2113.

We believe that *Flood* is readily distinguishable from this case. First, the time honored, though unusual, exemption from federal antitrust laws which professional baseball enjoys would be meaningless if state antitrust laws were not also inapplicable. Thus, in *Flood* there was a clear conflict between federal and state antitrust enforcement policies.

Second, professional baseball is significantly different from the uranium market. Baseball involves "[a] complex web of franchises, farm teams and recruiters . . ." 443 F.2d at 267. Baseball clubs are organized into leagues and

> are dependent on the league playing schedule . . . . Therefore, it is the league structure at which any state anti-

trust regulation must be aimed . . .. [E]ach league extends over many states, and . . . ., if state regulation were permissible, the internal structure of the leagues would require compliance with the strictest state antitrust standard.

*Id.* at 267–68.

No single state has a particularly significant interest in the operation of nationwide professional sports. However, this State has a very substantial relationship to uranium production, and therefore, a significant interest in preventing anti–competitive practices in the uranium industry. Moreover, in energy–related matters, unlike professional baseball, there is uniformity of treatment of anti–competitive practices under both federal and state law. Challenging such activities is federal policy. Challenging the uranium cartel and Gulf's role therein was the federal practice.[64]

The fact that the uranium market is nationwide in scope does not require a different result. In *Flood*, state antitrust regulations would have directly affected the entire "complex web" of professional baseball, and would have been aimed at league structure. In this case, the state law has been applied solely to private contracts for the sale of specific goods. In *Flood*, the reserve clause being challenged was a recognized practice in the sport. Here, the alleged conspiracy was a secret attempt to dominate an industry, a practice condemned by the Congress, the Justice Department, and the courts. If the fact that the commerce at issue involved a national market was enough to render state law invalid, the states' power to regulate anti–competitive practices would be effectively destroyed.

In *Exxon Corp. v. Governor of Maryland, supra*, the United States Supreme Court rejected a similar argument advanced by Gulf and other oil companies regarding the

---

**64.** *See* n. 50, *supra*, and accompanying text. In addition to the hearings held on the anti–competitive practices of the cartel (*see Hearings on International Uranium Cartel, supra*), in 1975 another subcommittee of the U. S. House of Representatives held extensive hearings on competition in the energy industry. *Energy Industry Investigation: Hearings Before the Subcomm. on Monopolies and Commercial Law of the House Comm. on the Judiciary*, 94th Cong., 1st Sess., Serial No. 48–49, Parts 1–2 (1975). (Gulf submitted a report on its uranium business as part of those hearings. The report did not, however, reveal Gulf's role in the uranium cartel.)

national scope of the petroleum industry and a state statute that regulated aspects of that industry in Maryland. The Court said:

> [W]e cannot adopt appellants' novel suggestion that because the economic market for petroleum products is nationwide, no State has the power to regulate the retail marketing of gas. Appellants point out that . . . the cumulative effect of this sort of legislation may have serious implications for their national marketing operations. While this concern is a significant one, we do not find that the Commerce Clause, by its own force, preempts the field of retail gas marketing. . . . [T]his Court has only rarely held that the Commerce Clause itself pre-empts an entire field from state regulation, and then only when a lack of national uniformity would impede the flow of interstate goods. . . . In the absence of a relevant congressional declaration of policy, or a showing of a specific discrimination against, or burdening of, interstate commerce, we cannot conclude that the States are without power to regulate in this area.

437 U.S. at 128–29, 98 S.Ct. at 2215. (citations and footnote omitted).

No showing has been made that application of New Mexico law entails "a specific discrimination against, or burdening of, interstate commerce." No embargo has been placed on interstate shipments of uranium. Compare Penna. v. West Virginia, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923) and West v. Kansas Natural Gas Co., 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed. 716 (1911). Unlike other situations in which state regulations have been invalidated under the Commerce Clause,[65] there is little likelihood that in the area of state antitrust laws an excessive cost of compliance will be imposed by piecemeal state regulation. The cost of compliance is nothing more than refraining from the kind of anti–competitive, predatory trade practices which federal law and the laws of virtually all states condemn. The pervasiveness of antitrust regulation in the economy demonstrates a uniformity between state and federal laws which was not present in Exxon Corp. v. Governor of Maryland, supra. Therefore, the New Mexico Antitrust Act was applied consistently with the Commerce Clause of the federal constitution.

### 2. Preemption by Sherman Antitrust Act

GAC's second claim is that the New Mexico Antitrust Act is preempted by the Sherman Antitrust Act in the context of this case.

■ Congress has the unquestioned power to preempt state regulations in the field of interstate and foreign commerce.[66] Preemption may be ascertained from the express language of the federal statute,[67] by reference to the statute's legislative history,[68] or from a clear inconsistency, repugnancy, or serious danger of conflict between the state and federal regulations.[69] However, none of these sources evidence a Congressional intent to preempt state antitrust laws in the circumstances present in this case.

We begin with the well–established principle that "in a field which the States have traditionally occupied," "the historic police

---

**65.** See e. g., Bibb v. Navajo Freight Lines, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959) (state law required change of mudguards on interstate carriers at state line); Southern Pacific Co. v. Arizona, supra, (state law required change in length of trains at state line).

**66.** De Canas v. Bica, 424 U.S. 351, 357, 96 S.Ct. 933, 937, 47 L.Ed.2d 43 (1976); Southern Pacific Co. v. Arizona, supra, 325 U.S. at 769, 65 S.Ct. at 1520.

**67.** Florida Avocado Growers v. Paul, 373 U.S. 132, 146–47, 83 S.Ct. 1210, 1219, 10 L.Ed.2d 248 (1963); Campbell v. Hussey, 368 U.S. 297,

300–01, 82 S.Ct. 327, 328–29, 7 L.Ed.2d 299 (1961); J. Flynn, supra, at 119.

**68.** De Canas v. Bica, supra, 424 U.S. at 358, 96 S.Ct. at 937; City of Burbank v. Lockheed Air Terminal, 411 U.S. 624, 634–37, 93 S.Ct. 1854, 1860–1861, 36 L.Ed.2d 547 (1973); J. Flynn, supra, at 125.

**69.** Florida Avocado Growers v. Paul, supra, 373 U.S. at 146, 83 S.Ct. at 1219; Pennsylvania v. Nelson, 350 U.S. 497, 505, 76 S.Ct. 477, 481, 100 L.Ed. 640 (1956).

powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress. (Citations omitted.)" *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). *See also Florida Avocado Growers v. Paul, supra,* 373 U.S. at 146, 83 S.Ct. at 1219.

■ Nothing in the language of the Sherman Act expresses any intent to preempt state antitrust laws, many of which were enacted prior to the Sherman Act. *See United Nuclear Corp. v. General Atomic Co., supra,* 93 N.M. at 125, 597 P.2d at 310; J. Flynn, *supra,* at 90–91. The legislative history of the Sherman Act indicates that, rather than intending to supersede state antitrust laws, Congress was seeking to supplement the enforcement of those laws. *See* remarks of Senator Sherman quoted in *United Nuclear Corp. v. General Atomic Co., supra,* 93 N.M. at 125, 597 P.2d at 310. *See also* H.R.Rep. No. 1707, 51st Cong., 1st Sess. 1 (1890). This legislative history has been interpreted as evidence of a lack of an intent to preempt state antitrust laws. *United Nuclear Corp. v. General Atomic Co., supra,* 93 N.M. at 125, 597 P.2d at 310; *R. E. Spriggs Co. v. Adolph Coors Company, supra,* 112 Cal.Rptr. at 589.

■ Preemption may also be inferred where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the states to regulate,[70] or where the state act touches a field in which the federal interest is so dominate that state regulation might interfere with the federal purposes,[71] or where there is a "direct and positive" conflict or repugnancy between the state and federal laws.[72]

GAC points to no "direct and positive" conflict between state and federal antitrust laws in general, or as the state law has been

applied in this case. However, it suggests that if state antitrust laws are applied to interstate commerce of the nature involved in this case, "intolerable burdens" would be imposed on that commerce because of "differing limitations upon competition in each jurisdiction where goods might be produced, transported or sold."

In *Exxon v. Governor of Maryland, supra,* the Supreme Court rejected a similar argument, stating that the existence of such potential conflicts is " 'entirely too speculative' . . . to warrant preemption." 437 U.S. at 131, 98 S.Ct. at 2216. The Court went on to say that it is not only "generally reluctant to infer pre–emption," but also, that it would be "particularly inappropriate to do so" where "the basic purposes" of the state and federal statutes are similar. *Id.* at 132, 98 S.Ct. at 2217.

The basic purposes of the state and federal antitrust laws in question here are not merely similar; they are identical–"to establish a 'public policy of first magnitude'; that is, promoting the national interest in a competitive economy." *United Nuclear Corp. v. General Atomic Co., supra,* 93 N.M. at 125, 597 P.2d at 310 (citation omitted). *See also* J. Flynn, *supra,* at 138. The state act in question uses substantially the same language as the Sherman Act. J. Flynn, *supra,* at 139. The state act has been applied consistently with federal actions regarding the cartel and Gulf's role therein. *See* n. 50, *supra,* and accompanying text. There is thus no "clash of competing fundamental policies." *United Nuclear Corp. v. General Atomic Co., supra,* 93 N.M. at 125, 597 P.2d at 310.

GAC suggests that even in the absence of "direct and positive" conflicts between state and federal antitrust laws, the dominate federal interest in foreign commerce precludes application of state antitrust laws to

---

**70.** *See e. g., Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978); *City of Burbank v. Lockheed Air Terminal, supra,* 411 U.S. at 633, 93 S.Ct. at 1859; *Rice v. Santa Fe Elevator Corp., supra,* 331 U.S. at 230, 67 S.Ct. at 1152. Note, *The Commerce Clause and State Antitrust Regulation,* 61 Colum.L.Rev. 1469, 1477–78 (1961).

**71.** *Id.*

**72.** *Kelly v. Washington,* 302 U.S. 1, 10–11, 58 S.Ct. 87, 92, 82 L.Ed. 3 (1937). *See also R. E. Spriggs Co. v. Adolph Coors Company, supra,* 112 Cal.Rptr. at 593.

cartel activities. However, we are not interested in this case in regulating foreign commerce; we are concerned with practices that allegedly were aimed at restraining trade in this State. Without full cartel disclosure, we cannot determine to what commerce the cartel's activities extended. We will not cast aside laws designed to protect the trade of this State without the necessary factual predicate upon which to base a finding that they have been preempted by federal law, particularly where the bad faith conduct of the party charged with violations of those laws has been found to be largely responsible for the missing factual material. *See* Section III, *infra*.

GAC also argues that the dominate federal interest in energy matters warrants a finding that state antitrust laws are preempted insofar as they may be applied to anti–competitive practices in the field of energy. However, the concept of preemption based on federal dominance of a subject matter rests on the likelihood that state regulations in the area will interfere with the federal purposes. *See City of Burbank v. Lockheed Air Terminal, supra* ; *Head v. New Mexico Board*, 374 U.S. 424, 429–30, 83 S.Ct. 1759, 1762–63, 10 L.Ed.2d 983 (1963). The promotion of anti–competitive trade practices in uranium marketing is not part of any federal energy program. *See* n. 50, *supra*, and accompanying text, and n. 64, *supra*. Thus, the prevention of such practices by the states poses no significant possibility of conflict with federal policy.

■ Therefore, we find no basis upon which to hold that the New Mexico antitrust laws, as applied to the contracts for the sale of uranium at issue in this case, have been preempted by the federal antitrust laws.

### 3. Scope of the New Mexico Antitrust Act

GAC's third argument as to the inapplicability of the New Mexico Antitrust Act is that the Act only applies to contracts which are illegal on their face. GAC contends that ordinary purchase and sale contracts—such as the Supply Agreements at issue here—which are fair and enforceable on their face, are valid even if they are related in some peripheral way to an antitrust violation.

GAC relies on *State v. Electric City Supply Company*, 74 N.M. 295, 393 P.2d 325 (1964) and *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959). We find both cases distinguishable from this case. First, unlike the Sherman Antitrust Act at issue in *Kelly v. Kosuga*, the New Mexico Act *does* contain an explicit provision voiding contracts which have as their object or operate to restrict or monopolize any part of the trade or commerce of New Mexico. Section 57–1–3, N.M.S.A.1978 (current version at § 57–1–3, N.M.S.A.1978 (Supp. 1979)) states:

> All contracts and agreements in violation of the foregoing two sections [57–1–1, 57–1–2, N.M.S.A.1978] shall be void, and the person or persons, corporation or corporations, association or associations who shall violate the provisions of either of said sections shall be civilly liable to the party injured for any and all damage occasioned by such violation, and any purchaser of any commodity from any individual, corporation or association transacting business in violation of such sections shall not be liable for the payment for such commodity.

By recognizing the defense of contract illegality in this case, we are, rather than creating a new remedy, merely giving effect to the express provisions of the antitrust laws of this State.[73]

Second, in both *Kelly v. Kosuga* and *Electric City Supply Company*, the contracts sued upon had been fully performed, and the courts refused to permit one party to avoid its obligation to pay for the goods it received.[74] Thus, in those cases the courts

---

**73.** Because the New Mexico Antitrust Act "does not provide for treble damages as available to federal litigants, the ability to have a contract declared void is the most effective tool provided by New Mexico law." Weschler, *supra*, 9 N.M.L.Rev. at 9 n. 70.

**74.** In *Electric City Supply Company*, the contract sued upon was not even alleged to have violated the antitrust laws. There, a contractor sold equipment to a municipality which he had purchased from a materialman. After the contractor was paid by the city, he sought to avoid

furthered the general policy, as Justice Holmes put it, "of preventing people from getting other people's property for nothing when they purport to be buying it." *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 271, 29 S.Ct. 280, 296, 53 L.Ed. 486 (1909) (dissenting). *See Kelly v. Kosuga*, 358 U.S. at 520–21, 79 S.Ct. at 431–432. This policy controlled the *Kelly* case. *See Viacom Intern. Inc. v. Tandeum Productions, Inc.*, 526 F.2d 593, 599 (2d Cir. 1975); Comment, *The Defense of Antitrust Illegality in Contract Actions*, 27 U.Chi.L.Rev. 758, 769 (1960).

No such policy is involved here, for United is not seeking to avoid its obligation to deliver the uranium and yet at the same time recover the contract price for it. In the case of executory contracts, such as those at issue here, the policy of avoiding the unjust enrichment which would result from recognition of an antitrust defense simply is not relevant. *See* 27 U.Chi.L.Rev. at 769–71; Lockhart, *Violation of the Antitrust Laws as a Defense in Civil Actions*, 31 Minn.L.Rev. 507, 573 (1947). *Compare Atlantic Richfield Co. v. Malco Petroleum, Inc.*, 471 F.2d 1258, 1260–61 (6th Cir. 1972) *with Associated Press v. Taft–Ingalls Corporation*, 340 F.2d 753, 769 (6th Cir.), *cert. denied*, 382 U.S. 820, 86 S.Ct. 47, 15 L.Ed.2d 66 (1965).

Third, the Supply Agreements at issue here are alleged to be one of the means by which GAC and Gulf sought to monopolize the uranium market of the United States. If proven, United's allegations would establish that the Supply Agreements, rather than being collateral to or independent of the alleged monopolistic conspiracy, were essential parts of a general plan or scheme which the law condemns. *Compare Connol-*

his obligation to pay the materialman on the ground that his contract *with the municipality* violated state and federal antitrust laws. The materialman was not a party to that contract. Thus, since the contractor had been fully paid by the city, this Court refused to permit him to avoid his obligation to pay the materialman.

**75.** A similar argument was rejected in the unreported decision of *General Atomic Company v. Exxon Nuclear Company, Inc.*, (No. 78–223E)

*ly v. Union Sewer Pipe Co.*, 184 U.S. 540, 546–49, 22 S.Ct. 431, 434–35, 46 L.Ed. 679 (1902) *with Continental Wall Paper Co. v. Louis Voight & Sons Co., supra*, 212 U.S. at 258–62, 29 S.Ct. at 290–292. Under such circumstances, the refusal to recognize an antitrust defense would place the court in the position of "enforcing the precise conduct made unlawful by the [antitrust laws]." *Kelly v. Kosuga, supra*, 358 U.S. at 520, 79 S.Ct. at 432. It would be contrary to the public policy of this State to enforce a sale which was in execution or aid of an illegal price–fixing, anti–competitive, monopolistic conspiracy where recovery would aid the alleged law violator to accomplish the very purpose of his illegal agreement.

Finally, we do not read the words in *Electric City Supply Company* that the contract sued on must "itself [be] tainted with illegality" to mean that the contract must overtly call for some illegal act on its face before the antitrust laws can provide a defense. To the extent that that decision can be so construed, it is inconsistent with the language of Section 57–1–3. *See generally Bruce's Juices v. Amer. Can Co.*, 330 U.S. 743, 763–64, 67 S.Ct. 1015, 1024–25, 91 L.Ed. 1219 (1947) (Murphy, J., dissenting); 31 Minn.L.Rev. at 547 n. 211.[75]

Based on the foregoing reasons, we find that the contracts at issue and United's antitrust allegations are within the scope of the New Mexico Antitrust Act.

### III.

### GAC'S NONCOMPLIANCE WITH DISCOVERY ORDERS AND THE DISCOVERY SANCTIONS IMPOSED FOR NONCOMPLIANCE

In this section of the opinion we examine GAC's conduct in the discovery process, and

(S.D.Cal., Sept. 6, 1978). Like United here, Exxon sought to have its obligation to supply uranium to GAC declared invalid. The court held that a contract need not call for some overtly illegal act on its face before performance of it is enjoined. The court concluded that it would be enough if it was proved that GAC's contract with Exxon "would have the effect of securing to GAC monopoly control of the relevant uranium market."

analyze both the discovery sanctions and the means by which they were imposed. In light of the complex and lengthy proceedings which led to that judgment, an extensive and detailed examination of the questions presented is imperative. They will be analyzed in the following order:

1. Whether GAC was guilty of a willful failure to comply with the rules of discovery and the discovery orders of the court.
2. Whether findings of willful noncompliance could be made without a hearing.
3. Whether the sanctions entered for such noncompliance were appropriate.

The trial court's sanctions order and default judgment of March 2, 1978 was entered under Rule 37(b)(2)(iii), which provides that if a party or an officer or managing agent of a party refuses to obey an order issued under Rule 37(a) to answer interrogatories, or an order made under Rule 34 to produce documents,

the court may make such orders in regard to the refusal as are just, and among others the following:

. . . . .

(iii) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, *or rendering a judgment by default against the disobedient party*[.] (Emphasis added.)

■ The case law in New Mexico is not clear as to whether Rule 37(b)(2) is applicable only to a willful or bad faith refusal to obey orders entered under Rules 37(a) and 34. *Compare Rio Grande Gas Company v. Gilbert*, 83 N.M. 274, 276–78, 491 P.2d 162, 164–66 (1971) *with Pizza Hut of Santa Fe, Inc. v. Branch*, 89 N.M. 325, 326–27, 552 P.2d 227, 228–29 (Ct.App.1976). We agree with the approach of the United States

Supreme Court in *Societe Internationale v. Rogers, supra*, 357 U.S. at 208–12, 78 S.Ct. at 1094–96, where, in construing identical language in Rule 37 of the Federal Rules of Civil Procedure, the Court stated:

For purposes of subdivision (b)(2) of Rule 37, we think that a party "refuses to obey" simply by failing to comply with an order. So construed the Rule allows a court all the flexibility it might need in framing an order appropriate to a particular situation. Whatever its reasons, petitioner did not comply with the production order. Such reasons, and the willfulness or good faith of petitioner, can hardly affect the fact of noncompliance and are relevant only to the path which the District Court might follow in dealing with petitioner's failure to comply.

*Id.* at 208, 78 S.Ct. at 1094. Thus, Rule 37(b)(2) applies to *any* failure to comply with discovery orders of the type specified therein. However, the sanctions provided by Rule 37(b)(2)(iii), entailing the denial of an opportunity for a hearing on the merits, may only be imposed when the failure to comply is due to the willfulness, bad faith or fault of the disobedient party. *See Societe Internationale v. Rogers, supra*, 357 U.S. at 212, 78 S.Ct. at 1096.[76]

We have previously adopted the following test of willfulness:

[A] willful violation of a provision of a statute or regulation is any conscious or intentional failure to comply therewith, as distinguished from accidental or involuntary non–compliance, and . . . no wrongful intent need be shown to make such a failure willful. (Citations omitted.)

*Rio Grande Gas Company v. Gilbert, supra*, 83 N.M. at 278, 491 P.2d at 166, quoting from *Brookdale Mill v. Rowley*, 218 F.2d 728, 729 (6th Cir. 1954).

---

**76.** Because both *Rio Grande Gas Company v. Gilbert, supra*, and *Pizza Hut of Santa Fe, Inc. v. Branch, supra*, involved such sanctions, the requirement of a willful refusal they applied is consistent with the approach we take here. *Kalosha v. Novick*, 77 N.M. 627, 426 P.2d 598

(1967), is also consistent with the distinction we make based on *Societe Internationale v. Rogers, supra*, because *Kalosha* involved Rule 37(d), which, unlike Rule 37(b)(2), expressly requires a showing of willfulness.

The trial court in this case made the requisite finding that GAC's discovery failures were willful. It was based on forty–eight recitals, in which the court described GAC's discovery failures in detail. The court concluded:

[T]he defendant, General Atomic Company, has followed a conscious, willful and deliberate policy throughout this litigation, which continues to the present time, in cynical disregard and disdain of the Rules of Procedure relating to discovery and this Court's discovery Orders, of concealing rather than in good faith revealing the true facts concerning the international uranium cartel in which Gulf Oil Corporation was involved and which through its subsidiaries, officers, agents and affiliates, including defendant, GAC, participated . . .; the aforesaid policy of defendant, GAC, of hiding that information from the Court and opposing counsel, and in consequence thereof, the exercise of the utmost bad faith in all stages of the discovery process up to the present time, leads the Court to the inescapable conclusion that at this late date, the Court's discovery Orders will not be complied with by the defendant, GAC, and that this Court is powerless to secure unto all parties to this case either due process of law or a fair trial based upon equality and parity of right and duty unless sanctions under Rule 37 are imposed by the Court at this time.

■ The scope of review on appeal from such a judgment is

"to consider the full record" as well as the reasons assigned by the Trial Court for its judgment, and to reverse the judgment below, if after such review, the appellate court " 'has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.' "

*Wilson v. Volkswagen of America, Inc.,* supra, 561 F.2d at 506 (footnote omitted), quoting from *Finley v. Parvin/Dohrmann Company, Inc.,* 520 F.2d 386, 390 (2d Cir. 1975). *See also Anderson v. Air West, Inc.,* 542 F.2d 522, 524 (9th Cir. 1976). Where the judgment involves the sanctions provided by Rule 37(b)(2)(iii),

an appellate court's review should be particularly scrupulous lest the district court too lightly resort to this extreme sanction, amounting to judgment against the defendant without an opportunity to be heard on the merits.

*Emerick v. Fenick Industries, Inc.,* 539 F.2d 1379, 1381 (5th Cir. 1976). In making this determination, we must consider the entire record,[77] and "the totality of circumstances surrounding the failure to make discovery." [78]

■ Before turning to that task, we consider GAC's argument that the judgment is defective because the trial court adopted almost verbatim the proposed recitals submitted by United. The practice of verbatim adoption of proposed findings is not desirable, but it may be acceptable in some instances. *See United Nuclear Corp. v. General Atomic Co.,* supra, 93 N.M. at 122, 597 P.2d at 307. Such findings "are not to be rejected out–of–hand." *United States v. El Paso Gas Co.,* 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964).

The ultimate test as to the adequacy of findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision, and whether they are supported by the evidence.

*Schilling v. Schwitzer–Cummins Co.,* 79 U.S.App.D.C. 20, 142 F.2d 82, 84 (D.C. Cir. 1944) (footnotes omitted). *See also United Nuclear Corp. v. General Atomic Co.,* supra, 93 N.M. at 122, 597 P.2d at 307.

**77.** *See In Re Liquid Carbonic Truck Drivers Chemical, Etc.,* 580 F.2d 819, 823 (5th Cir. 1978), *cert. denied sub nom. Strain v. Turner,* 441 U.S. 945, 99 S.Ct. 2165, 60 L.Ed.2d 1047 (1979); *Affanato v. Merrill Bros.,* 547 F.2d 138, 140 (1st Cir. 1977).

**78.** *Trans World Airlines, Inc. v. Hughes,* 449 F.2d 51, 57 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

The verbatim adoption of proposed findings requires the appellate court to "view the challenged findings and the record as a whole with a more critical eye to insure that the trial court has adequately performed its judicial function." *Ramey Const. Co., Inc. v. Apache Tribe, Etc.*, 616 F.2d 464, 467 (10th Cir. 1980) (citations omitted). *See also In Re Las Colinas, Inc.*, 426 F.2d 1005, 1010 (1st Cir. 1970). This we have done.

■■ GAC did not challenge thirteen of the forty–five recitals of United which the trial court adopted. At least seven others are narrative descriptions of the proceedings which, although challenged by GAC, are uncontradicted by any evidence. Many of the recitals merely described actions the trial court had previously taken or statements it had made in open court; several reiterated rulings the court had made over the course of the preceding two years of proceedings. All of the matters recited were within the personal knowledge of the trial court, and most concerned matters that had been argued before the court in previous hearings. In light of these factors and our conclusion that the findings of bad faith are amply supported by the record, it was not reversible error to adopt the proposed findings of United. *United Nuclear Corp. v. General Atomic Co., supra*, 93 N.M. at 122, 597 P.2d at 307.

## A.

### GAC WILLFULLY FAILED TO COMPLY WITH THE COURT'S DISCOVERY ORDERS AND THE RULES OF DISCOVERY

As found by the trial court, GAC's bad faith in discovery consisted of four categories of misconduct: (1) Its responses to the First Set of Interrogatories; (2) its responses to the Second Set of Interrogatories; (3) its failure to produce Canadian cartel documents; and (4) its conduct regarding the production of the so–called "Grand Jury Documents" and "Snyder Documents." The first area will be examined in the following section. The remaining three areas,

which cover events that transpired in the final year of the proceedings in the trial court, will be examined together in a second section.

### 1. The First Set of Interrogatories

#### a. The Trial Court's Recitals on the First Set of Interrogatories

The following is a summary of the contested recitals of the trial court regarding GAC's responses to the First Set of Interrogatories:

1. The definition section and certain questions of those interrogatories (including questions 30–34 and 69) specifically requested information from the constituent partners of GAC. Neither the definitions nor the questions were objected to within the time provided by Rule 33.

2. Gulf was obligated by the terms of the parties' agreement of March 12, 1976 to produce its relevant business records.

3. Cartel documents were subject to production under the First Set of Interrogatories and the March 12 agreement.

4. No law of Canada prohibited the production of cartel documents as of March 1976.

5. GAC's first answers to the interrogatories were "wholly inadequate and evasive," in part, because of the failure to include information on the cartel.

6. GAC agreed in its answer to interrogatory number 69 to produce the business records of Gulf and Scallop.

7. From March 12, 1976, GAC neither identified nor produced cartel documents or information in the possession of Gulf despite its agreement to do so and the court's order of April 30, 1976 that it comply with that agreement.

8. From December 31, 1975 through September 23, 1976–the date of the promulgation of the Canadian Uranium Information Security Regulations–GAC informed neither United nor the trial court about the existence of the cartel, Gulf's participation therein, or about Gulf cartel documents in Canada.

9. A good faith, non—evasive answer to the First Set of Interrogatories would have, in whole or in part, eliminated the necessity for the Second Set of Interrogatories.

10. Cartel documents and records were clearly within the ambit and requirement of a good faith compliance with United's initial discovery demands, and subsequent demands made prior to September 23, 1976.

11. GAC was in default and violation of its obligation to produce cartel documents prior to September 23, 1976.

Before analyzing these recitals, we detail the history of the portion of the proceedings they cover.

b. The Proceedings Through April 1977

On December 31, 1975, United filed its complaint in Santa Fe District Court. On the same day it received leave of the court pursuant to Rule 33 to serve interrogatories on GAC. This, the First Set of Interrogatories, was virtually identical to a set served in September 1975 in the previous action.[79] Certain portions of these interrogatories, which later became a key issue in the case, are set forth below.[80] Although the interrogatories did not specifically refer to the cartel, the definitions and interrogatories were extremely broad. The definitions defined GAC as including "a partnership [and] its general partners." In addition to Interrogatories 30 through 34, numerous other interrogatories called for information from the "partnership and the partners."

Although GAC's counsel stated in October 1976, that the interrogatories were "in the broadest form that I have ever seen in my years of practice"; although GAC was to concede almost two years later that "interrogatories 32, 33 and 34 relate to every conceivable relationship of uranium to the partnership or the partners"; and although GAC now objects on appeal to these interrogatories as being "literally limitless" in scope—GAC did not timely object to their vagueness, to their breadth, or to the fact

---

**79.** See n. 2, *supra.* Answers to the interrogatories never became due in the earlier action, and none were ever filed.

**80.** The interrogatories contain the following definitions:

B. "Gulf" means Gulf Oil Corporation *and person(s)*, as hereafter defined.

. . . . .

D. "General Atomic" means General Atomic Company, a partnership, *its general partners Gulf and Scallop*, and all person(s) as hereafter defined.

. . . . .

F. "Person(s)" means all entities, including, without limiting the generality of the foregoing, all individuals, any and *all business entities, associations, partnerships, limited partnerships, joint ventures or corporations which are owned or controlled by or which are under common control of any corporation* and any person acting on behalf of any of the entities described in this definition. (Emphasis added.)

The interrogatories which are of particular importance to the issues on this appeal are the following:

30. Identify all properties owned or *controlled by the partnership or the partners* directly or indirectly for the exploration, development or mining of uranium bearing ore.

31. Identify all licenses, permits, leases and agreements and all past and pending, contemplated negotiations *of the partnership or the partners* directly or indirectly pertaining to the exploration, development, mining and milling of uranium bearing ores.

32. Identify all agreements and all past, pending or contemplated negotiations *of the partnership or the partners* directly or indirectly pertaining to the processing of uranium bearing ores into $U_3O_8$ the conversion thereof into $UF_6$ or any other form and the marketing and sale of all such uranium bearing products.

33. Identify all agreements and all past, pending and contemplated negotiations *of the partnership or the partners* directly or indirectly pertaining to the acquisition of uranium in any form.

34. Identify all studies, evaluations, projections and other data pertaining to uranium ore reserves, the mining and milling thereof, the further processing and conversion of uranium and the marketing and sale of all such uranium products.

. . . . .

69. Specify a date and place where counsel for Plaintiff may examine and reproduce the relevant business records *of the partnership or the partners* and each of them and those records of GUNFC [Gulf—United] *in the custody of the partnership or the partners.* (Emphasis added.)

that they called for information from the partners.

Three days after the time for filing objections had passed, Gulf and GAC held a litigation strategy meeting in San Diego. Notes of that meeting, which were inadvertently produced to United in this case, reflect a discussion on the topic of "how to reduce discovery by Bigbee [United's counsel]." [81]

On the day before answers to the interrogatories were due under Rule 33, GAC sought and received an extension until February 23, 1976, to answer or otherwise plead to the complaint and to answer the interrogatories. The court also extended the time for filing objections to the interrogatories, even though it had already expired.

On February 23, GAC moved to dismiss the case for lack of personal jurisdiction. It also moved for a protective order under Rules 33 and 30(b) to stay its obligation to answer the interrogatories until the motion to dismiss was disposed of.[82] United refused to consent to the protective order, and GAC did not secure an order based on its motion. The time for filing answers or objections to the interrogatories again passed. On March 10, 1976, United filed its first application for a default judgment under Rule 37(d), alleging that GAC had "wilfully failed to answer interrogatories."

GAC now seeks to excuse its failure to comply with the February 23 deadline on two bases: First, it had filed the motion for a protective order on that date; and second, on March 4, 1976, United's counsel agreed that answers would not have to be filed while motions were pending.[83]

Motions for protective orders under Rule 30(b) "do not have the effect of automati-

cally accomplishing what is sought therein." *Wieneke v. Chalmers*, 73 N.M. 8, 14, 385 P.2d 65, 69 (1963). GAC's position was aptly described in *Pioche Mines Consolidated, Inc. v. Dolman*, 333 F.2d 257, 269 (9th Cir. 1964), *cert. denied*, 380 U.S. 956, 85 S.Ct. 1081, 13 L.Ed.2d 972 (1965):

Counsel's view seems to be that a party need not appear if a motion under Rule 30(b), F.R.Civ.P. is on file, even though it has not been acted upon. Any such rule would be an intolerable clog upon the discovery process. Rule 30(b) places the burden on the proposed deponent to get an order, not just to make a motion. And if there is not time to have his motion heard, the least that he can be expected to do is to get an order postponing the time of the deposition until his motion can be heard. . . . But unless he has obtained a court order that postpones or dispenses with his duty to appear, that duty remains. Otherwise, . . . a proposed deponent, by merely filing motions under Rule 30(b), could evade giving his deposition indefinitely. Under the Rules, it is for the court, not the deponent or his counsel, to relieve him of the duty to appear.

*See also Twardzik v. Sepauley*, 286 F.Supp. 346, 350 (E.D.Pa.1968) ("we criticize the filing of a motion for a protective order on the very day on which the depositions were scheduled"); *Jefferson v. Greater Anchorage Area Borough*, 451 P.2d 730, 734 (Alaska 1969).

The alleged agreement between counsel of March 4, 1976, is largely irrelevant since GAC was not defaulted on the basis of this original failure to answer. In any event, any agreement reached on that date to relieve GAC of its obligation to answer the

---

**81.** The notes also reflect that the idea of filing a motion to disqualify United's counsel was discussed and rejected. However, the motion was filed fourteen months later. *See* Section IV, *infra*, especially n. 152, *infra*. *See also* n. 32, *supra*.

**82.** Rule 30(b) provides for protective orders from the taking of depositions. Rule 33 provides that the provisions of Rule 30(b) apply to interrogatories as well.

**83.** GAC originally contended that on February 13, 1976, United had agreed that answers to the interrogatories did not have to be filed on February 23. At a hearing on October 1, 1976, GAC conceded that although a proposal to that effect was discussed, no such agreement was ever reached.

interrogatories does not alter the fact that ten days *earlier* GAC had failed to meet a deadline set by the court.

United's first motion for a default judgment was not acted upon by the court because the parties signed a written agreement on March 12, 1976, whereby United agreed to withdraw its motion for a default judgment. GAC in turn agreed to "answer in good faith" the interrogatories. Counsel[ ] for Gulf also signed the agreement, consenting to an extension of time within which United could answer or otherwise plead to a federal declaratory judgment action Gulf had filed against it the previous month.[84] The agreement provided that documents called for by the interrogatories would be produced at GAC's San Diego headquarters instead of being supplied with the answers, but it made no mention of the fact that the interrogatories specifically requested information from the partners. The agreement specified that if claims of privilege were to be made as to any documents, the grounds for such privilege would be "set forth in the answers to Interrogatories." One section of the agreement stated that certain documents could be only generally identified. It gave as an example "two boxes of correspondence relating to miscellaneous Gulf activities." On the basis of this language, the trial court ultimately found that Gulf had expressly agreed to produce its relevant documents.

On April 5, 1976, GAC filed its first set of answers to the First Set of Interrogatories. The trial court ultimately found these answers to be "wholly inadequate and evasive" because, for the most part, information concerning the uranium business activities of the individual partners was not pro-vided, and no mention of the cartel was made. The answers did not, as specified in the March 12 agreement of the parties, set forth the grounds for any claims of privilege as to unproduced documents. The answers also did not contain objections to any of the interrogatories or definitions.[85]

Despite its agreement to answer the interrogatories in good faith and its promise to produce documents in June, GAC filed a motion on April 16, 1976 to stay all proceedings, including discovery, pending the outcome on appeal of GAC's challenge to the court's jurisdiction. The trial court granted GAC's motion as to any new discovery by either party. However, the court held that since GAC had agreed to answer United's interrogatories and to produce documents responsive to the interrogatories, it was bound by that agreement. United warned that it would file a motion for sanctions "if we do not get the documents and if . . . there has been a failure to make the discovery agreed to."

As scheduled, document discovery began at San Diego. It continued through the first week of August. It resumed in mid–September and finally ended in mid–October. During this period of discovery, several million pages of documents were made available to United, who copied almost two hundred thousand pages. GAC argues that the number of documents it produced during that summer refutes any notion that it was acting in bad faith, but neither cartel documents nor any other documents which were then in the custody of the individual partners were produced. The quantity of material produced does not relieve a party of the obligation to produce what is requested.

---

**84.** On January 19, 1976, GAC filed an interpleader action against United, and on the following day, Gulf filed the declaratory judgment action. Both actions were dismissed for lack of subject matter jurisdiction, and appeals were taken from the dismissals. Dismissal of the first action was affirmed. *General Atomic Co. v. Duke Power Co.,* 553 F.2d 53 (10th Cir. 1977). The appeal in the second case was abandoned. *Gulf Oil Corp. v. United Nuclear Corp.,* Civ. No. 76–032–B (D.N.M.1976). In neither case did GAC nor Gulf seek arbitration or the disqualification of United's counsel. *See* n. 152, *infra.*

**85.** Indeed, GAC answered Interrogatory 69, which asked for a date and place where United could examine "the relevant business records of the partnership *or the partners and each of them* and those records of GUNFC [Gulf–United] in the custody of the partnership *or the partners*" (emphasis added), as follows:

*Answer No. 69.* June 20, 1976, General Atomic Company, San Diego, California.

In August 1976, United filed its second application for a default judgment, alleging that GAC had failed to comply with the March 12 agreement, had filed answers to the interrogatories which were "so evasive and unresponsive . . . as to constitute a failure to answer," and had failed to properly make claims of privilege as contemplated by the agreement. However, neither this application nor the briefs in support of it mentioned GAC's failure to produce documents in the custody of the partners, or specifically, the failure to produce cartel records.

A hearing on the application for a default judgment was set for October 1, 1976. One week before the hearing, the Canadian Government promulgated the Uranium Information Security Regulations. The Regulations generally prohibit the release of information contained in documents located in Canada concerning discussions taking place between January 1, 1972 and December 31, 1975 relating to various aspects of the uranium business. *See* n. 41, *supra*. The Regulations were adopted for the express purpose of preventing the production of cartel–related information in American courts.[86]

Two days before the October 1 hearing, in a memorandum filed in support of its second application for a default judgment, for the first time, United specifically pointed out that GAC had failed to produce documents in the possession or custody of the individual partners, Gulf and Scallop, as required by the First Set of Interrogatories.

On October 26, 1976, GAC for the first time informed the court that it did not consider itself obligated to supply documents "held individually" by the partners. GAC also argued:

> Whether or not the answers to the interrogatories are true or false involves the ultimate issues of fact in this case. . . . The correctness of defendant's answers to interrogatories is not within the scope of the issues to be determined at this hearing. . . .
>
> . . . . . .
>
> . . . [T]he issue in question . . . is whether or not defendant wilfully failed to answer the interrogatories. The issue is not whether defendant's answers are factually correct.

This is not a correct statement of the law.[87]

On November 30, 1976, the trial court denied United's second application for a default judgment. But the court stated that the denial was without prejudice to the plaintiff's right to apply to the court to compel "full, detailed and complete discovery responses," or "for appropriate sanctions for the failure of the defendant partnership *or either partner thereof* to comply with specific orders of the Court directing discovery." (Emphasis added.) The court held that the right to discovery "exists against . . . a party partnership *and the individual partners comprising the partnership,* and the agents, servants, employees, directors and officers of a party *or partner.*" (Emphasis added.)

United then moved to compel further answers to the First Set of Interrogatories

---

86. There is no evidence that Gulf or GAC played any role in securing the adoption of the Regulations. To the contrary, the Canadian Government has stated: "These Regulations were not procured by members of the uranium industry. . . ." However, that Government has said that the Regulations were promulgated "when it became clear that documents located in Canada bearing on the [cartel] might be removed to the United States in response to proceedings there." The Canadian Government's immediate concern was apparently several cases involving Westinghouse. *See* n. 88, *infra*.

87. *Cf. Evanson v. Union Oil Co. of California,* 85 F.R.D. 274, 277 (D.Minn.1979) ("Giving a false answer [to an interrogatory] is itself sufficient evidence of bad faith"); *Hunter v. International Systems & Controls Corp.,* 56 F.R.D. 617, 631 (W.D.Mo.1972) ("Parties like witnesses are required to state the truth, the whole truth and nothing but the truth in answering written interrogatories"); *Buehler v. Whalen,* 70 Ill.2d 51, 374 N.E.2d 460, 467 (1977) ("[W]e cannot condemn too severely the conduct of the [defendant]. . . . It gave false answers to interrogatories under oath"). *See also Life Music, Inc. v. Broadcast Music, Inc.,* 41 F.R.D. 16, 24 (S.D.N.Y.1966).

and for the production of documents from GAC and the individual partners. GAC responded by contending that it had "no obligation or ability" to furnish documents in the possession of the partners, a point decided against GAC in the November 30 order. GAC's statement that it had "no ability" to produce partner documents was false, since less than four months later it began to produce those records.

In early January 1977, the court set a deadline of July 1, 1977 for the completion of all discovery, to which GAC made no objection. The court granted United's motion for supplemental answers to its First Set of Interrogatories and for the production of partner documents. It set a deadline of April 15, 1977 for the filing of the answers, stating that it expected "a good faith answer . . ., a complete answer, a non-evasive answer."

GAC informed the court that none of Gulf's or Scallop's documents had been reviewed, although the court had held on two previous occasions that the partners were subject to discovery. The court reaffirmed that ruling at two other hearings in January 1977.

GAC then informed the court that

there are some problems that Gulf has in getting materials from Canada because there are some regulations and statutes that forbid transportation to the United States. There are a lot of problems that would be involved in some of the Gulf documents. . . .

The court ordered GAC to make "specific objections." However, GAC did not at that time inform the court of the Uranium Information Security Regulations promulgated almost four months earlier.

At another hearing in January, GAC argued that even if the court could order production of "partnership related" documents in the possession of the partners, it could not require the partners to produce "non–partnership" documents. The trial court rejected this distinction. Although GAC's counsel told the judge, "I understand your position," GAC raised the very same objection one month later.

In February 1977, United moved to compel the production of documents Gulf had produced in cartel–related litigation in Pennsylvania (the *Duquesne* documents),[88] and to the federal grand jury in Washington, D. C. (the Grand Jury documents), which was then investigating Gulf's participation in the cartel. In response, GAC reargued the issue of the production of "non–partnership documents," and for the first time suggested that the production of such materials would require the disqualification of United's counsel. Again GAC alluded to "a serious legal problem with respect to the partnership's ability to produce foreign documents," but it did not elaborate on this point. A week later, GAC finally raised the Uranium Information Security Regulations and the Ontario Business Records Protection Act as a bar to the production of Gulf Canada's records. However, it said nothing about the fact that those records included information on the cartel.

United's motions to compel the production of the Grand Jury and *Duquesne* documents were heard on March 7, 1977. Again GAC reargued the question of the production of the partners' "non–partnership documents." It informed the court that it was producing the first of Gulf's records that very day, despite at least four prior orders of the court that the partners were subject to discovery, and despite an earlier court order that production of the partners' documents begin on January 24, 1977 and proceed "diligently and . . . continuously" thereafter.

At the end of the March 7 hearing, the court granted United's motions for the production of the *Duquesne* and Grand Jury

---

88. *Duquesne Light Co., et al. v. Westinghouse Electric Corporation*, (No. G.D. 75–23978) (Pa. Ct.Comm.Pleas 1975). This was one of several cases brought by utility companies against Westinghouse for the delivery of uranium. Westinghouse defended by alleging that its obligations had been rendered commercially impracticable, in part because of the actions of the cartel. *See also In Re Westinghouse Electric Corporation Uranium Contracts Litigation* (M.D.L. 235) (E.D.Va.).

cartel documents, stating that they were "already covered" by its previous orders. The court again held that any specific documents subject to "good faith" claims of relevancy or privilege had to be made in accordance with its prior orders. Again the court insisted that "there be full and honest, good faith discovery available to all parties." And he warned:

> If that is not done, I assume that some party is going to file a motion for a default judgment, and . . . if I become convinced that there has been any, any invasion of good faith discovery, I would certainly look long and hard at a Motion for Default Judgment. . . .

Eleven days later, GAC finally moved to disqualify United's counsel. *See* Section IV, *infra.*

On April 15, 1977, GAC filed approximately five thousand pages of supplemental answers to the First Set of Interrogatories. However, not a single word was said of the cartel or Gulf's role in it, nor was there any claim that cartel documents were privileged, irrelevant, or protected from disclosure by Canadian law. GAC did file objections to I&M's request for the production of depositions of Gulf cartel participants which had been taken in the *Duquesne* litigation, and any exhibits attached thereto. GAC stated that production of this material, which was located in the United States, "would be violative of Canadian law," despite the fact that six weeks earlier it had informed the trial court that Canadian nondisclosure laws did not apply to documents in the United States. Twelve days later, GAC withdrew these objections.

It is in the context of the foregoing chronology of events that we examine the recitals of the trial court concerning GAC's answers to United's First Set of Interrogatories.

### c. *Analysis of the Recitals on the First Set of Interrogatories*

We hold that each of the recitals of the trial court is supported by the record.

The fact that the interrogatories called for information from the constituent partners of GAC is apparent from the plain meaning of the words in which they were written. *See* n. 80, *supra.* GAC did not object to this language, either within the time provided by Rule 33 (January 10, 1976), or within the extension of time granted by the trial court for the filing of objections (February 23, 1976).

The law is well established that the failure to timely file objections to interrogatories operates as a waiver of any objections the party might have.[89] This rule is generally applicable "[r]egardless of how outrageous or how embarrassing the questions may be."[90] When a party fails to file timely objections, the only defense that it has remaining to it is that it gave a sufficient answer to the interrogatories.[91]

GAC's first answers to the interrogatories almost totally failed to include information concerning the uranium activities of the partners despite the wording of the interrogatories. *See* n. 80, *supra.* Under the rules, if the interrogatories do not assign a particular meaning to the phrases they con-

---

**89.** *Monogram Models, Inc. v. Industro Motive Corporation*, 492 F.2d 1281, 1287 (6th Cir. 1974); *Perry v. Golub*, 74 F.R.D. 360, 363 (N.D. Ala.1976); *United States v. 58.16 Acres of Land, Etc., Clinton Cty., Ill.*, 66 F.R.D. 570, 572 (E.D.Ill.1975); *Harlem River Con. C., Inc. v. Associated G. of Harlem, Inc.*, 64 F.R.D. 459, 465 (S.D.N.Y.1974); *Zatko v. Rogers Manufacturing Company*, 37 F.R.D. 29, 33 (N.D. Ohio 1964); *Bohlin v. Brass Rail*, 20 F.R.D. 224, 225 (S.D.N.Y.1957).

**90.** *Davis v. Romney*, 53 F.R.D. 247, 248 (E.D. Pa.1971). *Cf. Bollard v. Volkswagen of America, Inc.*, 56 F.R.D. 569, 579 (W.D.Mo.1971) (the "contention of the vagueness of the interroga-

tories is not credible . . . when defendant . . . did not file any timely objection to the interrogatories on this ground and sought no pretrial conference to submit its contentions") and *Cephas v. Busch*, 47 F.R.D. 371, 372–73 (E.D.Pa.1969) (answers compelled "notwithstanding that much of the information sought is totally irrelevant . . . and notwithstanding that the interrogatories . . . are harassing and vexatious," and "patently objectionable").

**91.** *National Transformer Corporation v. France Mfg. Co.*, 9 F.R.D. 606, 607 (N.D.Ohio 1949).

tain, the answering party is obligated to answer the interrogatories in "the ordinary, everyday usage and meaning" of the language in which the questions are asked. *Roesberg v. Johns–Manville Corp.*, 85 F.R.D. 292, 298 (E.D.Pa.1980). These interrogatories did not assign a particular meaning to questions calling for information from the partners which would support the limited construction GAC gave to them. Therefore, the trial court was correct in finding those answers to be "wholly inadequate and evasive."

GAC's explanation for this failure is without merit. It contends that because the partners were dropped as parties when the case was refiled on December 31, 1975 (*see* n. 2, *supra*), discovery could only be had from the partnership itself. However, GAC could have attempted to work out the matter with opposing counsel, or failing that, presented its objection to the trial court; it did neither. GAC simply made its own unilateral legal determination of the propriety of the questions asked. It later informed the court that it had "construed the interrogatories to be consistent with the information to which plaintiff was entitled under the rules," which it defined to be only those documents which were in the custody or control of GAC. This practice is universally condemned. *Cf. United States v. Board of Trade of the City of Chicago, Inc., supra*, 18 F.R.Serv.2d at 319 ("The proposition that an adverse litigant may not unilaterally determine the scope of discovery needs no citation"); *Fond Du Lac Plaza, Inc. v. Reid*, 47 F.R.D. 221, 222 (E.D.Wis. 1969) ("It is inappropriate for the party to determine on his own that the subject matter of the inquiry is 'premature' ; thus, it was the plaintiff's responsibility in this case to answer the interrogatories or to seek relief from the court"). *See also Cohn v. Dart Industries, Inc. v. Kavanagh*, 21 F.R. Serv.2d 792, 794 (D.Mass.1976). *Armour & Co. v. Enenco, Inc.*, 17 F.R.Serv.2d 514, 517–18 (W.D.Tenn.1973); *Cardox Corporation v. Olin Mathieson Chemical Corp.*, 23 F.R.D. 27, 31 (S.D.Ill.1958); C. Wright & A. Miller, *Federal Practice and Procedure* § 2173, at 544 (1970).

GAC's unilateral construction of its discovery obligations constituted bad faith. In *Hunter v. International Systems & Controls Corp., supra*, 56 F.R.D. at 622, the court said:

> The refusal to give the information on the ground that the defendant unilaterally and without seeking a ruling of the Court concluded [that the information sought was objectionable] constituted a wilful obstruction of discovery when defendant was possessed of the information (as it now admits). . . . [D]efendant could have objected and sought clarification of its obligation to answer but did not.

The court went on to say, in language applicable to this case:

> [I]t is found that this misconstruction and failure to make discovery was a callous disregard of discovery obligations, and a designing, self–serving unilateral construction of interrogatories 30 and 31. The wording of the interrogatories and answers themselves would not lead to any other reasonable conclusion.

*Id.* at 625 (footnote omitted). The court concluded:

> [I]t is a dangerous practice which incurs the risk of possible sanctions for a party to limit an interrogatory addressed to it to only a portion of the information which it explicitly requests.

*Id.* at 631.

The designing, self–serving nature of GAC's construction of the First Set of Interrogatories is particularly apparent in light of the conflicting representations that GAC later made to the trial court. It represented to the court in December 1976 that it had "no ability" to produce information in the separate possession of its constituent partners; a host of GAC attorneys filed affidavits with the court on March 13, 1978, stating their understanding to be that only information and documents in GAC's possession were subject to production; and GAC argued to this Court that the court below committed error in ordering the production of documents in the possession of

the partners. *See* Section II A, *supra.* However, John Ross, the GAC attorney in charge of supervising and coordinating GAC's efforts to provide discovery in response to United's First Set of Interrogatories, stated in an affidavit filed with the court in February 1978:

> Based on the [March 12] discovery agreement, my interpretation of UNC [United] interrogatory number 69 and the history of the case . . . I understood GAC's obligation regarding the production of documents to include . . . [a]ll relevant business records of GUNF [Gulf United], *whether in the custody of GAC, Gulf or Scallop.* . . . (Emphasis added.)

He went on to say that

> [n]o documents in the custody of either Gulf or Scallop were included . . . inasmuch as GAC had concluded that there were no relevant business records of GUNFC [Gulf–United] in the custody of Gulf or Scallop which were not duplicated in the records possessed by GAC.

That determination could not have been made without having examined the records in the custody of the partners.[92]

Indeed, some information concerning partner operations was contained in GAC's first answers to the interrogatories. For the point made here, it is immaterial that this information concerned only matters relating to the business of Gulf–United or GAC, as GAC has defined that relationship. The fact is that *some* information from the partners was produced, contrary to GAC's disavowal of the availability of such information; to the arguments we rejected in Section II A, *supra*, of this opinion; to the March 1978 representations of its attorneys; and to the October 1976 expression of its understanding of the extent of its obligations. GAC's eventual production of thousands of partner documents demonstrates that such materials, were available from the outset.[93] This conduct–which includes contradictory representations and actions and complete reversals of position–is compelling evidence of bad faith and merits the strongest condemnation. *See Diapulse Corporation of America v. Curtis Publishing Co.*, 374 F.2d 442, 446 (2d Cir. 1967); *State of Ohio v. Crofters, Inc.*, 75 F.R.D. 12, 24 (D.Colo.1977), *aff'd sub nom., State of Ohio v. Arthur Andersen & Co.*, 570 F.2d 1370 (10th Cir. 1978), *cert. denied*, 439 U.S. 833, 99 S.Ct. 114, 58 L.Ed.2d 129 (1978); *Armour & Co. v. Enenco, Inc., supra*, 17 F.R.Serv.2d at 518–19; *Furrenes v. Ford Motor Co.*, 79 Wis.2d 260, 255 N.W.2d 511, 516 (1977).

GAC argues that it should not be penalized for its unilateral construction of the interrogatories because United did not complain about GAC's failure to provide information from the partners until September 1976. A similar argument was rejected in *Fond Du Lac Plaza, Inc. v. Reid, supra*, 47 F.R.D. at 222, where the court said:

> [C]ounsel sought to shift the burden to the defendants and require the latter to apply to the court. This is not the format contemplated by the . . . Rules of Civil Procedure. (Citation omitted.)

It was GAC's duty to object to the interrogatories, not United's to object to GAC's failures.

---

**92.** In *In Re Folding Carton Antitrust Litigation, supra*, 76 F.R.D. at 423–24, the defendant corporation objected to the definition of an interrogatory served on it to the extent that it required the production of documents in the custody of its parent corporation. An affidavit was later filed by an officer of the defendant subsidiary, in which he swore that he had searched the files of the parent company to determine the existence of any documents called for by the plaintiffs' discovery requests. He also stated that only certain documents in the parent's files were within the ambit of that request. Based on these statements, the court refused to entertain the defendant's objection that it had no "control" over the parent's records. The situation is almost identical here, except that GAC, unlike the defendant in that case, did not present its objection to the court in a timely fashion.

**93.** *Cf. Bollard v. Volkswagen of America, Inc., supra*, 56 F.R.D. at 575 (defendant's "later unilateral . . . supplying of partial answers constituted an admission that the original disavowals and claims of unavailability of knowledge were false answers made with knowledge of their falsity." (Citation omitted.)).

Although some of GAC's answers revealed its interpretation of the requirements of the interrogatories,[94] others contained information from Gulf, and some stated that documents responsive to the questions would be provided later. GAC's answer to Interrogatory 69 is illustrative in that it failed to disclose the limited scope GAC gave to the questions. *See* n. 85, *supra.* The record is uncontradicted that United never represented to either GAC or the court that it did not desire information and documents from the partners. It will not be faulted for its patience in waiting for GAC to fully comply with its requests.[95]

The court's recital that Gulf was obligated by the terms of the parties' March 12 agreement to produce its relevant business records is also fully supported. The Ross affidavit makes this point clear, regardless of how one construes the reference in that agreement to "correspondence relating to miscellaneous Gulf activities." Although Ross limited it to the "relevant business records of GUNF [Gulf–United]," the language of the interrogatories and the allegations of the complaint are clearly inconsistent with that limited construction.[96]

The trial court's finding that cartel documents were within the scope of the First Set of Interrogatories is also supported by the record. Interrogatory 32 called for the identification of "all agreements and all past, pending or contemplated negotiations of the partnership or the partners directly or indirectly pertaining to . . . the marketing and sale of all . . . uranium bearing products." A cartel consists of a combination of producers of a product who agree to control the production, sale and price of the product, and to obtain a monopoly in any particular industry or commodity. *Black's Law Dictionary* 270 (4th rev. ed. 1968). The uranium cartel consisted of agreements among producers, including Gulf Canada, to set floor prices for and quotas on the marketing of uranium.[97] *See* n. 102, *infra.* The definitions in the interrogatories clearly encompassed Gulf Canada, for GAC was defined to include Gulf, and Gulf was defined as including "all business entities, associations, partnerships, limited partnerships, joint ventures or corporations" under its control, a category into which its wholly–owned Canadian subsidiary clearly fell.

GAC offers five excuses for its failure to provide cartel information and documents in response to the First Set of Interrogatories: (1) The interrogatories were initially understood to be directed only at GAC; (2) the language of the interrogatories and United's complaint did not either explicitly or implicitly refer to the cartel; (3) the cartel was not raised as an issue until March 1977, and then, only as a legal issue; (4) United knew of the cartel before the complaint was filed; and (5) United's inaction and representations manifested its view that the cartel was not covered by the First Set of Interrogatories.

We have previously rejected the first assertion, but whatever its merit might be as to GAC's original answers, it was no excuse whatsoever for GAC's failure to include information on the cartel in its supplemental

---

**94.** For example, in answer to Interrogatory 30, which called for the identification of the uranium ore bearing properties of "the partnership or the partners," GAC stated: "Neither of the partners owns or controls any such property for or on behalf of the partnership." United's counsel, of course, knew that Gulf owned massive uranium reserves at Mt. Taylor. *See* Section IV, *infra.*

**95.** In certain circumstances, a failure to object to insufficient interrogatory answers can constitute a waiver of any right to further answers or sanctions. In *Butler v. Pettigrew*, 409 F.2d 1205, 1207 (7th Cir. 1969), the court found such a waiver where the party complaining of insufficient answers failed to seek sanctions until after a trial on the merits and the entry of a judgment thereon. Such extreme circumstances are not present here.

**96.** GAC's counsel stated to the court in March 1977 that in United's complaint, "Gulf is the main focal point of the action." *See also* n. 153, *infra.* It could hardly have come as a surprise to GAC then that United sought information from Gulf.

**97.** In its briefs on appeal, GAC describes the cartel as a marketing agreement, precisely the language used in Interrogatory 32.

answers, after the court had ordered GAC on at least six occasions to provide information from Gulf in those answers.[98]

The second of the excuses—the failure of the complaint or interrogatories to explicitly or implicitly mention the cartel—is immaterial. United's right to information did not turn upon its discovery of a magic formula. The scope of the definitions and questions in the First Set of Interrogatories clearly included the cartel. It was GAC's duty to fully answer the questions according to their terms. Its strained interpretation of the interrogatories to exclude the cartel amounts to "an attempt at gamesmanship, contrary to the principle that the purpose of our rules of discovery is to minimize concealment and surprise in litigation." *Hilmer v. Hezel*, 492 S.W.2d 395, 396 (Mo.Ct.App.1973) (citation omitted). There was no reason for GAC's belief that the cartel was not covered by the interrogatories except its desire to so believe. However, its "ostrichlike attitude of self–delusion" cannot be accepted as establishing a good faith belief on its part. *Mitchell v. Hausman*, 261 F.2d 778, 780 (5th Cir. 1958). Although "a misunderstanding or misapprehension does not import wilfulness," *Kalosha v. Novick, supra*, 77 N.M. at 631, 426 P.2d at 601, " '[g]ood faith' . . . does not include ignoring the obvious." *Wirtz v. Lone Star Steel Company*, 405 F.2d 668, 670 (5th Cir. 1968). It should have come as no surprise to GAC that as part of its antitrust case, United would desire information on an organization whose purpose was, as a Gulf attorney described it, "to completely frustrate free competition," and in which the very officials of Gulf and GAC with whom United had dealt were involved.[99] GAC's understanding that the cartel was not within the scope of the First Set of Interrogatories could be characterized as follows: "If

he did not know, it was because he did not look, or looking, did not see, or want to see what was so plainly there." *Mitchell v. Raines*, 238 F.2d 186, 188 (5th Cir. 1956).

Even if this excuse had merit as to the first set of answers, it is no justification for the supplemental answers, for by April 1977, GAC was clearly on notice that the interrogatories encompassed the cartel.

In January 1977, when the court ordered GAC to include information on the partners' uranium activities in its supplemental answers, GAC asked if that ruling would require it to include in its answer to Interrogatory 30, information on "any properties [the partners] might hold in [their] individual capacity, anywhere in the world?" The court answered that such information "may be relevant to the issues in this case. If you make a claim that they are not relevant, the Court will pass upon it." The court proceeded to say that "the same ruling applies to" Interrogatories 31 through 34.

GAC then raised the issue of the Canadian regulations which were promulgated for the express purpose of preventing the disclosure of information on the cartel, thereby manifesting its understanding that such information was called for.

GAC argues that at the hearing on March 7, United disclaimed any interest in cartel discovery. The portion of the transcript it cites does not support this claim. United merely pointed out that it sought the Duquesne and Grand Jury documents "to get Gulf off the dime," and that Canadian law did not shield those records because they were in the United States. GAC conceded the latter point, although it raised the same objection five weeks later.

Nothing United's counsel stated at that or any other hearing could be construed as

---

**98.** GAC points out that although the court had ordered it to produce Gulf information and documents, it had not ordered it to produce cartel documents. What "cartel documents" are in the context of this case, if they are not Gulf documents, has never been apparent to this Court. In any case, in March 1977, the court did order GAC to produce the Grand Jury and

Duquesne documents, which, as GAC was later to concede, "all had to do with the cartel."

**99.** The executive vice–president of GAC, Gallaway, whose involvement in cartel discussions was discussed in Sections II A and B, *supra*, of this opinion, verified GAC's first answers to the First Set of Interrogatories, which failed to mention the cartel.

disclaiming an interest in cartel discovery—either from sources in the United States or elsewhere. In fact, at the hearing on March 7, United's counsel stated that the Grand Jury and Duquesne cartel documents "are clearly within the scope of interrogatories." He then referred specifically to Interrogatories 30, 32 and 33. Thus, GAC had been told that information on the cartel was expected in its supplemental answers. It is immaterial that United did not refer to the cartel by name. As GAC later told the trial court: "[T]his whole cartel thing . . was what the whole grand jury thing was about and the whole Duquesne thing, that was what it was all about. It all had to do with the cartel." [100]

At another hearing on March 25, 1977, United's counsel alleged that both Allen and Hoffman were "active participants in the international uranium cartel." GAC's counsel objected on the grounds of relevancy, stating: "I can get up and deny that there is any truth to this." [101] United's counsel then made it abundantly clear that United sought cartel information. He said:

My only point is this. *I would like for the Court to be alerted to that kind of material, when it reviews the documents.* This kind of anti-trust activity is illegal; it is a crime under the laws of the United States and under the laws of the State of New Mexico. And no privilege attaches to that. (Emphasis added.)

Counsel for GAC responded to what he called "the continual reference to the so-called international uranium cartel," by stating that it was "very difficult to appreciate any possible relevancy of that cartel, if it did in fact exist." [102]

At the end of this hearing, the court again called for GAC to submit by the April 15 deadline all documents it claimed were privileged or irrelevant. Three weeks later, GAC submitted the supplemental answers which were silent on the cartel.[103]

GAC's third excuse—that the cartel was not raised as an issue until March 1977—is also without merit. In October 1976, United had referred to GAC's and Gulf's efforts to inject themselves into the cartel as an example of how they had violated the antitrust laws of New Mexico.[104] In its Janu-

---

**100.** The fact that the Duquesne and Grand Jury documents were produced is no excuse for the total failure to mention the cartel in those answers. In January 1977, the court had held that "in addition to providing the documentation, you will have to answer the interrogatories. . . . [United is] entitled to their answers to interrogatories in addition to the right to inspect and copy documents, so that you will pin yourself down and bind yourself by your answers; instead of merely furnishing the document to them." That information on Gulf's participation in the cartel's marketing agreements could have been provided, apart from information in the cartel documents in Canada, is evidenced by the fact that GAC later filed three sets of answers to United's Second Set of Interrogatories on the cartel, and by the presence in the United States of several GAC and Gulf employees who were intimately familiar with the cartel.

**101.** Seven months later, GAC's counsel informed the trial court: "Mr. Rolander, Mr. Gallaway, Mr. Allen, Mr. Hoffman, Mr. Zagnoli, all of them knew about the cartel." In fact, records GAC produced show that Allen and Hoffman were among Gulf's representatives at the Johannesburg meeting of the cartel in May and June 1972.

**102.** On October 24, 1977, GAC's counsel stated: "Let's go to the cartel. It's undisputed. . . . It was in its intention a cartel in every sense of the word."

**103.** By the end of March, United had submitted two proposed pretrial orders which listed GAC's and Gulf's participation in the cartel as a contested issue of law, and a proposed amendment to its complaint which charged that Gulf and GAC were members of a cartel which violated the New Mexico Antitrust Act, and that the 1973 Supply Agreement was obtained in furtherance of the cartel's activities.

I&M filed a counterclaim on March 7 containing allegations concerning the cartel. GAC's reply, filed on March 28, denied these allegations, thus placing the cartel squarely at issue.

**104.** The document United referred to in support of this allegation was introduced into evidence at a hearing on November 1, 1976, over GAC's objection that the exhibit "has nothing to do with GAC, and has nothing to do with the issues in this case." However, the exhibit contained two documents, both of which were written by and addressed to officials at Gulf Energy (Hunter, Rolander, Gregg and Hoff-

ary 1977 answers to GAC's interrogatories, United had alleged that Gulf ruined the Gulf–United business by "collaborating" with the cartel to control uranium prices. More importantly, it is beside the point when the cartel was raised as an issue. It was GAC's obligation to provide discovery, or to seek guidance from the court as to the scope of its obligation. Any other rule would require the party seeking discovery to know what was in the opposing party's documents before he saw them. Finally, the concession that the cartel was an issue in March highlights the inadequacy of the supplemental answers GAC filed in April.[105]

The fourth excuse is also irrelevant. Although some United officials testified at the trial that they were aware that a group of foreign uranium producers, including Gulf Canada, was discussing uranium marketing, there was no evidence adduced that United knew of the extent of Gulf's involvement, of the participation in the cartel of members of the Gulf–United board, or of cartel discussions involving Gulf competitors in the United States. GAC's argument also ignores the fact that the evidence shows that the cartel took "deliberate and elaborate steps to cloak its activities." *In Re Uranium Antitrust Litigation, supra,* 480 F.Supp. at 1155. In any event, United did seek information on the cartel by virtue of its request for Gulf records in general, and for the Grand Jury and Duquesne cartel documents in particular.

GAC's final excuse for its failure to include information on the cartel in either set of its answers to the First Set of Interrogatories is that United had demonstrated by its inaction and representations that it did not consider the cartel to be covered by the First Set of Interrogatories. There is clearly nothing in the record to support this

argument up to the time GAC served its first answers in April 1976. As we have seen, the record establishes that prior to the filing of the supplemental answers, United had made it abundantly clear that it sought information on the cartel, and had specifically informed GAC that cartel documents were within the scope of Interrogatories 30, 32 and 33.

Although United did not object to the failure of the supplemental answers to include information on the cartel until late 1977, this delay does not reflect a lack of desire for cartel information, nor does it constitute a waiver of any claim that GAC's supplemental answers were inadequate. *See* n. 95, *supra.* In *Hunter v. International Systems & Controls Corp., supra,* 56 F.R.D. at 623, the court said:

> [I]t is irrelevant to the question of whether there was a failure to make discovery to consider whether the moving party was later willing to settle for other materials than were originally requested. The purpose of Rule 37, *supra,* is to secure compliance with discovery rules and orders. (Citations omitted.)

Similarly, it is immaterial to the question of the good faith of GAC's supplemental answers that United was later willing to settle for *other means*–the Second Set of Interrogatories–of securing information on the cartel. As United's counsel stated in August 1977: "[T]he necessity for these late interrogatories [the Second Set] was brought about by the difficulty of obtaining information from Gulf."

The trial court's finding that no law of Canada prohibited the production of cartel documents as of March 1976, is also essentially correct. GAC did contend both to the

man), all of whom later occupied key positions in GAC. *See* Section II A, *supra,* especially n. 16–17, *supra.* The documents referred to early cartel meetings in Canada. GAC unsuccessfully sought a protective order in order to keep these records sealed from the public.

**105.** This concession also contradicts the representation GAC later made to the trial court. In an affidavit filed in March 1978 in support of

its motion for reconsideration of the default judgment, a GAC attorney stated that he "did not consider or recognize" that the cartel was an issue in this case until August 1977. However, it was this very same attorney who objected on March 25, 1977 to what he called "the continual reference to the so–called international uranium cartel."

trial court [106] and to this Court that "GMCL [Gulf Canada] was barred at all relevant times by the Ontario Business Records Protection Act [1947, Ont.Rev.Stat. c. 54 (1970)] from producing [cartel] documents." However, at the oral argument of this appeal, GAC abandoned this position. GAC's counsel stated:

> [T]here were no legal impediments until then [September 1976]. There was . . . the Ontario Business Records Act in effect at the time period we are talking about. *But the Ontario Business Records Act is no impediment to discovery.* It prevented documents from being taken out of Canada. But those documents could be inspected in Canada by appellees or by anybody else. They could be used for depositions of GMCL [Gulf Canada] personnel in Canada, notes could be taken on them and notes could be brought back here. (Emphasis added.)

GAC never made the foregoing explanation of the Ontario Act to the trial court,[107] contrary to the well–established rule that "[o]bjections to interrogatories must be specific and be supported by a detailed explanation as to why interrogatories or a class of interrogatories is objectionable." [108] The "bald assertion that production of the requested information would violate a privilege [provided by law] is not enough." [109] The party resisting discovery has the burden "to clarify and explain its objections and to provide support therefor." [110] "General objections without specific support may result in waiver of the objections." [111] These principles are equally applicable to

objections based on foreign nondisclosure laws.[112] Instead of explaining the operation of the Ontario Act to the trial court as it did to this Court, GAC simply insisted that the Act was a complete bar to all discovery of cartel records. "[S]uch complete reversal of position . . . show[s] 'callous disregard of responsibilities' owed" by GAC and its counsel to the court and to the adversary parties. *Furrenes v. Ford Motor Co., supra*, 255 N.W.2d at 516. *See also State of Ohio v. Crofters, Inc., supra*, 75 F.R.D. at 19–20.

Had GAC been more assiduous in its responsibility in discovery prior to September 23, 1976, Canadian cartel discovery could have been made without any serious foreign law entanglements. *Accord State of Ohio v. Crofters, Inc., supra*, 75 F.R.D. at 23. By failing to provide cartel information prior to the passage of the Canadian Uranium Information Security Regulations, and then relying on these Regulations as an excuse for nonproduction, GAC is "in the position of having slain [its] parents and then pleading for mercy on the ground that [it] is an orphan." *Life Music, Inc. v. Broadcast Music, Inc., supra*, 41 F.R.D. at 26. *Accord Shepard v. General Motors Corporation*, 42 F.R.D. 425, 427 (D.N.H.1967).

Finally, the court's finding that from December 31, 1975 to the date of the promulgation of the Uranium Information Security Regulations, GAC did not inform either United or the trial court about the existence of the cartel, Gulf's participation therein, or about Gulf cartel documents located in Canada, is fully supported by the

---

**106.** GAC first raised the Ontario Business Records Protection Act as a bar to discovery on March 1, 1977. It again relied on it in October 1977, and thereafter.

**107.** Other courts have held the Ontario Business Records Protection Act to be inapplicable in similar situations. *See In Re Uranium Antitrust Litigation, supra*, 480 F.Supp. at 1143; *American Industrial Contr., Inc. v. Johns–Manville Corp.*, 326 F.Supp. 879, 880 (W.D.Pa. 1971).

**108.** *United States v. 58.16 Acres of Land, Etc., Clinton Cty., Ill., supra*, 66 F.R.D. at 572 (citations omitted). *See also In Re Folding Carton*

*Antitrust Litigation*, 83 F.R.D. 260, 264 (N.D.Ill. 1979).

**109.** *Miller v. Doctor's General Hospital*, 76 F.R.D. 136, 139 (W.D.Okla.1977).

**110.** *Roesburg v. Johns–Manville Corp., supra*, 85 F.R.D. at 297 (citations omitted).

**111.** *Id.* (citation omitted).

**112.** *See State of Ohio v. Arthur Andersen & Co., supra*, 570 F.2d at 1374; Note, *Foreign Nondisclosure Laws and Domestic Discovery Orders in Antitrust Litigation*, 88 Yale L. J. 612, 624 (1979)."

record. There is not a scintilla of evidence to contradict it. As late as March 25, 1977, GAC was objecting to references to the cartel, "if it did in fact exist," and denying United's allegation that Allen and Hoffman were participants in the cartel.

2. *The Second Set of Interrogatories.*

 a. *The Court's Recitals on the Second Set of Interrogatories and the Identification and Production of Canadian Cartel Documents*

The following summarizes the pertinent recitals of the trial court in the sanctions order and default judgment concerning GAC's discovery failures subsequent to the filing of the Second Set of Interrogatories on August 16, 1977:

1. GAC's first answers to the Second Set of Interrogatories consisted in large measure of a "do–it–yourself" kit, merely directing United to deposition pages. These answers were defective, incomplete, inadequate and unacceptable. The answers failed to identify cartel documents as called for by the interrogatories.

2. GAC's second answers to these interrogatories excluded all information contained in Gulf documents in Canada and did not identify the documents as GAC had been ordered to do on October 11, 1977. These answers did not comply with the court's order to make complete, good faith, non–evasive answers.

3. GAC's third answers to these interrogatories were unresponsive and evasive to the questions asked and were mere legal argument in many instances. The answers also failed to make a commitment to a set of facts, posture or position on the subject matter of the interrogatories. Instead, GAC simply stated that various cartel documents "purport to" reflect certain events. GAC steadfastly refused to admit that such events took place or to state true facts concerning the cartel.

4. GAC's three sets of answers to the Second Set of Interrogatories showed disdain for the court's orders, and coupled with what had gone before, constituted obstruction of justice and demonstrated a wilful, deliberate and flagrant scheme of delay, resistance, obfuscation and evasion. GAC has willfully, intentionally, deliberately and in bad faith, failed and refused to answer the Second Set of Interrogatories.

5. GAC did not make a good faith and diligent effort to secure the release of documents in Canada or the information contained in them. GAC's efforts to obtain a waiver of Canadian nonproduction laws demonstrated an intent to conceal evidence on the cartel, rather than a good faith effort to produce such information.

6. Gulf followed a conscious and deliberate policy of housing cartel documents in Canada, rather than in the United States. This action amounted to deliberately courting legal impediments to the production of the records.

7. GAC's failure to provide documents from the files of Gulf Canada was not based on inability to comply with production requests, but rather, on a bad faith refusal to produce.

8. GAC deliberately and improperly failed to inform the court and opposing parties in a timely manner of the actions of U.S. District Judge Snyder on August 10, 1977 deprivileging and making public documents turned over to him by Gulf in another case. GAC never accurately disclosed the existence of all of the documents turned over to Judge Snyder. These documents were called for by the First Set of Interrogatories, but the existence of most of them was not disclosed until over a year after those interrogatories were filed. The existence of some Snyder documents was not disclosed until after Judge Snyder deprivileged them. Some of these documents were first identified and produced only after United brought the matter to the attention of the trial court. The failure to reveal the existence of and to identify all Snyder documents in a timely fashion was a deliberate attempt to further conceal those documents and avoid producing relevant information.

9. GAC in bad faith failed to reveal the existence of documents it produced to a federal grand jury in January 1978, to the trial court or to the opposing parties until after United had learned of their existence from a third party and made a demand upon GAC.

b. *The Proceedings from April 1977 to March 1978*

Four days after filing its massive supplemental answers to the First Set of Interrogatories, GAC moved to extend the discovery period to March 1, 1978, and to delay the trial until April 1978. At the hearing on this motion, GAC asked that the trial setting be further postponed until October 1978. The trial court rejected this delay, but it extended the discovery period from July 1, 1977 to September 1, 1977, and set the trial date for October 31, 1977.

Discovery continued throughout the spring and summer of 1977, during which time the parties produced and reviewed thousands of pages of documents. During this period, GAC alone deposed almost one hundred persons.

Beginning in late May, the Congressional subcommittee began to hold hearings on the cartel. *See Hearings on International Uranium Cartel, supra.* Various Gulf officials were prominent witnesses. New cartel records were released and much information was developed on Gulf's role in the cartel.

On August 16, 1977, one day after the last of these Congressional hearings, United served its Second Set of Interrogatories. These interrogatories inquired in great detail into the cartel and Gulf's role therein. United also filed motions for the production of cartel documents.

One week later, GAC filed objections to the Second Set of Interrogatories and the motions to produce. With the exception of a single specific document United had requested, the objections made no reference to any Canadian nondisclosure laws. GAC's objections were based on the grounds that

the interrogatories were untimely, "unduly lengthy, burdensome, oppressive and harassing," and inquired into irrelevant matters.

At the hearing on these objections, United contended that the necessity for the Second Set of Interrogatories "was brought about by the difficulty of obtaining information from Gulf." GAC responded that most of the information covered by the interrogatories had already been provided, particularly with the production of the Grand Jury and Duquesne documents. GAC's counsel specifically objected to the notion that "this whole cartel thing is something new" in this case.[113]

The trial court overruled GAC's objections, but it granted an extension until September 20, 1977—only one day short of the date GAC had requested—to file answers to the interrogatories. The court also gave GAC until September 5, 1977, to file additional, "specific" objections to the interrogatories. The court asked if GAC had any objection to attaching responsive documents to its answers to the extent it was required to answer the interrogatories. GAC stated that it had no such objections. It made no mention of Canadian disclosure laws.

In its specific objections to the interrogatories, GAC again did not mention the foreign nondisclosure laws. At the hearing on these objections, GAC promised to include in its answers information from the senior management of Gulf Canada. The court modified certain interrogatories, but it otherwise overruled GAC's objections. It stated that in identifying documents, a summary of the contents need not be provided if the documents were produced.

The day before the answers were due, GAC filed a motion for an extension until September 26, 1977, to answer the interrogatories. The court granted the extension, but it warned that sanctions would be imposed if the interrogatories were not answered. GAC represented that ninety to

---

**113.** Six months later, GAC took the position that the cartel was first raised as an issue when the Second Set of Interrogatories was filed in August. It has abandoned this position on appeal, as it must. *See* n.n. 103 and 105, *supra*, and accompanying text.

ninety–five percent of the information called for by the interrogatories had already been provided to United. Once again, GAC failed to raise the question of Canadian nondisclosure laws.

On September 26, GAC filed its first set of answers to the Second Set of Interrogatories. Although narrative answers were made to most questions, virtually all the answers contained the statement that responsive information was contained in depositions and documents previously produced. GAC cited extensive lists of references to specific depositions and exhibits. GAC finally raised the issue of Canadian law, stating that information contained in the documents of Gulf Canada as well as the documents themselves would not be provided because of the proscriptions of unspecified Canadian statutes and regulations.

United moved to compel further answers to the Second Set of Interrogatories on the grounds that the answers of September 26 were inadequate, that only a few documents were produced, and that no documents were identified in the answers. United also sought the production of cartel documents, and requested that sanctions be imposed. In an accompanying brief, United alleged that Gulf had "deliberately placed documents in Canada so as to make them more difficult for U.S. courts to subpoena." I&M joined in this motion. In response, GAC relied for the first time since March 1977 on the Ontario Business Records Protection Act and the Uranium Information Security Regulations as excuses for the nonproduction of cartel documents located in Canada.

At the hearing on the motion, GAC's counsel assured the court that "[e]very document that is available in the United States that are responsive to these interrogatories have been produced." However, some documents were not produced until February 1978. Again, GAC stated that Canadian laws barred the disclosure of documents in Canada. United again responded by contending that Gulf had deliberately housed documents in Canada in order to avoid their disclosure in courts in this country. The court took the motions under advisement, again warning that it expected "full, complete, good faith discovery."

On October 11, 1977, the court granted the motion for further answers to the interrogatories, finding that most of the first answers were "defective, incomplete, inadequate and unacceptable." The court held that GAC was obligated to make "a firm commitment to a set of facts, posture or position on the subject matter of the interrogatory" in its answers, and that the references in the answers to depositions and other documents were inadequate. The court ordered that new answers be filed by October 20, 1977.

The court also found that GAC had failed to provide the identification of documents called for by the interrogatories, and it ordered compliance with this request. The court found that GAC had not "in good faith, without evasion or reservation" produced all cartel documents in the United States, and ordered that this be done. The court also found that GAC had not made a good faith effort to produce cartel documents in Canada. The court stated that GAC was obligated to make "an immediate diligent and good faith effort to obtain a lawful waiver of or dispensation from" Canadian nondisclosure laws in order to lawfully produce those records. The court said that GAC had not shown that identification of the documents was violative of Canadian law, and it ordered GAC to "separately, clearly and definitively" identify all documents called for by the interrogatories. Again, the court warned that further failures to abide by its orders to make good faith discovery would subject the offending party to sanctions.

On October 13, GAC wrote to the Canadian Minister of Energy, Mines and Resources, requesting a waiver of the Uranium Information Security Regulations in order to produce the records and permission to identify the documents *with* a summary of their contents. The Canadian Minister refused to grant a waiver, and stated that identification of the documents "in the manner described in [GAC's] letter" would

violate the Regulations. On October 21, 1977, GAC filed the Canadian Minister's reply to its request for a waiver, along with its second set of answers to the interrogatories.

On November 4, 1977, four days after the trial began, United again moved to compel GAC to identify and produce all cartel documents and to identify those documents in Canada without a summary of contents. United argued that GAC's second answers were inadequate for failure to identify documents located in Canada, and it charged that Gulf had deliberately courted legal impediments to production of the cartel records by housing them in Canada. It requested that the court find all facts provable by those documents against GAC as a sanction under Rule 37(b)(2)(i).

On November 8, 1977, GAC wrote a second letter to the Canadian Minister requesting permission to identify the Canadian cartel documents without a summary of their contents. The Minister informed GAC that as a result of a decision of the Supreme Court of Ontario on November 9, 1977, he was unable to consider its request.

After hearings on United's motion of November 4, the court found that GAC had failed to produce the documents in part because of "its own early and deliberate policy of housing such documents in Canada." The court held that its order of October 11 had not required identification of the documents with a summary of their contents. It indicated that GAC's request of October 13 to the Canadian Minister to so identify them was an attempt to avoid that order. Again the court ordered GAC to "clearly and definitively" identify all documents in Canada, and it stated that facts provable from documents housed in Canada would be found against GAC.

In December, I&M moved to compel further answers to United's Second Set of Interrogatories. United joined in this motion. On December 27, 1977, the court granted the motion for further answers, and stated that GAC had still failed to show to its satisfaction that the simple identification of cartel documents would violate Canadian

law. However, the court held that sanctions would have to be imposed under Rule 37 for failure to comply with its order of November 18, even if such identification was prohibited. The court found that GAC's second set of answers had not complied with its previous orders to give "complete, good faith and non–evasive answers" to the Second Set of Interrogatories. The court set January 13, 1978, as the deadline for the filing of new answers, and again threatened to impose sanctions for further discovery failures.

After receiving two more extensions of time, GAC filed its third set of answers to the Second Set of Interrogatories on February 1, 1978. Nine days later, United again moved for a default judgment based on all of GAC's previous discovery failures. United asserted that GAC's third set of answers to its Second Set of Interrogatories were "deficient and defective in almost every respect," and that GAC had willfully refused to answer the interrogatories in good faith. United also alleged that GAC had willfully and deliberately withheld certain documents which it had submitted to the federal grand jury in Washington, D.C. I&M joined in this motion.

GAC then moved for an evidentiary hearing on the allegations that it had acted in bad faith. The motion was accompanied by various affidavits, including several from Gulf and GAC officials on the question of the housing of cartel documents in Canada. The parties filed briefs and proposed findings of fact on the motions for sanctions. On March 2, 1978, the trial court entered its sanctions order and default judgment, in which it found all issues of liability against GAC and in favor of United and I&M.

GAC filed a motion, accompanied by additional affidavits, for reconsideration of the sanctions order and default judgment. This motion was denied.

c. *Analysis of the Recitals on the Second Set of Interrogatories and the Identification and Production of Canadian Cartel Documents*

We will examine these findings in the following order: (1) The adequacy of the

three sets of answers to the Second Set of Interrogatories; (2) the failure to identify or produce cartel records located in Canada, including the findings that GAC had failed to make good faith efforts to obtain a waiver of the Canadian nondisclosure laws and that it had deliberately courted legal impediments to the production of those records by housing them in Canada; and (3) the production of the Snyder and Grand Jury documents.

### (1) GAC's Answers to the Second Set of Interrogatories

Before examining the propriety of the trial court's recitals concerning the inadequacy of GAC's three sets of answers to United's Second Set of Interrogatories, it is necessary to consider GAC's contention that the trial court erred in overruling its objections to those interrogatories.

GAC originally objected on the grounds that the interrogatories were "unduly lengthy, burdensome, oppressive and harassing." It also contended that they were untimely because they were served only fifteen days before the date set for the end of all discovery. GAC later contended that the interrogatories were duplicative of the First Set of Interrogatories, and that although prior court orders had required the parties to produce their documents, there was "a clear distinction" between requiring the partners to produce documents and to answer interrogatories.[114]

We hold that the trial court did not abuse its discretion in overruling these objections. The interrogatories were filed within the period set for discovery. As United argued, "the necessity for these late interrogatories was brought about by the difficulty of obtaining information from Gulf." Had GAC properly answered the First Set of Interrogatories, and had it been more diligent in producing documents from the partners, the need for these late interrogatories would have been obviated in whole or in part.[115]

The objection that the interrogatories were harassing is without merit for the same reason. As was stated in *SCM Societa Commerciale S.P.A. v. Ind. & Com'l Res.*, 72 F.R.D. 110, 114 (N.D.Tex.1976):

> [T]he short answer to Defendant's contention is that much of the Plaintiff's so-called harassment has become necessary because of the Defendant's failure to comply with this Court's orders.

GAC's third objection—that the interrogatories duplicated the First Set of Interrogatories—is also without merit. "A claim of duplication is insufficient, unless all documentary material from which the interrogatory answers may be conveniently obtained has been previously provided." *In Re Folding Carton Antitrust Litigation, supra*, 83 F.R.D. at 264–65 (citation omitted). Even GAC has never contended that all documentary evidence on the cartel has been produced.

GAC's objection that the prior orders of the court did not require the partners to provide answers to interrogatories was a spurious argument. Not only had the court so held,[116] but also, its holding was legally correct. *See* Section II A, *supra*

114. GAC also objected on the grounds that the interrogatories inquired into irrelevant matters. This contention is addressed in Section II B, *supra*, of this opinion.

115. For the same reason, it was not error for the trial court to refuse to grant GAC's motion for a continuance of the trial setting or to require additional discovery from GAC during the course of the trial. In *Wieneke v. Chalmers, supra*, 73 N.M. at 12, 385 P.2d at 68, this Court held that it was within the sound discretion of the trial court to permit additional discovery during the course of a trial, particularly where the need for it results from previous failures to make discovery. In refusing to grant a continuance in this case, the trial court noted that the remaining discovery "in good faith should have been taken care of earlier." In these circumstances, "[t]o grant another continuance would in effect be a sanction against the Court." *G–K Prop. v. Redevelop. Agcy. of City of San Jose*, 409 F.Supp. 955, 959 (N.D.Cal.1976), *aff'd*, 577 F.2d 645 (9th Cir. 1978).

116. At a hearing on January 11, 1977, the court stated: "[W]henever an interrogatory is propounded to General Atomic, it is propounded to GAC's constituent partners also. That is my ruling. The interrogatories . . . [are] obligatory upon the constituent partners." On January 21, the court entered an order to this effect.

We turn now to the question of whether the trial court's recitals on the inadequacy of GAC's answers to the interrogatories were correct. In making this determination, we are guided by the principle that "[u]ltimately, the question of what constitutes satisfactory responses to interrogatories rests within the sound discretion of the Court." *Martin v. Easton Publishing Co.*, 85 F.R.D. 312, 316 (E.D.Pa.1980).

The first answers consisted in large measure of references to documents and to depositions, many of which had been taken in other litigation. After hearing argument and reviewing the answers and referenced documents and depositions, the trial court concluded that these answers were inadequate and unacceptable, in part because most of the information contained in the references was subject to wide differences of opinion and interpretation and was "vague, indefinite, uncertain, incomplete, elusive and non–responsive." In the sanctions order and default judgment, the court stated that these answers had constituted "a do–it–yourself" kit. *See Life Music, Inc. v. Broadcast Music, Inc., supra*, 41 F.R.D. at 25.

Although GAC referred to specific pages in the referenced documents and depositions in its answers, rather than committing the universally condemned practice of referring to a mass of undifferentiated material,[117] our review of the record satisfies us that the court did not abuse its discretion in finding these answers to be unacceptable.

■■■ First, much of the material GAC referred to was "elusive and non–responsive."[118] A party cannot answer an interrogatory simply by reference to another equally unresponsive answer. *Martin v.*

*Easton Publishing Co., supra*, 85 F.R.D. at 315.

■■■ Second, the purpose of interrogatories is to narrow and clarify the basic issues between the parties and to permit the ascertainment of the facts relative to those issues. *Smith v. Danvir Corporation*, 55 Del. 418, 188 A.2d 118, 120 (1963). As one court stated:

Incorporation by reference of portions of a deposition of a witness, much of it discursive, . . . is not a responsive answer. The fact that a witness testified on a particular subject does not necessarily mean that a party who is required to answer interrogatories adopts the substance of the testimony to support his claim or contention.

*J. J. Delaney Carpet Co. v. Forrest Mills, Inc.*, 34 F.R.D. 152, 153 (S.D.N.Y.1963). *See also Martin v. Easton Publishing Co., supra*, 85 F.R.D. at 315. Such answers make it impossible to satisfy the purposes of interrogatories because a party's admissions under oath cannot be obtained. *Life Music, Inc. v. Broadcast Music, Inc., supra*, 41 F.R.D. at 26.

This problem was clearly apparent in this case. When United sought to admit into evidence at trial the portions of the documents referred to in GAC's interrogatory answers, GAC objected on the grounds that the references "contain opinions, conclusions, . . . legal contemplation speculations," and hearsay. GAC's counsel informed the court that it made the references "without knowing whether or not they were the best evidence or whether they were reliable or trustworthy." GAC's first answers cannot be read as stating that

---

117. *See Martin v. Easton Publishing Co., supra*, 85 F.R.D. at 315; *Flour Mills of America, Inc. v. Pace*, 75 F.R.D. 676, 682 (E.D.Okla.1977); *Kozlowski v. Sears, Roebuck & Co.*, 73 F.R.D. 73, 76–77 (D.Mass.1976); *Harlem River Con. C., Inc. v. Associated G. of Harlem, Inc., supra*, 64 F.R.D. at 462; *Budget Rent–A–Car of Missouri, Inc. v. Hertz Corporation*, 55 F.R.D. 354, 357 (W.D.Mo.1972); *Life Music, Inc. v. Broadcast Music, Inc., supra*, 41 F.R.D. at 25; *Smith v. Danvir Corporation*, 55 Del. 418, 188 A.2d 118, 120–21 (1963).

118. For example, one such reference was to thirty–two pages of the deposition of Zagnoli, the head of Gulf Minerals, which had been taken in the *Westinghouse* litigation. In twenty–two of those pages, Zagnoli answered questions with the phrases "I do not recall" twenty–one times and "I don't know" twelve times. When Zagnoli was asked if "I don't recall" meant the same thing as "I don't know," he responded: "I don't know that."

GAC and Gulf did not have or could not obtain information necessary to give narrative answers to the interrogatories. If, as GAC later represented, neither it nor Gulf could furnish the information, it should have so stated at the very outset. *See In Re Master Key*, 53 F.R.D. 87, 90 (D.Conn. 1971).

Even more significant than the inadequacy of the references contained in the answers, however, was GAC's failure to identify or include information from cartel documents located in Canada. GAC's failure to promptly bring the problem of Canadian nondisclosure laws to the attention of the trial court is inexplicable. GAC failed to mention the problems posed by those laws in either set of its objections to the interrogatories. Instead, GAC promised the trial court in August that it would attach responsive documents to its answers, but it did not qualify that promise with any territorial limitations as to their location, even though neither the interrogatories themselves nor the court's order to answer them restricted the scope of inquiry to materials in the United States. At the hearing on GAC's "specific" objections, GAC promised to answer the interrogatories "on the basis of the knowledge, the present knowledge of the senior management of the corporation, *including the senior management of Gulf Minerals Canada* and Gulf Minerals Resources," (emphasis added), but it did not represent that it could only answer on the basis of the knowledge of officials of Gulf Canada who were located in the United States. When GAC received another time extension on the day the answers were due, it again failed to disclose the foreign law obstacles. Only when it filed its answers did GAC finally raise unspecified foreign laws as a bar to the production of information on the cartel.

 This failure to promptly raise the foreign law problem was contrary to settled principles of law governing discovery. As we previously noted, objections to interrogatories must be raised within the time provided by Rule 33 or within any extension of time granted by the trial court.

The provisions of that rule "should be strictly adhered to." *Lackey v. Mesa Petroleum Co.*, 90 N.M. 65, 67, 559 P.2d 1192, 1194 (Ct.App.1976). As the court stated in *Philpot v. Philco–Ford Corporation*, 63 F.R.D. 672, 674 (E.D.Pa.1974): "A full and precise understanding of the . . . Rules of Civil Procedure will surely escape even the most erudite attorney if he chooses not to read them." (Footnote omitted.) In general, the filing of an answer to an interrogatory is deemed a waiver of the right to object. *Kozlowski v. Sears, Roebuck & Co.*, 71 F.R.D. 594, 597 (D.Mass.1976); *Harlem River Con. C., Inc. v. Associated G. of Harlem, Inc., supra*, 64 F.R.D. at 465; *Skelton & Co. v. Goldsmith*, 49 F.R.D. 128, 130 n.1 (S.D.N.Y.1969); *Riley v. United Air Lines, Inc.*, 32 F.R.D. 230, 234 (S.D.N.Y.1962).

The failure to immediately raise this problem, particularly when considered in light of the trial, set to begin in only four weeks, was itself evidence of a lack of good faith. In *Shepard v. General Motors Corporation, supra*, 42 F.R.D. 425, the defendant failed to answer interrogatories, and later informed the court that it could not answer because key employees had either died or retired. The court imposed sanctions, stating:

> The defendant had the opportunity [at two previous hearings] in conjunction with previous motions concerning this set of interrogatories, to inform both the Court and counsel for the plaintiffs that Gandelot was no longer in the employ of General Motors. . . . [N]o explanation was given for the defendant's failure to raise this matter sooner and, therefore, the Court cannot now accept such an untimely objection. Defendant's conduct amounts to a deception of this Court and said conduct has materially hampered plaintiffs' counsel in the preparation of these cases.

*Id.* at 427. *Cf. United States v. 3963 Bottles, More or Less, Etc.*, 265 F.2d 332, 337 (7th Cir.), *cert. denied*, 360 U.S. 931, 79 S.Ct. 1448, 3 L.Ed.2d 1544 (1959) ("[T]hough first representing to the court that it had such information available and im-

plicitly offering it in support of this motion, when it was later served with interrogatories seeking details of such 'extensive research and consultation,' claimant asserted its claimed privilege"); *Perry v. Golub, supra,* 74 F.R.D. at 368 ("The fact that the defendants advanced these requested conditions long after the expiration of the period for the filing of objections and *after they had represented to the Court at the hearing that the documents would be produced* is further evidence of the defendants' intransigent conduct in responding to discovery and in complying with the Court's Order") (citation omitted and emphasis added).

GAC had full knowledge at the time the Second Set of Interrogatories was filed that Canadian laws posed a problem for the production of cartel information, for it had informed the court six months earlier that it was prepared to present those proscriptions to the court. However, it was apparently unprepared or unwilling in September to do what it had promised in March; it clearly was not unable to do this in a prompt manner.[119]

Third, even if the reference in the answers to unspecified foreign laws could be considered to have been timely, it was not sufficient. The simple assertion that production would violate the laws of Canada did not comport with established principles governing the filing of objections. *See* n.n. 108–112, *supra,* and accompanying text.

Finally, GAC was under a duty to make every effort to obtain the requested information and, if, after adequate effort, it was unsuccessful, its answers should have recited in detail the attempts which it made to acquire the information. *Jackson v. Kroblin Refrigerated Xpress, Inc.,* 49 F.R.D. 134, 137 (N.D.W.Va.1970). *See also Budget Rent–A–Car of Missouri, Inc. v. Hertz Corporation, supra,* 55 F.R.D. at 357; *Breeland v. Bethlehem Steel Company,* 179 F.Supp. 464, 467 (S.D.N.Y.1959); 4A J. Moore, *Federal Practice* § 33.26, at 33–140 (2d rev. ed. 1980). Until ordered by the court to seek a

waiver of Canadian law, GAC did nothing at all, with full knowledge that, at that time, the Uranium Information Security Regulations contained a provision permitting a Canadian Government Minister to consent to the disclosure of cartel information. None of the foregoing failures bespeak of GAC's good faith response to its discovery obligations under the rules or the orders of the court.

As the trial court found, GAC's second set of answers failed to comply with the court's order to identify cartel documents in Canada and failed to contain information from those documents. However, it was not until the filing of these answers that GAC first informed the trial court that, contrary to its earlier representation, it would not provide information from persons in Canada because of Canadian law.

The trial court found that GAC's third set of answers were inadequate because they did not contain "a commitment to a set of facts, posture or position," but merely stated that various cartel documents "purport to" reflect certain events. Based on our review of those answers and the following factors we discuss, we are unable to say that the court abused its discretion in making this finding.

GAC contends that it could not have been faulted for merely stating that certain documents "purport to" reflect certain events, because no personnel employed by GAC or Gulf at the time the answers were prepared were able to verify the contents of those documents. GAC points out that a response to an interrogatory indicating that a party does not know the answer is sufficient if that, in fact, is the case, (*see Harlem River Con. C., Inc. v. Associated G. of Harlem, Inc., supra,* 64 F.R.D. at 463; *Roberson v. Great American Insurance Companies of N.Y.,* 48 F.R.D. 404, 411 (N.D.Ga.1969); 4A J. Moore, *Federal Practice* § 33.26, at 33–140 (2d rev. ed. 1980)), and that where the

---

**119.** GAC's mention in March of the proscriptions of those laws is no excuse for its failure to raise the point in August and September. As far as the trial court knew, the laws might have been repealed, or a waiver of them secured. In any case, in March GAC had not specified those proscriptions with the particularity the law requires.

information is obtained from third persons, the party is not required to admit its accuracy. *Riley v. United Air Lines, Inc., supra,* 32 F.R.D. at 233; 4A J. Moore, *Federal Practice* § 33.26, at 33–145 (2d rev. ed. 1980).

Although these are correct statements of basic principles, they do not aid GAC. The time for stating the limited extent of its knowledge and the absence of personnel to make responsive answers had long since passed. If GAC and Gulf were not able to vouch for the contents of their own business records, GAC should have promptly so informed the trial court.[120] Instead, when it promised to attach responsive documents to its answers and to answer "on the basis of the knowledge . . . of the senior management" of Gulf and its subsidiaries, GAC made no representation that the senior management was without sufficient knowledge to answer, or that it could not vouch for the authenticity of the "responsive" documents. In its first answers, GAC represented that various documents and depositions contained answers to United's questions, but it did not represent that it could not vouch for the reliability of the information contained in the references it gave. It was only after United attempted to admit these references at trial that GAC informed the court that it did not know "whether they were reliable or trustworthy."

Even if GAC and Gulf no longer employed personnel who could commit GAC to a posture, position or set of facts concerning the cartel, this inability merely highlighted the significance of the cartel documents located in Canada, and demonstrated the insolubility of the dilemma created by GAC's earlier discovery failures.

In any event, answers to interrogatories were an inadequate substitute for full production of records on the cartel. Without those documents, appellees were in no position to challenge the veracity, responsiveness, or completeness of those answers. As one commentator has stated: "The heart of any American antitrust case is the discovery of business documents. Without them, there is virtually no case." Note, *Discovery of Documents Located Abroad and U.S. Litigation: Recent Developments in the Law Concerning the Foreign Illegality Excuse for Non–production* 14 Va.J. Int'l L. 747 (1974). As Judge Marshall concluded in the *Westinghouse* case, when he ordered production of Gulf's Canadian cartel documents:

> That is especially true when plaintiffs allege an antitrust conspiracy which has taken deliberate and elaborate steps to cloak its activities. "If true, the nature of the activities must be ferreted out of dark and obscure corners." The documents at issue here are crucial to plaintiffs' proof. (Citation omitted.)

*In Re Uranium Antitrust Litigation, supra,* 480 F.Supp. at 1155.

### (2) *Production and Identification of Canadian Cartel Documents*

GAC contends that because Canadian law forbids production of cartel documents in the custody of Gulf Canada in Canada, its failure to produce them in this litigation was based on an inability to comply, and that such an inability could not be the basis for a default judgment.

The first part of this argument is undoubtedly correct–the Uranium Information Security Regulations prohibit the production of the documents or the release of their contents. Those Regulations, and the act under which they were promulgated, contain criminal sanctions for their violation. It is now clear that there is no possibility of a relaxation of those proscriptions. *See* n.125, *infra.*

The question of the power of a court to impose the severe sanctions provided by Rule 37(b)(2)(iii) for a party's failure to produce documents located in a foreign

---

**120.** GAC did inform the trial court on September 9, 1977, that some employees who were active in the cartel no longer were employed by GAC or Gulf. But it did not represent that it would be unable to furnish responsive answers because of their absence, either at that time or in its original answers of September 26, 1977.

country where the laws of that country forbid their disclosure was addressed in *Societe Internationale v. Rogers, supra,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255. The facts of that case were set forth in Section II C(2)(a), *supra,* of this opinion, where we discussed the aspect of *Societe* which addressed the propriety of an order to produce documents whose disclosure is prohibited by foreign law. The second aspect of *Societe* is the propriety of sanctions imposed for a party's failure to comply with such an order. In this section we are concerned with the latter issue.

In *Societe,* the Court held that where a plaintiff had in good faith made diligent efforts to secure the documents that could not be released without violating a foreign nondisclosure law, dismissal of the action was an inappropriate sanction under Rule 37. The Court stated that fear of criminal prosecution resulting from production of the documents "constitutes a weighty excuse for nonproduction." 357 U.S. at 211, 78 S.Ct. at 1095. However, the Court did not hold that foreign nondisclosure laws completely preclude the imposition of sanctions. Rather, the Court said that the reasons for noncompliance and the willfulness or good faith of the party "can hardly affect the fact of noncompliance and are relevant only to the path which the District Court might follow in dealing with petitioner's failure to comply." *Id.* at 208, 78 S.Ct. at 1094. The Court stated that in the absence of complete disclosure, the district court possessed "wide discretion to proceed in whatever manner it deems most effective." *Id.* at 213, 78 S.Ct. at 1096. It indicated that the court could draw infer-

ences of fact unfavorable to the plaintiff as to particular events related to the nonproduced documents.

GAC contends that under *Societe* the default judgment was an improper sanction for its inability to produce the Canadian cartel records. We disagree. The touchstone of *Societe* is that such a sanction is not permissible where the failure to comply with the court's production order was "due to inability, and not to willfulness, bad faith, or any fault of" the noncomplying party. *Id.* at 212, 78 S.Ct. at 1096. In *Societe,* the Court found that the plaintiff had made "extensive efforts at compliance," and that its failure to produce "was due to inability fostered neither by its own conduct nor by circumstances within its control." *Id.* at 211, 78 S.Ct. at 1095.

In this case, the trial court found that GAC's failure to produce the documents in Canada was not based on inability; rather, it was due to its own bad faith conduct. The recitals of bad faith upon which that conclusion was based are supported by the record. As the trial court found, GAC's misconduct in discovery involved more than merely the failure to produce documents located in Canada. The record here is hardly similar to the one that was before the Court in *Societe.*[121]

There are two additional aspects of GAC's failure to produce the documents in Canada which the Court in *Societe* suggested were material to the propriety of the imposition of a Rule 37(b)(2)(iii) sanction. The first concerns GAC's efforts to secure a waiver of the Canadian law; the second involves how the documents came to be

---

**121.** For similar reasons, GAC's reliance on *In Re Westinghouse Elec. Corp. Uranium, Etc., supra,* 563 F.2d 992, is misplaced. There the court reversed a contempt citation against Rio Algom for its failure to comply with subpoenas, where compliance would have violated the same Canadian regulations at issue here. However, the Court of Appeals found that Rio Algom had acted in good faith; had made a diligent effort to produce records which were not subject to the Canadian regulations; and had made an adequate effort to secure a waiver of the regulations from Canadian authorities. In this case, the trial court made findings to the

contrary, which, with the exceptions noted herein, we have found to be supported by the record. We also take note of the following factors in the Tenth Circuit's opinion which find no parallel here–(1) the discovery at issue was "in a sense cumulative" (563 F.2d at 999); (2) the case did not involve the enforcement of antitrust laws (*id.*); and (3) Rio Algom was not a party in the litigation, had not sought affirmative relief from the court, and therefore, was not in a position to profit from its failure to comply with the production orders. *Compare Societe,* 357 U.S. at 212, 78 S.Ct. at 1095. *See also* n. 125, *infra.*

located in the foreign nation. The trial court made findings on both issues in this case, which will be separately considered here.

In *Societe*, the Court pointed out that the plaintiff, a Swiss Company, was "in a most advantageous position to plead with its own sovereign for relaxation" of the Swiss non-disclosure laws, in order to achieve at least a significant measure of compliance with the court's production order. *Id.* at 205, 78 S.Ct. at 1092. It suggested that a party is required to make all maximum efforts to secure the release of the documents. In this case, the trial court found that GAC had not made a good faith effort to secure a waiver of or dispensation from the proscriptions of Canadian law.

On October 11, 1977, the court had ordered GAC to secure a waiver of the Canadian nondisclosure laws in order to produce the documents. It also ordered GAC to "separately, clearly and definitively" identify the documents.

On October 13, 1977, GAC consulted Canadian counsel on the appropriate way to secure a waiver. It was informed that only the Canadian Minister of Energy, Mines and Resources could grant a waiver. On the same date, GAC wrote to the Minister requesting permission to produce the cartel documents in Canada and to identify the documents *with* a summary of their contents. On October 19, 1977, the Canadian Minister rejected GAC's request of October 13 for a waiver of the Regulations, and he refused to give permission to identify the documents "in the manner" GAC had described. United then moved on November

4 for sanctions for GAC's failure to produce the documents and to compel identification of the documents *without* a summary of contents. Four days later, GAC sent a second letter to the Minister, requesting permission to so identify the documents.

On the following day, the Supreme Court of Ontario handed down a decision upholding the validity of the Uranium Information Security Regulations. *Joe Clark v. Attorney General of Canada*, 17 Ont.2d 593 (1977). However, the court struck down the portion of the Regulations which permitted the Minister to consent to the release of the documents. Accordingly, on December 6, the Minister informed GAC that in light of the court's decision, he was "not able to consider your request." GAC subsequently refused to produce or to in any way identify any of the cartel documents located in Canada.

On December 27, the trial court stated that it was not satisfied that simple identification of the documents was prohibited by Canadian law. GAC did not present further evidence on the issue.[122]

The trial court found that GAC's efforts to secure a waiver were not only insufficient, but also, were deliberate attempts to avoid producing or identifying the documents. First, the court found that it was improper for GAC to request permission to identify the documents *with* a summary of contents, as it did in its original letter of October 13, because the court's order of October 11 did not call for such identification. Second, the court found that GAC's second letter of November 8 requesting per-

---

122. On February 22, 1978, GAC suggested that the court and counsel for appellees meet with Canadian officials. Both the court and counsel refused. On the day after the default judgment was entered, GAC met with officials of the Government in Canada. GAC gave the court a report of that meeting, which stated that officials of the Canadian Department of Energy, Mines and Resources had informed GAC's representatives that there was no possibility that release of the cartel documents would be permitted by the Canadian Government, and that, in the opinion of the officials, simple identification of the documents without a summary of their contents was also prohibited by Canadian law. One official stated that no Canadian court had decided the latter issue, although it was the Government's intention that such identification be prohibited. However, in a Diplomatic Note sent to the United States on March 15, 1977, the Canadian Government stated that "[t]he interpretation of the Regulations, including a determination of their scope, is a matter for Canadian courts." Prior to entry of the default judgment on March 2, no Canadian court had addressed the question of the propriety of a simple identification of the documents, nor had GAC made any attempt to have a Canadian court decide the question.

mission to identify the documents *without* a summary of contents was written to the Minister with the knowledge that he did not have authority to interpret the Uranium Information Security Regulations. Third, the court construed the Regulations to permit simple identification of the documents. Fourth, the court found that GAC had failed to comply with the court's order to so identify the documents. Fifth, the court found that GAC's only effort, until late February 1978 (*see* n. 122, *supra*), to secure a waiver of the Regulations in order to produce the documents was to write the original letter of October 13. The court stated that writing "a simple letter" to an official who has been declared by the Canadian courts to have no power to interpret the Regulations did not constitute a good faith effort to secure the release of the documents. The court suggested that GAC, Gulf and Gulf Canada should have entered into negotiations with the Canadian Government to secure the documents.

We do not completely agree with these findings. First, GAC's original request to identify the documents with a summary of contents was not unreasonable, although the court's order of October 11 did not call for identification in that manner. United's Second Set of Interrogatories defined the term "identify" to include a summary of the contents of the documents. At a hearing on September 9, the court stated that if the documents were produced, GAC did not need to summarize their contents. The Canadian cartel documents were not produced; therefore, it was understandable that GAC asked for permission to identify them in the manner described in the interrogatories themselves.[123]

Second, GAC could not have written its second letter to the Canadian Minister with the knowledge that he had no power to either consent to a waiver of the Regulations or to construe them, because it was not until the day after that letter was sent that a Canadian court struck down the pro-

vision giving the Canadian Minister the authority to grant a waiver.

Third, although we do not necessarily disagree with the court's interpretation that the Regulations permit simple identification of the cartel records, such identification is not an adequate substitute for production of the documents themselves. We cannot perceive how identification which does not draw upon the contents of the documents could have significantly assisted either court or appellees.

Fourth, GAC concededly did not comply with the court's orders of November 18 and December 27 to make a simple identification of the documents. Although GAC might have taken further steps to ascertain the legality of making such an identification, in light of the time constraints imposed on it and the limited utility of such identification, we cannot agree that its failure to take such steps either constituted bad faith or prejudiced the rights of appellees.

The court's final recital on the issue of efforts to secure a waiver is, however, essentially correct. GAC did not make any effort to secure the actual production of the documents other than its letter of October 13 to the Canadian Minister. Although it was extreme to say that GAC's failure to make additional efforts demonstrated an "intent to conceal" evidence concerning the cartel, GAC's efforts were nevertheless inadequate in at least three respects.

First, GAC was under a duty to make every effort to obtain the requested information, *Jackson v. Kroblin Refrigerated Xpress, Inc., supra*, 49 F.R.D. at 137, which included making all efforts to secure a relaxation of the foreign nondisclosure laws to the maximum of its ability. *Societe Internationale v. Rogers, supra*, 357 U.S. at 205, 78 S.Ct. at 1092. This obligation arose no later than when the court ordered GAC to answer the Second Sets of Interrogatories and to produce cartel documents; it did not originate with the court's order of Octo-

---

**123.** However, as we have previously noted, as of the hearing on September 9, GAC had still not informed the court that it would not be able

to produce all documents responsive to the Second Set of Interrogatories.

ber 11. It is undisputed that prior to October 13, GAC had made no efforts whatsoever to secure the release of the documents located in Canada. *Compare State of Ohio v. Crofters, Inc., supra*, 75 F.R.D. at 21.

Second, GAC's letter of October 13 to the Canadian Minister did not constitute an effort to the maximum of its ability. GAC's letter was similar to a letter Rio Algom had written to the same Minister on June 23, 1977, requesting permission to comply with the subpoenas for cartel records issued in the *Westinghouse* case. Rio Algom's request had been denied by the Minister on July 19, 1977. GAC was aware of Rio Algom's letter and of the results it achieved. In writing this Minister, GAC chose an avenue which it knew would be to no avail.[124]

Finally, even if the letter of October 13 was a good place to start, as GAC had been advised by Canadian counsel, it was not the proper place to stop. Even if, as is now apparent, the Canadian Government's position on the subject is completely inflexible, GAC's lack of effort after October to secure the documents does not comport with the command that a party make "every effort," or efforts to the maximum of its ability, to secure the information it has been ordered to produce. Taken alone, GAC's inaction is not very significant because it has subsequently become clear that further actions would not have been more successful.[125] However, the court could properly consider this conduct as part of the totality of circumstances surrounding GAC's approach to its discovery obligations.

The final aspect of *Societe* which is relevant to the propriety of the default sanction imposed on GAC for its failure to produce cartel documents concerns the trial court's finding that Gulf had followed a conscious and deliberate policy of housing the cartel documents in Canada, rather than in the United States; and that this action amounted to deliberately courting legal impediments to the production of the records. GAC contends that the recital is improper not only because it did not pursue such a policy, but also, because it was denied a hearing on the allegations that it did.

In *Societe*, the Supreme Court stated that if a party, who failed to comply with a court order to produce documents whose production was proscribed by foreign law, had attempted to take advantage of that foreign secrecy law, and thus, had "deliberately courted legal impediments to production of the . . . records," this fact would have "a vital bearing on justification for dismissal of the action" under Rule 37(b). 357 U.S. at 208–09, 78 S.Ct. at 1094.

United first raised this issue on September 30, 1977 in support of its motion for sanctions and for supplemental answers to its Second Set of Interrogatories. United asked that inferences of fact be drawn against GAC because of the policy of keeping documents in Canada. GAC did not respond to these charges, nor did it offer evidence to refute them. The trial court did not make any findings regarding the housing allegation in its order of October 11.

After GAC informed the court that the Canadian Minister had refused to waive the proscriptions of the Uranium Information Security Regulations, United moved on November 4, 1977, for sanctions for GAC's failure to produce Canadian cartel documents. In a supporting memorandum of the same date, United again raised the housing allegation.

---

**124.** GAC contends that this letter was sufficient because the Tenth Circuit had held on October 11 that Rio Algom's letter was an adequate attempt to secure a waiver. *In Re Westinghouse Elec. Corp. Uranium, Etc., supra*, 563 F.2d at 999–1000. However, when Rio Algom wrote on June 23 it did not know what GAC was aware of on October 13–that the Minister would not consent to the release of the documents.

**125.** In addition to the Canadian Minister's refusals to grant waivers to Rio Algom and GAC, Canadian courts have refused to enforce letters rogatory to secure the cartel records. *See In the Matter of the Evidence Act*, R.S.O.1970, c. 151 (*and In Re Westinghouse Electric Corporation Uranium Contracts Litigation*), 16 Ont.2d 273 (1977); *Joe Clark v. Attorney General of Canada*, 17 Ont.2d 593 (1977); *Gulf Oil Corp. v. Gulf Canada Ltd.* (Sup.Ct. of Canada, slip op. March 18, 1980). *See also In Re Uranium Antitrust Litigation, supra*, 480 F.Supp. at 1155.

The trial court set November 14 as the date for a hearing on United's motion. The court suggested that an evidentiary hearing might be required. GAC stated that with the exception of one witness, it was prepared to present its side on affidavits alone. United stated that it would only rely "on affidavits and deposition references." The court ordered the parties to submit their affidavits by November 11. Neither United nor GAC filed affidavits on that date concerning the housing question.

At the hearing on November 14, a GAC attorney testified on various GAC discovery efforts. However, GAC again did not present any evidence on the housing question.

At the continuation of the hearing on November 16, United's counsel sought to admit into evidence in connection with its motion for sanctions references from Gregg's deposition in the *Westinghouse* litigation. United had quoted these references in the hearing on October 7 and in the memorandum in support of its November 4 motion. GAC objected, claiming surprise because United had not submitted affidavits on the housing issue by the November 11 deadline. The court indicated that it agreed with GAC, but when United's counsel pointed out that the references were quoted in its memorandum, GAC's counsel withdrew the objection and stipulated to the admission of the four references from the Gregg deposition "for purposes of this motion."

On November 18, the court found that GAC's previous failures to produce cartel records were due in part to "its own early and deliberate policy of housing such documents in Canada." In December 1977, GAC moved to vacate the order of November 18. However, it presented no evidence to refute the finding that it had stored cartel documents in Canada. This motion was denied.

Not until three days after United's final motion for sanctions was filed in February 1978, did GAC offer evidence on the question of whether either it or Gulf had pursued a policy of housing cartel documents in Canada. GAC asked for another evidentiary hearing on that question. The court denied this request.

GAC now contends that its constitutional right to due process was denied by the failure to conduct a hearing on the housing issue. We disagree.

GAC had adequate notice that United was relying on the housing allegation in support of its November 4 motion for sanctions. Not only did United's supporting memorandum expressly make this allegation, with specific references to Gregg's deposition, but also, on November 7 the court had listed the subject of "the effort to get away with the Canadian law" as a subject for consideration at the hearing on November 14. In a brief filed with the court on November 14, GAC recognized that "[m]ost of [United's] argument in its memorandum brief in support of its Motion" for sanctions was based on the housing allegation. GAC said that that matter had been settled by the court's order of October 11, which was untrue since the order did not even mention that issue. GAC said that it would "therefore not respond to those arguments," except to note that *it*, unlike Gulf Canada, had no documents in Canada. Thus, GAC had ample notice that United was relying on the housing allegation; it simply did not respond.

The record establishes that GAC's counsel not only stipulated to the admission of Gregg's testimony, but failed to take advantage of several opportunities to present evidence to contradict it.[126] Under such circumstances, GAC was not deprived of an evidentiary hearing on the housing allegation. As the court said in *Satterfield v. Edenton–Chowan Bd. of Ed.*, 530 F.2d

---

**126.** When the court agreed to consider Gregg's testimony "for purposes of this motion," it invited GAC to submit a brief on the subject. GAC did not. On the day following the hearing, GAC wrote to the court, stating its understanding that the November hearing was limited to the question of whether it had complied with the court's order of October 11 to secure a waiver. However, it enclosed materials which it said bore on United's other contentions, but none of the submissions were related to the housing issue.

567, 572 (4th Cir. 1975): "[W]hen this opportunity [to be heard] is granted a complainant, who chooses not to exercise it, that complainant cannot later plead a denial of procedural due process." (Footnote omitted.) *See also Birdwell v. Hazelwood School District*, 491 F.2d 490, 495 (8th Cir. 1974).

We turn now to an examination of the evidence in the record on the housing issue, and the applicable principles of law in this regard. In the deposition references whose admission was stipulated to by GAC at the November hearing, Gregg testified that he and Ediger, the head of Gulf Canada, "had an understanding" that "anything that I sent to the United States would be with his approval, and I did not send anything of this type down there." He also stated that there was an understanding that "we should minimize, to the greatest extent possible, sending any of this type of material down." Gregg testified that the subject of "concealing" information on cartel activities had been discussed at "great length" in a meeting at which "a large number of lawyers [were] present," and that it was agreed "not to send anymore across the border than absolutely necessary." This testimony, which is consistent with other evidence in this record,[127] constitutes substantial evidence to support the trial court's finding that Gulf followed a policy of housing cartel documents in Canada.

GAC contends that although cartel documents were kept in Canada, this policy did not amount to the prohibited conduct of "courting legal impediments" to the production of the records. It argues that GAC did not keep such documents in Canada. It also contends that these records were Gulf Canada's, and that it was a normal business practice for Gulf Canada to keep those records at its headquarters in Canada. GAC maintains that the records were kept in Canada before the promulgation of the Uranium Information Security Regulations, and thus, neither it nor Gulf could have been courting legal impediments prior to the enactment of such impediments. It further contends that the documents were kept in Canada long before any foreseeable litigation arose, and thus, Gulf had not been taking unusual actions motivated by a desire to frustrate such litigation. Finally, GAC contends that the presence of many cartel records in this country refutes the notion that Gulf followed an illicit policy of housing them in Canada.

The evidence we have reviewed demonstrates that Gulf's policy of keeping cartel records in Canada was motivated in large part by an unusual concern for secrecy, and thus, was not just a normal business practice. Although Gulf Canada's headquarters are in Canada, many officials of Gulf from the United States participated in meetings of the cartel (e. g., Hunter, Hoffman, Allen, Zagnoli). At the important Johannesburg cartel meeting in May and June 1972, three of Gulf's four representatives were from the United States.

■ Although the Uranium Information Security Regulations were not in effect during the period the cartel was apparently in existence, the Ontario Business Records Protection Act was in effect. Although that Act is not a significant impediment to discovery, it was relied on by GAC in the court below as a total bar to the discovery of cartel records. If documents were housed in Canada with the expectation that the Ontario Act would be applicable, it is largely immaterial that the expectation was later realized in the form of a different

---

**127.** In his deposition in this case, Gregg testified that Allen of Gulf Minerals sent cartel materials to Canada from Denver because "he thought it was material that was best kept in Canada or better kept in Canada." In testimony before the Congressional subcommittee, Gregg was asked if there was any reason other than "the need for secrecy" that those materials were "better kept" in Canada. He replied: "None that I can think of." *Hearings on International Uranium Cartel, supra*, Serial No. 95–39, p. 271. Hunter was asked in his deposition in this case if one of the reasons Gregg was transferred to Canada was "the concern about the anti–trust laws of the United States." He replied: "Concern about all the documentation that would flow out of any implementation of the Johannesburg agreement and the desirability of having that out–non–U.S., in the Canadian subsidiary."

secrecy law. When a party places documents outside this country with the expectation that production of those documents will be frustrated in litigation here, the strong policy in favor of broad discovery dictates that that party bear the consequences of the dilemma created by the realization of its expectations.

It is not required that the actual litigation in which the documents are ordered produced must be either pending or contemplated at the time the housing policy is initiated and followed. In *Societe*, the Court suggested that an attempt to take advantage of foreign secrecy laws *before* the United States entered World War II would have "a vital bearing" on litigation which commenced many years later under the Trading with the Enemy Act. The evidence demonstrates that Gulf was very concerned about possible liability under American antitrust laws resulting from its participation in the cartel. *See* n. 127, *supra*, and Section II C(1), *supra*.

 We hold that GAC was not deprived of its right to notice of, and a hearing on, the housing allegations against it and Gulf. We also hold that there is substantial evidence to support the court's finding that Gulf followed a deliberate policy of storing cartel documents in Canada, and that this policy amounted to courting legal impediments to their production. Under *Societe*, these findings alone may be the basis for the imposition of such a discovery sanction as a default judgment.

### (3) *The Snyder and Grand Jury Documents*

The last two recitals of bad faith we examine concern documents which, for the most part, GAC did not produce until after the commencement of the trial. These documents consisted of two categories—the so-called Snyder and Grand Jury documents.

The term "Snyder documents" refers to a group of documents Gulf produced in another case involving the cartel. In that case, Westinghouse subpoenaed certain documents concerning the cartel from Gulf. Gulf claimed that the documents were subject to the attorney–client privilege. In

mid–August 1977, United States District Judge Daniel J. Snyder, Jr. held that many of the documents were not privileged, and ordered that they be turned over to Westinghouse. However, Judge Snyder maintained a confidentiality order prohibiting their disclosure to outsiders. *In Re Westinghouse Elec. Corp., Etc.*, 76 F.R.D. 47 (W.D.Pa.1977).

The trial court in this case found that (1) GAC wrongfully failed to inform it and the opposing parties of Judge Snyder's rulings of August 1977; (2) GAC never accurately disclosed to the court or to United the existence of all the Snyder documents; (3) these documents were called for by the First Set of Interrogatories, but the existence of most of them was not disclosed in this case until over a year after the interrogatories were filed; (4) the existence of some of the documents was not disclosed until after Judge Snyder held them to be public and not subject to claims of privilege; and (5) some of the documents were not identified or produced until after United brought the matter to the attention of the trial court in October 1977. The trial court concluded that GAC's failure to reveal the existence of, and to identify, the Snyder documents in a timely manner was a deliberate attempt to conceal relevant evidence.

As we have previously discussed, documents such as these were called for by the First Set of Interrogatories. Further, on January 11, 1977, the court had specifically ordered the production of such documents, and had set a deadline of April 15, 1977, for complete production or the submission of those documents as to which GAC was claiming a privilege to the court for an *in camera* review.

By April 1977, GAC had produced only a few of the Snyder documents. It had claimed a privilege on many others, but had not submitted any of the documents for an *in camera* review by the April 15 deadline. It was not until late August 1977, that GAC listed twelve of the documents on a privilege list. GAC did not submit the documents as to which its claim of privilege had

been challenged for an *in camera* review until September 16, 1977–five months after the deadline for their submission, over two weeks after the deadline for the completion of all discovery, and six weeks before the scheduled commencement of the trial.

On October 5, 1977, the court upheld GAC's claim of privilege in many of the instances in which it had been challenged. The remaining documents were turned over a week later. On October 7, 1977, United raised the question of the Snyder documents, stating that it had received only a few, despite Judge Snyder's rulings in August that many of the documents were not privileged. On October 11, the court held that documents de–privileged by another court were not subject to a claim of privilege in this case. On October 20, GAC produced the documents Judge Snyder had held were non–privileged, including documents which the court in this case had held to be privileged. On October 28, Judge Snyder order Gulf to produce the remaining documents he had not previously ruled on. On November 7–eight days after the trial commenced–GAC produced all of the remaining Snyder documents.

We cannot agree in all respects with the court's recital on the production of the Snyder documents. The court was incorrect in ruling that Judge Snyder had made the documents public; although produced to Westinghouse, the documents were still subject to a confidentiality order. The court also erred in faulting GAC for its failure to bring Judge Snyder's August order to its attention, since the court had stated prior to October 11 that it would not be bound by other judges' rulings on claims of privilege. Despite these errors, however, the court's conclusion that GAC did not fulfill its obligation to make full and complete discovery of the Snyder documents in a timely fashion is not manifestly erroneous.

GAC did not identify all of the documents in a timely manner. It did not submit the documents as to which it claimed a privilege for an *in camera* review until long after the date set for their submission. By failing to submit them until after the completion of the period set for discovery, appellees were effectively precluded from using the documents during depositions of key individuals taken during the summer of 1977. GAC's excuse for these delays is that discovery was an on going process which took a great deal of time. However, the court had made it clear throughout 1977 that adherence to the deadlines it set was a matter of considerable importance. After GAC failed to produce Gulf's records in response to United's original discovery requests, the court had ordered production of them to commence on January 24 and to continue diligently thereafter. Instead of producing the documents, GAC continued to reargue the production of partner records, despite several previous rulings on that subject. It waited until March 1977 to begin production of Gulf's records. The consequences which flowed from GAC's inability to comply with the court's orders in a timely fashion were self–inflicted wounds.

The second group of documents consisted of records Gulf produced to the federal grand jury. The trial court found that GAC had in bad faith failed to reveal the existence of these documents to the court or the other parties until after United learned of their existence from a third party and had made a demand on GAC for them. The facts concerning these documents are largely uncontested; the only issue is the correctness of the trial court's conclusion that GAC had acted in bad faith with respect to their production.

When these documents were produced to the grand jury in January 1978, copies were apparently sent to GAC's counsel in Santa Fe, but they were not turned over to the court or the opposing parties. United filed a demand for them on February 15, 1978, after learning of their existence from Westinghouse.

GAC contends that it did not act in bad faith because it was still reviewing the documents at the time United filed its demand, and that it turned them over before completing its review. It contends that in view of the constraints involved in reviewing the

documents while the trial was continuing, it acted as expeditiously as possible.

The trial court's finding on this subject was not erroneous. On October 7, 1977, GAC's counsel represented to the trial court that "every document that is available in the United States that are responsive to [the Second Set of Interrogatories] has been produced." That representation could not be made in good faith at a time when a file search was continuing. *Compare Armour & Co. v. Enenco, Inc., supra,* 17 F.R.Serv.2d at 515, 519. When the documents were sent to Santa Fe, GAC could have informed the trial court and opposing counsel that it was reviewing additional material; however, it did not. These documents were called for by United's first discovery requests. Their production had specifically been ordered as early as January 1977, over a year before they were eventually produced. "Such a dilatory response . . . hardly bespeaks of the good faith compliance which [defendant] repeatedly asserts." *State of Ohio v. Crofters, Inc., supra,* 75 F.R.D. at 19. *See also Perry v. Golub, supra,* 74 F.R.D. at 365; *Von ·Brimer v. Whirlpool Corporation,* 362 F.Supp. 1182, 1186 (N.D.Cal.1973), *aff'd,* 536 F.2d 838 (9th Cir. 1976); *Armour & Co. v. Enenco, Inc., supra,* 17 F.R.Serv.2d at 515–16. Under these circumstances, it was reasonable for the trial court to conclude that GAC's actions as to the production of these documents were improper. *See generally Link v. Wabash Railroad Co.,* 370 U.S. 626, 634–35 n. 11, 82 S.Ct. 1386, 1391 n. 11, 8 L.Ed.2d 734 (1962).

If GAC's conduct with regard to the production of the Snyder and Grand Jury documents were the only matters at issue, we might take a different view. But they are just two instances to be considered in the pattern of intransigence which characterized GAC's actions during discovery. *DiGregorio v. First Rediscount Corporation,* 506

F.2d 781, 787 (3rd Cir. 1974). *See also Link v. Wabash Railroad Co., supra,* 370 U.S. at 634, 82 S.Ct. at 1390; *Diapulse Corporation of America v. Curtis Publishing Co., supra,* 374 F.2d at 446; *Riverside Memorial, Etc. v. Sonnenblick–Goldman,* 80 F.R.D. 433, 436 (E.D.Pa.1978), *aff'd mem., Riverside Memorial Mausoleum, Inc. v. Umet Trust,* 605 F.2d 1196 (3rd Cir. 1979), *cert. denied,* 444 U.S. 1075, 100 S.Ct. 1022, 62 L.Ed.2d 757 (1980). In light of the full record, the trial court did not err in reaching the conclusions it did regarding the production of these two categories of documents.[128]

With the few exceptions we have noted, the recitals of the trial court on GAC's bad faith conduct during discovery are supported. Considering the full record, we do not have the " 'definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors' " that is required to reverse the judgment. *Wilson v. Volkswagen of America, Inc., supra,* 561 F.2d at 506. Although we do not agree with a few of the recitals, the conclusion that the trial court reached– that GAC acted in bad faith and that this misconduct precluded a full and fair trial of the issues in the case–was not manifestly erroneous; indeed, it is compelled by an exhaustive review of the record.

### B.

### REQUIREMENTS OF NOTICE AND HEARING ON DISCOVERY FAILURES

GAC argues that the trial court's findings that it had acted in bad faith during discovery, and the sanction of a default judgment which followed from those findings, could not have been entered without prior, specific notice of, and an evidentiary hearing on, the allegations against it. GAC contends that the trial court's refusal to

128. I&M asserts that GAC and Gulf produced various cartel documents in other litigation subsequent to the entry of the sanctions order and default judgment in this case which it had not produced here, including certain documents from Canada, which it had determined were not covered by the Uranium Information Security Regulations, and various cartel documents from Gulf files in the United States, Japan and Switzerland. Because these matters are not of record in this case, we have not considered them.

conduct such a hearing, at which the parties would have had an opportunity to present live testimony and cross–examine witnesses, amounted to a denial of due process under Article II, § 18 of the New Mexico Constitution and the Fourteenth Amendment of the United States Constitution.

In Section III A, *supra,* we discussed the adequacy of the notice and hearing afforded on the question of whether GAC and Gulf had followed a policy of housing cartel documents in Canada. In this section, we discuss the notice and hearing issues as they relate to all the other recitals on GAC's discovery failures.

GAC requested an evidentiary hearing on February 13, 1978, in response to United's motion for a default judgment. In the sanctions order and default judgment, the court stated that the factual basis for imposing sanctions for GAC's bad faith "manifestly appear[s] from the face of the record . . . ., without any need or requirement for an evidentiary hearing." GAC renewed its request for an evidentiary hearing in connection with its March 13 motion for reconsideration of the sanctions order and default judgment. This motion was denied. Both of GAC's requests for an evidentiary hearing were accompanied by numerous affidavits from its attorneys and officers attesting to the good faith of their approach to discovery.

GAC was on notice long before the sanctions order and default judgment was entered that its conduct in discovery was at issue, that the court considered many of its actions improper and unresponsive, and that the court would consider the imposition of sanctions under Rule 37, including a default judgment, for further discovery failures. *See generally Riverside Memorial, Etc. v. Sonnenblick–Goldman, supra,* 80 F.R.D. at 436; *G–K Prop. v. Redevelop. Agcy. of City of San Jose, supra,* 409 F.Supp. at 959–60; *In Re Professional Hockey Antitrust Litigation,* 63 F.R.D. 641, 656 (E.D.Pa.1974), *rev'd,* 531 F.2d 1188 (3rd Cir. 1976), *rev'd, National Hockey League v. Met. Hockey Club,* 427 U.S. 639 (1976). At least five times before it entered the default judgment, the trial

court had warned that appropriate sanctions would be imposed for the failure of GAC or either partner thereof to comply with its discovery orders. In March 1977, it warned that it would "look long and hard" at a motion for a default judgment if there was a failure to make good faith discovery. Prior to March 1978, the trial court had found GAC's conduct in discovery deficient on at least four occasions. Under these circumstances, GAC will not now be heard to say that it did not foresee the consequences of its discovery failures. *Compare Link v. Wabash Railroad Co., supra,* 370 U.S. at 636, 82 S.Ct. at 1391, *with Asociacion de Empleados, Etc. v. Rodriguez Morales,* 538 F.2d 915, 917 (1st Cir. 1976).

 The other aspect of GAC's attack upon the procedures by which the judgment was entered–the lack of an evidentiary hearing–is also without merit. There is no requirement under Rule 37(b) that an evidentiary hearing be held before sanctions are imposed. *See Norman v. Young,* 422 F.2d 470, 474 (10th Cir. 1970). Under our rules, a court may decide motions on the basis of affidavits, oral testimony or depositions. N.M.R.Civ.P. 43(e), N.M.S.A.1978 (current version at N.M.R.Civ.P. 43(c), N.M. S.A.1978 (Repl.Pamp.1980)). Evidentiary hearings in cases involving the imposition of discovery sanctions have been required under some, but not all circumstances. *Compare Flaks v. Koegel,* 504 F.2d 702, 712 (2d Cir. 1974) *and McFarland v. Gregory,* 425 F.2d 443, 450 (2d Cir. 1970) *with Margoles v. Johns,* 587 F.2d 885, 888–89 (7th Cir. 1978) *and Norman v. Young, supra.*

In a previous opinion in this case, we considered the question of the circumstances under which a trial court is required to hold an evidentiary hearing. In *United Nuclear Corp. v. General Atomic Co., supra,* 93 N.M. at 123–24, 597 P.2d at 308–09, we rejected GAC's argument that the trial court erred in failing to hold an evidentiary hearing on GAC's motion to stay the proceedings pending arbitration. We noted that the critical question is "what type of hearing is 'appropriate to the nature of the case.'" *Id.* at 123, 597 P.2d at 308 (citation

omitted). The following general principles, set forth in our earlier decision, are equally applicable here:

> The requirements of due process are not technical, and no particular form of procedure is necessary for protecting substantial rights. The circumstances of the case dictate the requirements. The integrity of the fact–finding process and the basic fairness of the decision are the principal considerations.

*Id.* (citations omitted).

GAC's failures to make good faith discovery are "mirrored in the record." *In Re Liquid Carbonic Truck Drivers Chemical, Etc., supra,* 580 F.2d at 822; *DiGregorio v. First Rediscount Corporation, supra,* 506 F.2d at 788; *Norman v. Young, supra,* 422 F.2d at 474. The initial, self–serving misconstruction of the scope of the First Set of Interrogatories, the unjustified failure to include cartel information in the supplemental answers to those interrogatories, the contradictory representations GAC made to the trial court at various stages of the proceedings, the series of inadequate answers to the Second Set of Interrogatories, and the unfulfilled commitments to produce cartel documents, are all apparent from the face of the record. No amount of oral testimony could alter those aspects of the history of this litigation.

Further, the affidavits GAC filed on February 13 and March 13, 1978, in connection with its request for an evidentiary hearing, did not demonstrate any need for such a hearing. Rather, portions of those affidavits are themselves evidence of the lack of good faith on GAC's part. For example, the Ross affidavit of February 13, which stated that GAC understood its obligation under the First Set of Interrogatories to include the furnishing of at least some records in the custody of the partners, contradicted the March 13 affidavits of five GAC attorneys stating that they understood that only documents in the possession of GAC were required. One of the March 13 affidavits contained the assertion that United's allegation that documents in Gulf's possession were required was "patently false,"

which was rather startling in light of the Ross affidavit and the fact that *some* information from Gulf was provided in GAC's original answers to the First Set of Interrogatories. The trial court afforded these contradictory sets of affidavits the weight to which they were entitled.

Even if GAC's representations of February and March 1978 concerning its understanding of the scope of its obligations had been consistent, they would not have established that it had acted in good faith nor would they have demonstrated the presence of factual issues to be resolved at an evidentiary hearing. The undisputed fact is that without objecting to the interrogatories, without disclosing its understanding of its obligations to opposing counsel, and without seeking guidance from the court, GAC made a unilateral, self–serving construction of the scope of the interrogatories. "The wording of the interrogatories and answers themselves would not lead to any other reasonable conclusion." *Hunter v. International Systems & Controls Corp., supra,* 56 F.R.D. at 625 (footnote omitted). It is no defense to say that GAC simply made an innocent mistake of law in determining that information and documents in the possession of the partners were not subject to discovery under Rules 33 and 34. *Compare Unger v. Los Angeles Transit Lines,* 180 Cal.App.2d 174, 4 Cal.Rptr. 370, 378 (Ct. App.1960). As we have previously noted, the rules call for such a question to be presented in advance to the court for its determination.

The affidavits GAC submitted concerning its failure to provide information on the cartel in its supplemental answers to the First Set of Interrogatories similarly failed to present any factual issue as to the good faith of this failure. In one affidavit, a GAC attorney stated that he did not consider the cartel to be an issue when the supplemental answers were filed in April 1977, and only appreciated that it had become "a significant issue" when United filed its Second Set of Interrogatories on August 16, 1977. However, on March 25, 1977, almost three weeks before the supple-

238

mental answers were filed, this same attorney had objected in the presence of the trial court to United's "continual reference to the so–called international uranium cartel." In a second affidavit the GAC attorney who prepared the supplemental answers to questions 30–34 of the First Set of Interrogatories stated that no information on the cartel was provided in those answers because the cartel was not mentioned in United's complaint or in the interrogatories, and therefore, had not yet been raised as an issue. We have previously reviewed the evidence which contradicts these assertions or demonstrates the unreasonableness of them.

Finally, these affidavits did not create an issue as to the trial court's finding that GAC had, in bad faith, concealed the existence of the cartel and Gulf's participation in it. It was permissible for the trial court to conclude that GAC's excuses for not producing cartel information early in the litigation were inadequate. And it could reasonably be inferred from GAC's conduct in various aspects of the proceedings throughout the course of this litigation, as well as from the nature of the cartel evidence that was eventually made available, that GAC had deliberately concealed cartel information. *Compare Link v. Wabash Railroad Co., supra,* 370 U.S. at 633, 82 S.Ct. at 1390.

■ Even if GAC's failure to provide information on the cartel in response to the First Set of Interrogatories was not the product of a calculating, illicit attempt to conceal damaging information, the record compels the conclusion that, at best, it could be characterized as "gross disregard for the requirements of the discovery process." *Armour & Co. v. Enenco, Inc., supra,* 17 F.R.Serv.2d at 519. However, whether GAC's original failures to make cartel discovery were the result of a willful, intentional and bad faith attempt to conceal evidence, as the trial court found, or were due to a gross indifference to its discovery obligations, is immaterial. The willfulness required to sustain the severe sanctions of Rule 37(b)(2)(iii) may be predicated upon either type of behavior. *See Rio Grande Gas Company v. Gilbert, supra,* 83 N.M. at

278, 491 P.2d at 166; *Cine Forty–Second St. Theatre v. Allied Artists,* 602 F.2d 1062, 1066–68 (2d Cir. 1979); *Kozlowski v. Sears, Roebuck & Co., supra,* 73 F.R.D. at 77; *Armour & Co. v. Enenco, Inc., supra.* The two types of misconduct differ only in degree as to culpability, and they differ not at all in terms of the adverse effects that GAC's discovery failures have had on the due process rights of appellees and the integrity of the truth–seeking function of the trial court.

■ In conclusion, we note that the matters set forth in the recitals of bad faith were within the knowledge of the trial court. The parties had full opportunity to brief the facts and law regarding GAC's failures to make discovery, its lack of good faith, and the sanctions to be applied; they filed extensive briefs with the court prior to entry of the sanctions order and default judgment. Each side filed proposed findings, and GAC submitted numerous affidavits. "The briefs and affidavits fully recounted the circumstances surrounding the noncompliance with the court's order[s]." *Margoles v. Johns, supra,* 587 F.2d at 889. Therefore, the trial court did not err in failing to hold additional evidentiary hearings on GAC's conduct in discovery.

### C.

### THE BREADTH OF THE SANCTIONS FOR NON–COMPLIANCE

GAC contends that even if sanctions should have been entered under Rule 37 for its discovery failures, a default judgment on all issues was unconstitutionally overbroad. GAC makes two points in this regard. First, GAC contends that the trial court could have imposed lesser sanctions to resolve the problem of the nonproduction of cartel documents. Second, GAC argues that its discovery failures, particularly those relating to the cartel, did not relate to all dispositive issues, and that a default judgment depriving it of a trial on the merits on other issues amounted to "mere punishment." We are not persuaded by either argument.

■ It is well–settled that the choice of sanctions under Rule 37 lies within the sound discretion of the trial court.[129] Only an abuse of that discretion will warrant reversal.[130] Although the severest of the sanctions should be imposed only in extreme circumstances,[131] "in this day of burgeoning, costly and protracted litigation courts should not shrink from imposing harsh sanctions where, as in this case, they are clearly warranted."[132] As one court stated:

> [W]hen a defendant demonstrates flagrant bad faith and callous disregard of its responsibilities, the district court's choice of the extreme sanction is not an abuse of discretion. It is not our responsibility as a reviewing court to say whether we would have chosen a more moderate sanction.

*Emerick v. Fenick Industries, Inc., supra,* 539 F.2d at 1381.

■ The trial court's conclusion that GAC acted in flagrant bad faith and callous disregard of its responsibilities is supported by the record. In light of the principle that the choice of sanctions "must be weighed in light of the full record in the case,"[133] the trial court did not abuse its discretion in imposing the stringent sanction of a default judgment.[134]

First, we are unpersuaded by GAC's argument that the trial court should have attempted to resolve the problem of Canadian cartel documents by employing lesser sanctions. Although the severest of sanc-

tions should be imposed only "when the court in its discretion determines that none of the 'lesser sanctions available to it,' would truly be appropriate," the court need not exhaust the lesser sanctions. *Asociacion de Empleados, Etc. v. Rodriguez Morales, supra,* 538 F.2d at 917 (construing Fed.R.Civ.P. 41(b)) (citation and footnote omitted). *See also Anderson v. Air West, Inc., supra,* 542 F.2d at 525 (construing Fed. R.Civ.P. 41(b)). GAC's argument rests on a premise we reject–that the discovery dilemma was not due in large measure to GAC's misconduct. But equally important, the lesser sanctions which GAC suggests could have been imposed were not commensurate with the nature of its misconduct, and were totally incapable of remedying the dilemma created by that misconduct.

GAC suggests three alternative means the court could have utilized–(1) an order to produce the Canadian cartel documents pursuant to an order of civil contempt carrying the sanction of a daily fine for disobedience; (2) an attempt to secure the documents by letters rogatory executed in Canada; or (3) the entry of preclusive findings under Rule 37(b)(2)(i) which were closely tailored to facts that could reasonably have been proven by the missing Canadian documents.

The trial court did not err in failing to employ any of these alternatives. Even GAC does not contend that a contempt citation would have secured the production of cartel documents located in Canada.[135]

---

**129.** *Rio Grande Gas Company v. Gilbert, supra,* 83 N.M. at 278, 491 P.2d at 166; *Pizza Hut of Santa Fe, Inc. v. Branch, supra,* 89 N.M. at 328, 552 P.2d at 230; *Gallegos v. Franklin,* 89 N.M. 118, 122, 547 P.2d 1160, 1164 (Ct.App.1976), *cert. denied,* 89 N.M. 206, 549 P.2d 284 (1976); *National Hockey League v. Met. Hockey Club,* 427 U.S. 639, 642, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747 (1976); *DiGregorio v. First Rediscount Corporation, supra,* 506 F.2d at 788.

**130.** *General Dynamics Corp. v. Selb Manufacturing Co.,* 481 F.2d 1204, 1211 (8th Cir. 1973), *cert. denied,* 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974).

**131.** *Emerick v. Fenick Industries, Inc., supra,* 539 F.2d at 1381; *Asociacion de Empleados, Etc. v. Rodriguez Morales, supra,* 538 F.2d at 917 (construing Fed.R.Civ.P. 41(b)).

**132.** *Cine Forty–Second St. Theatre v. Allied Artists, supra,* 602 F.2d at 1068.

**133.** *Cine Forty–Second St. Theatre v. Allied Artists, supra,* 602 F.2d at 1068.

**134.** *See Emerick v. Fenick Industries, Inc., supra,* 539 F.2d at 1381.

**135.** Other courts have also found a contempt citation or fine to be an inappropriate or inadequate sanction for failure to make discovery. *See G–K Prop. v. Redevelop. Agcy. of City of San Jose, supra,* 409 F.Supp. at 959; *Perry v. Golub, supra,* 74 F.R.D. at 366; *Buehler v. Whalen, supra,* 374 N.E.2d at 467.

Further, such an order would have entailed a command to violate the nondisclosure laws of a foreign state, something the trial court repeatedly, expressly, and properly refused to do. The second alternative, letters rogatory, was equally unavailing, as GAC itself recognized,[136] and as subsequent events have proven. *See* n. 125, *supra*. The third alternative, closely tailored cartel findings, was met in this case. Without fully setting forth those findings here, it is enough to say that we are satisfied those findings were as closely tailored to the withheld information as was possible under the circumstances. After fully considering the entire record, "we are unable on review to hold that the trial court could have fashioned an equally effective but less drastic remedy." *Diaz v. Southern Drilling Corp.*, 427 F.2d 1118, 1127 (5th Cir.), *cert. denied*, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970).

The second aspect of GAC's argument that the sanction of a default judgment was inappropriate is based on the principle that the least restrictive alternative sufficient to protect the opposing party must be imposed. GAC contends that the default related only to the Canadian cartel documents, and that such information could not have been dispositive of every issue in the case. Therefore, it argues that an across-the-board default judgment amounted to "mere punishment," in contravention of settled principles of constitutional law. *Compare Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909) *with Hovey v. Elliott*, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897). This argument is also without merit.

■■■ When a party takes a cavalier approach to its discovery obligations, as GAC did in this case, the entry of a default judgment is an appropriate sanction. Upon the default, the allegations of the complaint are taken as true. *Gallegos v. Franklin*, *supra*, 89 N.M. at 123, 547 P.2d at 1165.

A position similar to GAC's was rejected in *Trans World Airlines, Inc. v. Hughes*, *supra*. There the court said that the non-defaulting party "had no obligation to introduce any evidence whatever in support of the allegations of its complaint." The defaulting party, the court said, cannot escape liability for its bad faith approach to discovery by relying on evidence "which only *tends* to contradict the allegations of the complaint." The defaulting party must show that the evidence it relies upon "could not conceivably have been refuted and disproved . . . had there been a trial." 449 F.2d at 63. The court concluded:

> It would usher in a new era in the dynamics of litigation if a party could suffer a default judgment to be entered against it and then go about its business as if the judgment did not exist and as though, despite the opportunities to comply with the court's orders and to defend on the merits which had been ignored, the slate was wiped clean and a new day had dawned. To state the proposition is to expose the folly of it.

*Id.* at 63–64.

■■■ GAC was not defaulted merely because of the prejudice caused to the opposing parties by its failure to produce Canadian cartel records. The default judgment was entered as a result of a course of misconduct in discovery which began at the very outset of the case and ended only with the entry of that judgment. Although it is settled that discovery sanctions cannot be entered as "mere punishment," all such sanctions involve an element of punishment. *Norman v. Young*, *supra*, 422 F.2d at 474. As the court stated in *Buehler v. Whalen*, *supra*, 374 N.E.2d at 467:

> Our discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the viola-

---

**136.** On October 7, 1977, GAC's counsel informed the trial court:

> I don't find it all surprising that neither [United] nor [I&M] have tried to go this same course and seek out letters rogatory because it would be my conclusion that they would get exactly the same answers from the Canada Courts that Westinghouse did. . . . Westinghouse tried it and Westinghouse lost and I don't think the courts of Canada will change their mind.

tion. Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitatingly impose sanctions proportionate to the circumstances.

It is "[o]nly where the sanction invoked is more stern than reasonably necessary" that a denial of due process results. *DiGregorio v. First Rediscount Corporation, supra,* 506 F.2d at 789. In light of the nature of GAC's misconduct, the element of punishment involved here does not rise to the prohibited level of reprisal. *Id. See also Norman v. Young, supra,* 422 F.2d at 474.

A party cannot approach its obligation to make good faith discovery however it chooses as to certain matters, and at the same time expect to have the case proceed in a normal fashion as to other issues. *See Haney v. Woodward & Lothrop, Inc.,* 330 F.2d 940, 945 (4th Cir. 1964). At stake is not only the appellees' right to a fair trial on the merits, but also, the integrity of the orders of the court. As the court in *Perry v. Golub, supra,* 74 F.R.D. at 365, stated:

> [T]he refusal of a party . . . to comply with an Order of the Court cuts substantially deeper than the question of prejudice to litigants and their attorneys. A basic tenet of our government of law is that a party is required to obey a Court order.

█ In imposing stringent sanctions to preserve this basic principle, "courts are free to consider the general deterrent effect their orders may have on the instant case *and on other litigation,* provided that the party on whom they are imposed is, in some sense, at fault." *Cine Forty-Second St. Theatre v. Allied Artists, supra,* 602 F.2d at 1066 (emphasis added and citations omitted). As the United States Supreme Court stated in *National Hockey League v. Met. Hockey Club, supra,* 427 U.S. at 643, 96 S.Ct. at 2781:

> [T]he most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in

appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.

*See also Emerick v. Fenick Industries, Inc., supra,* 539 F.2d at 1381; *Perry v. Golub, supra,* 74 F.R.D. at 366–67.

█ We are fully aware of the severity of the sanctions imposed by the judgment we affirm. Our affirmance of that judgment should not be construed as a retreat from the principle that such discovery sanctions are to be imposed only in extreme cases and only upon a clear showing of willfulness or bad faith. That principle is well-established in this jurisdiction; it is universally recognized in American jurisprudence; and it is fundamental to the constitutional right of due process. The length of this opinion and the months of study and consideration given to it are testimony to the trepidation with which we have approached the judgment in question.[137] In this extraordinary case, our review has been anything but cursory.

█ Although the sanctions of Rule 37(b)(2)(iii) are to be applied only in aggravated circumstances, they must nevertheless be available to a court in order to achieve compliance with its orders and to insure that a determination of a case on the merits is made only after a full, good faith disclosure of all relevant facts. We are not only concerned with the constitutional right of the defaulted party to an opportunity to be heard on the merits, but also, with the equally fundamental constitutional right of the party who seeks discovery to a hearing which is meaningful. When a party has displayed a willful, bad faith approach to discovery, it is not only proper, but imperative, that severe sanctions be imposed to preserve the integrity of the judicial process and the due process rights of the other litigants. *See In Re Liquid Carbonic Truck Drivers Chemical, Etc., supra,* 580 F.2d at 823; *Norman v. Young, supra,* 422 F.2d at 474.

---

**137.** "Because dismissal is the most severe sanction available to a district court under rule 37, we are ever reluctant to affirm its invoca-

tion." *DiGregorio v. First Rediscount Corporation, supra,* 506 F.2d at 788.

We are also mindful of the magnitude of the relief afforded in this case. It is unprecedented in New Mexico. We cannot consider such a matter lightly.[138] While we must guard against the possibility that such an enormous judgment is improperly imposed by an impatient court, we must also recognize that with stakes so high, there is a concomitant possibility that parties will make less than full, good faith disclosure. Undue leniency would encourage recalcitrance by litigants with something to hide.[139]

 The rules of discovery are as equally applicable to cases involving large sums as they are to small; and the obligation to comply with those rules in good faith and to obey the orders of the court is no less incumbent on the largest company than it is on the poorest citizen. Any contrary rule, or any special considerations in a billion dollar case, would be inimical to the most fundamental postulate of our legal system—that before the law, all stand equal.

## IV.

## DISQUALIFICATION OF UNITED'S COUNSEL

GAC contends that the trial court erred in denying its motion to disqualify United's counsel, the law firm of Bigbee, Stephenson, Carpenter & Crout, now known as Bigbee, Stephenson, Carpenter, Crout & Olmsted (hereinafter referred to as the Bigbee firm), and that all orders entered by the court subsequent to the filing of its disqualification motion—including the sanctions order and default judgment—are therefore invalid and must be reversed.

This issue first arose on February 23, 1977—almost fourteen months after the filing of the complaint in this case—when GAC suggested that the Bigbee firm would have to be disqualified if Gulf documents regarding its "separate non–partnership uranium activities in New Mexico" had to be produced. On March 21, 1977—two weeks after the court ordered such production for at least the second time—at the direction of Gulf, GAC filed a motion to disqualify the Bigbee firm. The issue was submitted to the trial court on affidavits and depositions.[140] The court denied the motion without making specific findings. The trial court refused to certify the issue for an interlocutory appeal. GAC thereafter sought unsuccessfully to have the denial of its motion of disqualification reviewed by this Court, either as an appeal from a final judgment under the collateral order doctrine of *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), (No. 11469, June 29, 1977), or as a petition for an extraordinary writ (No. 11484, July 1, 1977). GAC renewed the motion in November 1977, which the court again denied.

In 1961, the Bigbee firm began to represent United in connection with its uranium activities in New Mexico. It has continuously represented United since that time. In 1971, Gulf hired the Bigbee firm to represent it on legal matters relating to

---

**138.** Cf. *Trans World Airlines, Inc. v. Hughes*, *supra*, 449 F.2d at 63 ("[I]t would appear that were less at stake in this litigation, the propriety of the default judgment would not nave deserved the full discussion we have afforded it.")

**139.** Cf. *Trans World Airlines, Inc. v. Hughes*, 332 F.2d 602, 615 (2d Cir. 1964), *cert. denied*, 380 U.S. 248, 85 S.Ct. 934, 13 L.Ed.2d 817 (1965) (misconduct in discovery "is particularly intolerable in a large and complex litigation such as this one"); *Philadelphia Hous. A. v. American Radiator & S. San. Corp.*, 50 F.R.D. 13, 19 (E.D. Pa. 1970), *aff'd sub nom, Mangano v. American Radiator & Standard San. Corp.*, 438 F.2d 1187 (3d Cir. 1971) (severe discovery sanctions are "particularly appropriate in complex antitrust litigation like that now before the Court where efficient and effective discovery procedures are essential to orderly adjudication"). *See also Harlem River Con. C. Inc. v. Associated G. of Harlem, Inc.*, *supra*, 64 F.R.D. at 465.

**140.** At a hearing in May 1977, GAC informed the court that there was no need for an evidentiary hearing because "there is no genuine issue [as] to any material fact." On appeal, GAC has reversed itself, and argues that there are disputed facts as to some issues, and that an evidentiary hearing was required. In light of its representation to the trial court, and the approach we take to this issue, it is unnecessary for us to decide this question.

Gulf's uranium operations in New Mexico, particularly the large reserves at Mt. Taylor it was then in the process of acquiring. The Bigbee firm had continued to represent Gulf until November 1976, ten months after the complaint in this case was filed. The principal services performed by the Bigbee firm for Gulf during this period were perfecting and protecting Gulf's title to mining rights — including maintenance of possessory rights, application for mineral patents, defense of mining claims, and representation in quiet title suits — and representing Gulf before the New Mexico State Legislature on a variety of issues.

GAC contends that because Gulf's uranium production activities in New Mexico became an issue in this case, there is a substantial relationship between the Bigbee firm's past representation of Gulf and its present representation of United in this case, and a concomitant danger that confidential information given to the Bigbee firm in its prior representation might be used against Gulf's interests in the present action. United argues that there was no substantial relationship between the firm's representation of Gulf and United; that Gulf consented to any conflicting representation; and that by their delay in raising the disqualification issue, Gulf and GAC were estopped from asserting it.

 We believe that the substantial relationship test is the proper standard by which motions to disqualify counsel are to be judged under Canon 4 of the Code of Professional Responsibility, which provides that a lawyer must preserve the confidences and secrets of a client. Simply stated, the substantial relationship standard requires disqualification "where an attorney represents a party in a matter in which the adverse party is that attorney's former client ... [and] the subject matter of the two representations are 'substantially related.'" *Westinghouse Elec. Corp. v. Gulf Oil Corp.,* 588 F.2d 221, 223 (7th Cir. 1978), rev'g *Westinghouse Elec. Corp. v. Rio Algom,*

*Ltd.,* 448 F.Supp. 1284, 1310–12 (N.D. Ill. 1978). In the *Westinghouse* decision, the Seventh Circuit Court of Appeals found that the substantial relationship test had been satisfied, and reversed the district court's denial of Gulf's motion to disqualify the Bigbee firm from representing United in the *Westinghouse* uranium litigation. We think that the approach taken by the Seventh Circuit was the proper one. Because the facts and law are fully set forth in its decision, we will not further elaborate on the substantial relationship question.

The substantial relationship standard does not, however, entirely dispose of the question of the propriety of the Bigbee firm's professional conduct in this affair. From the filing of the predecessor to this case on August 8, 1975, to the present time, United has alleged that GAC and Gulf have committed various tortious acts in New Mexico and have violated the New Mexico Antitrust Act. United, represented at all times by the Bigbee firm, has repeatedly asserted that by its action in acquiring, and allegedly delaying production from, its Mt. Taylor reserves, Gulf has committed antitrust violations. For the Bigbee firm to be making these accusations on behalf of United, at the same time that it was continuing to represent Gulf with respect to these very reserves, raises a second ethical question of serious dimensions. The propriety of an attorney making such allegations against a *current,* rather than a former, client

> must be measured not so much against the similarities in litigation, as against the duty of undivided loyalty which an attorney owes to each of his clients.

> * * * * * *

Under the Code, the lawyer who would sue his own client, asserting in justification the lack of "substantial relationship" between the litigation and the work he has undertaken to perform for that client, is leaning on a slender reed indeed.[141]

---

141. Although the Bigbee firm had ended its representation of Gulf by the time the motion to disqualify was filed, we think that this prin-

ciple is nonetheless applicable here, where the contemporaneous representation of United and

*Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976). *See* Canon 5–105 of the Code of Professional Responsibility;[142] *State v. Aguilar*, 87 N.M. 503, 504, 536 P.2d 263, 264 (Ct.App. 1975); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 232–35 (2d Cir. 1977).

 United argues that "the Bigbee firm's conduct in this litigation was in accord with both the letter and spirit of the highest ethical standards of the bar." We do not agree. However, "a violation of professional ethics does not . . . automatically result in disqualification of counsel."[143] "[E]thical problems cannot be resolved in a vacuum."[144] In disqualification cases, judges cannot "exclude from their minds realities of which fair decision would call for judicial notice."[145] Because a disqualification motion is of an equitable nature,[146] it is appropriate to consider the prior conduct and statements of the movant and its attorneys on the question of the movant's good faith and credibility in connection with the motion to disqualify.[147]

 A motion to disqualify opposing counsel should be filed at the onset of the litigation,[148] or "with promptness and reasonable diligence once the facts" upon which the motion is based have become known.[149] A failure to act promptly may warrant denial of the motion.[150]

GAC's delay in raising the disqualification issue — considered in the context of United's allegations against it and GAC's conduct throughout the proceedings in the trial court — casts serious doubt on the good faith with which the motion was made. GAC's motion to disqualify the Bigbee firm was filed after twenty months of litigation with United. During this period very extensive pretrial proceedings were conducted in the trial court, and GAC had sought appellate review of several of its decisions both in this Court and the United States Supreme Court. *E. g., General*

Gulf continued for ten months after the filing of this lawsuit.

**142.** Canon 5–105 reads in pertinent part:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under Rule 5–105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under Rule 5–105(C).

(C) In the situations covered by Rule 5–105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

**143.** *W.T. Grant Co. v. Haines*, 531 F.2d 671, 677 (2d Cir. 1976) (citation omitted).

**144.** *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 565 (2d Cir. 1973). *See also Silver Chrysler Plymouth, Inc. v. Chrysler Mot. Corp.*, 518 F.2d 751, 753 (2d Cir. 1975).

**145.** *Silver Chrysler, supra*, 518 F.2d at 753. *See also City of Cleveland v. Cleveland Elec. Illuminating*, 440 F.Supp. 193, 197 (N.D. Ohio 1976), *aff'd*, 573 F.2d 1310 (6th Cir. 1977).

**146.** *Milone v. English*, 113 U.S.App.D.C. 207, 306 F.2d 814, 818 (D.C. Cir. 1962); *Marco v. Dulles*, 169 F.Supp. 622, 632 (S.D. N.Y. 1959), *appeal dismissed*, 268 F.2d 192 (2d Cir. 1959).

**147.** *Fleischer v. A.A.P., Inc.*, 163 F.Supp. 548, 559 (S.D. N.Y. 1958), *appeal dismissed sub nom., Fleischer v. Phillips*, 264 F.2d 515 (2d Cir.), *cert. denied*, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959). *See also Marco v. Dulles, supra*, 169 F.Supp. at 632.

**148.** *International Brotherhood of Teamsters, Etc. v. Hoffa*, 242 F.Supp. 246, 257 (D.D.C. 1965).

**149.** *Milone v. English, supra*, 306 F.2d at 818. *See also Marco v. Dulles, supra*, 169 F.Supp. at 632.

**150.** *Redd v. Shell Oil Company*, 518 F.2d 311, 315 (10th Cir. 1975); *Milone v. English, supra*, 306 F.2d at 818; *City of Cleveland v. Cleveland Elec. Illuminating, supra*, 440 F.Supp. at 203–05; *Marco v. Dulles, supra*, 169 F.Supp. at 632. *But see Emle Industries, Inc. v. Patentex, Inc., supra*, 478 F.2d at 574; *W.E. Bassett Company v. H.C. Cook Company*, 201 F.Supp. 821, 825 (D. Conn. 1961), *aff'd per curiam*, 302 F.2d 268 (2d Cir. 1962).

*Atomic Co. v. Felter, supra*, 90 N.M. 120, 560 P.2d 541, *rev'd*, *General Atomic Co. v. Felter, supra*, 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199, and *United Nuclear Corp. v. General Atomic Co., supra*, 90 N.M. 97, 560 P.2d 161. At no time during any of these proceedings was the disqualification issue raised.

GAC finally moved to disqualify the Bigbee firm only after two actions it had filed against United in federal court had been dismissed (*see* n. 84, *supra*); after the trial court in this case had found GAC's answers to the First Set of Interrogatories to be deficient; after United had twice moved for a default judgment for GAC's discovery failures; after the trial court had twice warned that sanctions would be imposed for further failures; after the court had held on at least five separate occasions in as many months that the partners were subject to discovery; after this Court had upheld the trial court's personal jurisdiction over GAC; and after United had raised Gulf's participation in the international uranium cartel as an issue. In this context, GAC's disqualification motion would seem to have been motivated more by "a desire to fragmentize the [opposition] than by any sensitivity to the ethical considerations involved." *Aetna Cas. & Sur. Co. v. United States*, 570 F.2d 1197, 1201 n. 7 (4th Cir.),

*cert. denied*, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).[151] The delay in raising the issue could hardly be ascribed to a lack of understanding. GAC and its constituent partners have been represented in this case by large and experienced law firms from throughout the country.[152]

GAC seeks to excuse its delay in raising the disqualification issue by asserting that the legal basis for the Bigbee firm's conflict did not become clear until the court had held that Gulf and Scallop were subject to its discovery orders. Under the terms of United's original discovery requests of December 1975, to which GAC made no objection, the partners were required to provide discovery. Contrary to GAC's representation, it was not in January 1977, but in November 1976, when the court first held that the partners were subject to its discovery orders. GAC waited almost four months after the November order before moving to disqualify the Bigbee firm.

GAC further seeks to excuse its delay by asserting that Gulf's Mt. Taylor uranium operations did not become an issue until early 1977. This excuse is also without merit. The complaint in this case alleged that GAC and Gulf had violated the antitrust laws of New Mexico by restricting trade in, and attempting to monopolize, the uranium market.[153] In light of the fact

---

**151.** Numerous other courts have recognized that motions to disqualify opposing counsel "have become common tools of the litigation process," *International Electronics Corp. v. Flanzer*, 527 F.2d 1288, 1289 (2d Cir. 1975), which are often used "for purely strategic purposes." *Woods v. Covington Cty. Bank*, 537 F.2d 804, 813 (5th Cir. 1976) (footnote omitted). *See also Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir. 1977); *Redd v. Shell Oil Company, supra*, 518 F.2d at 315; *Pennwalt Corp. v. Plough, Inc.*, 85 F.R.D. 264, 274 (D. Del. 1980). Comment, *The Appealability of Orders Denying Motions for Disqualification of Counsel in the Federal Courts*, 45 U.Chi.L.Rev. 450 (1978).

**152.** That GAC's and Gulf's inaction was not the result of any innocent misunderstanding is evidenced by the notes of the litigation strategy meeting held shortly after this case was filed. Those notes, to which we have previously referred (*see* n.n. 32 and 81, *supra*), reflect that GAC and Gulf attorneys rejected a move to

disqualify the Bigbee firm. Those notes, taken by an associate general counsel of Gulf, contain these remarks: "Move to disqualify Bigbee from UNC [United]? . . . *Don't* if case gets before Judge Bratton." (Emphasis in original.) Within a week of this meeting, GAC and Gulf filed a declaratory judgment and an interpleader action against United in federal court. *See* n. 84, *supra*. Both cases were assigned to Judge Bratton. In neither case was a disqualification motion filed. Judge Bratton dismissed both actions.

**153.** In March 1977, GAC's counsel made it clear that GAC recognized that Gulf's activities were at issue. Referring not to anything that had transpired in early 1977, but to "[t]he fact that the first 53 paragraphs [of the complaint] relate to Gulf's misconduct," he told the trial court that "Gulf is the main focal point of the action." He went on to say:

[N]early all of the misconduct alleged in the complaint was alleged misconduct on the part of Gulf before GAC was even formed. It

that the Mt. Taylor reserves are the most significant of Gulf's proven domestic uranium reserves and are the largest single body of uranium ore in the United States, it is clear that these reserves were pertinent to these antitrust allegations.[154]

In pleadings filed over one year before the motion to disqualify the Bigbee firm was filed, United charged that Gulf's "huge uranium reserves . . . in New Mexico . . . are part and parcel of the antitrust violations with which General Atomic is charged." United's counsel also alleged that GAC was "trying with this partner Gulf to monopolize uranium in New Mexico." He said: "That is what this suit is all about." United's reply to GAC's counterclaim, filed in June 1976, directly tied its antitrust allegations to Gulf's Mt. Taylor reserves.

■ In the *Westinghouse* litigation there was no evidence that Gulf belatedly raised the issue of the disqualification of the Bigbee firm. Furthermore, in that case there was a continuing possibility of the misuse of confidential information against Gulf by the Bigbee firm.[155] In the present case there is no such prospect. GAC nevertheless contends that the judgment entered against it for *its* discovery failures must be reversed — including all discovery orders entered after the disqualification motion was filed — "in order to uphold standards of ethics" for the bar. To accept GAC's position would permit a party to virtually ignore its obligation to follow the rules of discovery and the specific orders of the court, and then entirely escape liability for such misconduct by belatedly asserting a motion to disqualify opposing counsel. In such circumstances, we decline to reverse a

judgment that is not tainted by the Bigbee firm's conflict and that is otherwise supported by the record. *See W.T. Grant Co. v. Haines, supra,* 531 F.2d at 677.

## V.

## DISQUALIFICATION OF THE TRIAL JUDGE

GAC also contends that the sanctions order and default judgment must be reversed because the trial judge refused to disqualify himself. This contention is without merit. GAC has failed to demonstrate either a personal bias or prejudice on the part of Judge Felter toward any party or a reasonable basis for questioning his impartiality.

Two weeks after the complaint in this case was filed, GAC moved under Section 38–3–9, N.M.S.A. 1978, to disqualify Judge Campos, who was originally assigned to hear it. Judge Felter was then assigned to the case. Almost two years later, on November 9, 1977, GAC moved for the first time to disqualify Judge Felter, alleging that by language he used in two discovery orders entered in October 1977, and in in-court remarks he made on November 8, 1977, the judge had demonstrated "a bias, prejudice and 'interest'" against it. The motion was denied on the same day. GAC on two occasions renewed this motion, which the judge again denied. The motions were filed pursuant to Article VI, § 18 of the New Mexico Constitution, Canon 3(C)(1) of the New Mexico Code of Judicial Conduct, and the due process clauses of the United States and New Mexico Constitutions, U.S. Const., Amend. XIV, § 1 and N.M. Const., Art. II, § 18.[156]

is not a question of Gulf doing things on behalf of the partnership. What they are being charged primarily with are things that happened before the partnership was even in existence.

**154.** It is hard to believe that GAC did not recognize that the Mt. Taylor reserves were an issue in this case until late February 1977 when this Court had done so in October 1976. *United Nuclear Corp. v. General Atomic Co., supra,* 90 N.M. at 101, 560 P.2d at 165.

**155.** In *Westinghouse,* the Court of Appeals held that there had been no legally effective consent by Gulf to the Bigbee firm's representation of United in that litigation because "a client's consent will not justify the use of confidential information against the client." 588 F.2d at 228.

**156.** Section 38–3–9, N.M.S.A. 1978, provides that a judge may be disqualified by a party who files an affidavit alleging a "belief" that the judge cannot preside impartially. Under this section a judge is automatically disqualified

GAC's charge of bias and prejudice is based on the following allegations:

(1) The "vituperative tone" of several of the judge's orders and statements, especially in the sanctions order and default judgment, manifested a personal hostility towards GAC.

(2) The judge's actions during the trial were one–sided in favor of United, as evidenced by his interruption and termination of GAC's cross–examination of United's witnesses, his curtailment of GAC's right to impeach those witnesses, and his questioning of witnesses.

(3) Various orders and rulings on questions of evidence, procedure and discovery were favorable to United, prejudicial to GAC, and explainable only as expressions of hostility to GAC.

(4) In his conduct of pre–trial discovery and in his entry of sanctions, the judge acted with unreasonable haste and without exercising independent judgment, thereby prejudicing GAC and favoring United.

In this section of the opinion we are not concerned with whether the various rulings GAC complains of were legally correct, but rather, with whether those rulings are sufficient to establish that Judge Felter had a personal bias and prejudice against GAC.

■ Article VI, § 18 of the New Mexico Constitution provides: "No justice, judge or magistrate of any court shall, except by consent of all parties, sit in any cause . . . in which he has an interest." In *State v. Scarborough, supra,* 75 N.M. at 705, 410 P.2d at 734, we said that an "interest" necessary to disqualify a judge under this constitutional provision may be an actual bias or prejudice. However, we agree with the construction given to the term "bias or prejudice" by the United States Supreme Court in *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), where, in construing a federal judicial disqualification statute, 28 U.S.C. § 144, the Court held:

The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. (Citation omitted.)

*See also In Re International Business Machines Corp.,* 618 F.2d 923, 927–28 (2d Cir. 1980); *United States v. Haldeman,* 181 U.S. App.D.C. 254, 559 F.2d 31, 132 (D.C. Cir. 1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *United States v. Conforte,* 457 F.Supp. 641, 657 (D. Nev.

---

upon the filing of such an affidavit. *Norton v. Reese,* 76 N.M. 602, 604, 417 P.2d 205, 207 (1966); *Rivera v. Hutchings,* 59 N.M. 337, 341, 284 P.2d 222, 225 (1955). Thus, mere suspicion of bias or prejudice is a sufficient basis for the exercise of the statutory right of disqualification. *State v. Scarborough,* 75 N.M. 702, 713, 410 P.2d 732, 740 (1966) (Noble and Compton, JJ., dissenting). However, only one judge may be disqualified under that section, *Gray v. Sanchez,* 86 N.M. 146, 148, 520 P.2d 1091, 1093 (1974); *Beall v. Reidy,* 80 N.M. 444, 447, 457 P.2d 376, 379 (1969), and a party must file the disqualification affidavit within the statutory time limitations set forth in Section 38–3–10, N.M.S.A. 1978, which are strictly construed. *Gerety v. Demers,* 92 N.M. 396, 401, 589 P.2d 180, 185 (1978).

Because Judge Campos had already been disqualified, and because the motion to disqualify Judge Felter was not filed within the time limitations of Section 38–3–10, GAC had no *statutory* right to disqualify Judge Felter. However, the right of disqualification provided by Section 38–3–9 is not the exclusive method of disqualification. *See State v. Scarborough, supra,* 75 N.M. at 709, 410 P.2d at 736–37. *But see Doe v. State,* 91 N.M. 51, 52, 570 P.2d 589, 590 (1977). The guarantee of a fair and impartial tribunal, embodied in Article VI, § 18 and Canon 3(C)(1), and assured by the concept of due process, cannot be rendered meaningless by the limitations found in Sections 38–3–9 and 38–3–10. However, though mere suspicion is a sufficient basis for disqualification under Section 38–3–9, the other methods require more, as we explain in this section of the opinion. Although not strictly limited by the time limitations of Section 38–3–10, a disqualification motion based on one of the non–statutory grounds must nevertheless be filed within a reasonable time after the party becomes aware of the grounds for it. *Cf. In Re International Business Machines Corp.,* 618 F.2d 923, 932 (2d Cir. 1980) (construing similar federal provisions). Because we find there was no basis to disqualify Judge Felter, we do not consider the question of the timeliness of GAC's motion.

1978); *Lazofsky v. Sommerset Bus Co., Inc.,* 389 F.Supp. 1041, 1043 (E.D. N.Y.1975). Stated another way, the bias must be personal, and not judicial. *In Re International Business Machines Corp., supra,* 618 F.2d at 929.

GAC's original motion to disqualify Judge Felter was filed one day after he had accused GAC of "cover–ups" and "stonewalling information" in connection with an effort by Gulf to quash a subpoena issued for S. A. Zagnoli, the executive vice–president of Gulf Minerals in Denver.[157]

Although these remarks were the immediate precipitating event for the disqualification effort and the principal example of the judge's alleged bias and prejudice up to that time, GAC also cited the court's discovery order of October 11, 1977, wherein

the court found that GAC had not answered United's Second Set of Interrogatories in good faith, and an order of the court on October 27, 1977, denying GAC's motion for a continuance of the trial setting, wherein the court stated that adequate time had been given for trial preparation "by the exercise of reasonable diligence and good faith."

GAC has yet to show any extrajudicial conduct or incident which demonstrates any bias or prejudice on the part of Judge Felter.[158] Because GAC can establish no extrajudicial source for Judge Felter's alleged bias, it is forced to rely exclusively on his in–court comments and rulings. But as we have said, these afford no basis for disqualification.[159] The reasons for the extrajudi-

157. GAC had listed Zagnoli, who had represented Gulf at several cartel–related meetings, as a possible GAC witness at trial. United sought to have him appear to identify documents produced from Gulf files by GAC. The court granted the motion to quash, but stated:

> I will not completely buy this nonparty corporate stonewall proposition. The separate corporate identities and the rules relating to partnerships and so forth are not calculated to foment and bring about cover–ups and stonewalling information, and I am not going to permit them to be used that way.
>
> . . . [I]t seems to me that General Atomic easily could have voluntarily brought about the appearance of Mr. Zagnoli here without any harm to themselves. . . . But instead, it seems they desire to hide behind procedural and other rules in order to play a game of hide–and–go–seek with this Court, and I am getting sick of it. . . . I don't think that you are acting in good faith at all in this regard. I think you are trying to suppress information that could be brought to light and aid this Court. . . .

158. GAC does suggest that certain newspaper articles which discussed the favorable impact on the State of a judgment for United "could have had a serious prejudicial effect on the court," and amounted to "public pressure exerted through partisan appeals in the media." This is the very type of "indirect, remote, speculative, theoretical or possible interest" which we have previously said is not sufficient to warrant disqualification under Article VI, § 18. *State v. Scarborough, supra,* 75 N.M. at 705, 410 P.2d at 734. The articles were clearly not "partisan appeals." GAC has not shown that Judge Felter ever read those articles. Further-

more, many of the rulings that GAC relies on to support its claim of bias were made before the articles were published. It is difficult to believe that two innocuous newspaper articles had within two weeks of their publication transformed a judge, who GAC had said in May 1977 "has certainly furnished us complete due process all along," into what it now describes as a "patently hostile" jurist, harboring "personal grudges" and incapable of "calm impartial consideration."

159. We do not mean to suggest that a judge's in–court conduct can never be relevant to show a *personal* bias or prejudice against a party which has an extrajudicial source. *See In Re International Business Machines Corp., supra,* 618 F.2d at 928 n. 6. The critical distinction between an impermissible personal, extrajudicial bias, and in–court opinions was explained in *United States v. Conforte, supra,* 457 F.Supp. at 658 n. 12:

> The purpose of the extra–judicial source requirement concerns the origin of the judge's bias rather than the place of its expression. Certainly, judicial rulings or comments on the evidence made during the course of a proceeding do not fall within the rule. However, if a judge's statements or conduct during a trial refer to or reflect bias or prejudice which arose outside of his judicial duties, then the extrajudicial source rule is satisfied and recusal may be required.

The practical meaning of this distinction is perhaps best exemplified by comparing the statements and rulings which allegedly showed Judge Felter's bias with the in–court statements of the trial judge who was disqualified in *United States v. Hatahley,* 257 F.2d 920, 925–26 (10th Cir.), *cert. denied,* 358 U.S. 899, 79 S.Ct. 222, 3 L.Ed.2d 148 (1958).

cial source rule were recently set forth by the Second Circuit Court of Appeals in *In Re International Business Machines Corp., supra,* which involved a similar factual situation.

In the first place,

[a] trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias. Judicial independence cannot be subservient to a statistical study of the calls he has made during the contest.

618 F.2d at 929.

Second, a judge is not merely "a passive observer." *Id.* at 930.

He must . . . shrewdly observe the stratagems of the opposing lawyers, perceive their efforts to sway him by appeals to his predilections. He must cannily penetrate through the surface of their remarks to their real purposes and motives. He has an official obligation to become prejudiced in that sense. Impartiality is not gullibility. Disinterestedness does not mean child–like innocence. If the judge did not form judgments of the actors in those court–house dramas called trials, he could never render decisions.

*Id.,* quoting from *In Re J.P. Linahan,* 138 F.2d 650, 654 (2d Cir.1943) (footnotes omitted).

Criticism by the court of a party or its counsel is inevitable if the court's discovery

orders are to be enforced in the face of a party's intransigence. Indeed, the ultimate discovery sanctions imposed here require a finding of bad faith or willfulness. *See* Section III, *supra.* Since the principal evidence of the judge's alleged bias is the language he used to describe what he found to be GAC's bad faith in discovery, it would seem that if GAC's argument was accepted, only a biased judge could ever make the requisite finding of bad faith necessary to support the sanctions authorized by Rule 37(b)(2)(iii).[160] If this were true, such sanctions could never be imposed.[161]

Rulings adverse to a party do not necessarily evince a personal bias or prejudice on the part of the judge against it, even if the rulings are later found to have been legally incorrect. In *International Business Machines,* IBM contended, as GAC does here, that various erroneous rulings of the trial judge demonstrated that he was personally biased or prejudiced against it. The Second Circuit rejected this notion, stating that it

would necessarily require this court to examine each and every ruling to determine whether it was, initially, legally valid. If we determine that some adverse rulings were correctly made, obviously they could not be tainted by bias. Even if they were deemed to be incorrect, it of course does not follow that they were motivated by personal bias. We would next have to ask whether the error could be attributed to the judge's misunderstanding of the facts or the law. The exercise would require this court to be-

**160.** GAC also argues that the fact that the recitals containing this language were adopted almost verbatim from the proposed findings of United demonstrates the judge's bias against it and in favor of United. Although, as we have noted, this practice is not to be commended, it does not necessarily demonstrate that the judge acted in such a judicially irresponsible way as to require his disqualification. *See Ramey Const. Co., Inc. v. Apache Tribe, Etc., supra,* 616 F.2d at 468–69.

**161.** Not only is Judge Felter's description of GAC's conduct supported by the record, but also it was similar to language other courts have used to describe bad faith discovery efforts. *See, e.g., Fox v. Studebaker–Worthington, Inc.,* 516 F.2d 989, 991 (8th Cir.1975)

("shocking abuse," "flagrant violations of the rules of discovery"); *Conrad Music v. Modern Distributors, Inc.,* 433 F.Supp. 269, 270 (C.D. Cal.1977) ("utter disdain," "gross indifference," "deliberate callousness"); *Technograph Printed Cir. v. Packard Bell Electronics Corp.,* 290 F.Supp. 308, 320 (C.D. Cal.1968) ("wilful, intentional, and conscious flouting and disobedience," "callous, cynical disdain"); *Life Music, Inc. v. Broadcast Music, Inc., supra,* 41 F.R.D. at 28 (S.D. N.Y.1966) ("deliberate flouting of this court's order," "willful, intentional, and in bad faith," "contumacious conduct calculated and designed to frustrate the order of this court," "reprehensible and irresponsible in the extreme").

come intimately familiar with a 90,000 page trial transcript and to examine thousands of underlying documents and exhibits.

*Id.* at 930. The court concluded that it would be meaningless for it to determine the propriety of each contested ruling because it would be impossible to "divine its motivation." *Id.* at 933. In such circumstances, "the attribution of extrajudicial bias would require extrasensory perception." *Id.* at 934.

Another reason for the rule that judicial disqualification may not be based on in–court rulings is that "such rulings are reviewable otherwise." *Ex Parte Am. Steel Barrel Co.*, 230 U.S. 35, 44, 33 S.Ct. 1007, 1010, 57 L.Ed. 1379 (1913). *See In Re International Business Machines Corp., supra,* 618 F.2d at 929. This is particularly true here, where the propriety of the court's discovery orders and sanctions–which were the principal bases for the motions to disqualify Judge Felter–have been subject to full appellate review in this Court. *See* Sections II and III, *supra.*

■ GAC's contention that, independently of Article VI, § 18 of the New Mexico Constitution, Judge Felter's disqualification was required by Canon 3(C)(1) of the New Mexico Code of Judicial Conduct is also without merit. That Canon provides: "A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned . . . ." This provision sets up an objective standard geared to the appearance of justice, and thus expands the instances in which a judge should disqualify himself beyond those set out in Article VI, § 18. However, we adopt the construction given to an identical provision in 28 U.S.C. § 455(a) (1976), to the effect that there must be "a reasonable factual basis for doubting the judge's impartiality." Report of the Judiciary Committee of the United States House of Representatives (1974 U.S. Code Cong. & Ad. News 6351, 6355).

> [I]n assessing the reasonableness of a challenge to his impartiality, each judge must be alert to avoid the possibility that those who would question his impartiality are in fact seeking to avoid the consequences of his expected adverse decision. Disqualification for lack of impartiality must have a *reasonable* basis. Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not to have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

S.Rep.No. 93–419, 93d Cong., 1st Sess. 5 (1973); H.Rep.No. 93–1453, 93d Cong., 2d Sess. 5 (1974).[162]

For the very same reasons that courts have refused to permit a judge's in–court rulings to form the basis for his disqualification for actual bias or prejudice, Canon 3(C)(1) and identical language in its federal counterpart have been repeatedly construed to require extrajudicial bias. *In Re International Business Machines Corp., supra,* 618 F.2d at 929; *United States v. Haldeman, supra,* 559 F.2d at 132–33 n. 297.[163]

---

**162.** It is important to note that GAC moved to disqualify Judge Felter only after he had warned time and time again that he would impose sanctions for failure by either party to comply with the court's discovery orders; after he found in October 1977 that GAC had not previously acted in good faith in discovery; and after United had filed its fourth motion for sanctions. This is not the first case in which a party faced with the imposition of sanctions for its discovery failures has sought to question the judge's integrity and impartiality. *State of Ohio v. Arthur Andersen & Co., supra,* 570 F.2d at 1372; *Henry v. Sneiders,* 490 F.2d 315, 317–

18 (9th Cir.1974), *cert. denied,* 419 U.S. 832, 95 S.Ct. 55, 42 L.Ed.2d 57 (1974); *Pioche Mines Consolidated, Inc. v. Dolman, supra,* 333 F.2d at 259.

**163.** Canon 3(C)(1)(a) states that one instance in which a judge's impartiality "might reasonably be questioned" is where "he has a *personal* bias or prejudice concerning a party." (Emphasis added.) Because subsection (a) is not the only such instance, disqualification under Canon 3(C)(1) could also be required where the judge did not in fact have such a personal bias, but where there was nonetheless "a reasonable factual basis" for believing that he did. How-

In *Lazofsky v. Sommerset Bus Co., Inc., supra*, 389 F.Supp. at 1044, the court said:

If the words "impartiality might reasonably be questioned" and "avoid impropriety and the appearance of impropriety" were to be interpreted to encompass judicial rulings in the course of a trial or other proceeding, . . . then there would be almost no limit to disqualification motions and the way would be opened to a return to "judge shopping", a practice which has been for the most part universally condemned. Certainly every ruling on an arguable point during a proceeding may give "the appearance of" partiality, in the broadest sense of those terms, to one party or the other.

Therefore, we conclude that GAC's disqualification argument under Canon 3(C)(1) is deficient for the same reasons it is under Article VI, § 18 of the New Mexico Constitution.[164]

■ Because GAC failed to meet its burden of establishing that Judge Felter had a personal or extrajudicial bias or prejudice against it, the judge properly refused to disqualify himself. *See Gerety v. Demers, supra*, 92 N.M. at 400, 589 P.2d at 184; *In Re International Business Machines Corp., supra*, 618 F.2d at 934.

## VI.

## APPROPRIATENESS OF THE REMEDIES GRANTED APPELLEES

In this final section of the opinion we examine GAC's contentions concerning the propriety of the remedies awarded United and I&M by the trial court.

After entry of the sanctions order and default judgment, the court conducted a trial on damages.[165] The court invalidated the 1973 and 1974 Supply Agreements, and held that United had no obligation to supply any uranium to GAC or its predecessors. The court also found that GAC was obligated to indemnify United for any liabilities connected to United's failure to deliver uranium covered by the 1973 Agreement or any of the utility contracts. The court awarded I&M $15,950,752 in damages, and decreed specific performance of GAC's obligation to supply uranium to I&M. GAC contends that these remedies were improper.

GAC argues that the invalidation of a contract which displaced a prior, valid contract reinstates the prior contract. GAC also argues that rescission of a contract requires restoration of the status quo ante. *Prudential Insurance Company of America v. Anaya*, 78 N.M. 101, 106, 428 P.2d 640, 645 (1967). Because the 1973 Supply Agreement replaced the 1971 Agreement and continued United's obligation to supply uranium to Gulf–United, GAC contends that if the 1973 Agreement was correctly invalidated, the 1971 Agreement remains in force. Therefore, it concludes that the trial court erred in holding that United had no further obligations to supply uranium to GAC. Alternatively, GAC argues that if the 1971 Agreement is also invalidated,

ever, for the reasons stated in the text, even in that instance the extrajudicial source requirement must be satisfied.

**164.** Our determination that Judge Felter's disqualification was not mandated by Article VI, § 18 of the New Mexico Constitution or Canon 3(C)(1) of the Code of Judicial Conduct disposes of GAC's claim that its due process right to a fair trial was violated by Judge Felter's alleged bias against it. Clearly, the right to "[a] fair trial in a fair tribunal is a basic requirement of due process." *In Re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955). *See also Beall v. Reidy, supra*, 80 N.M. at 446, 457 P.2d at 378. Although we cannot say that a judge's disqualification may never be required by the due process clauses of the Unit-

ed States and New Mexico Constitutions even though it is not also mandated by Article VI, § 18 of the State Constitution or Canon 3(C)(1), it is difficult to conceive of circumstances in which a claim sufficient under the latter two standards would not also satisfy the due process test. *See In Re International Business Machines Corp., supra*, 618 F.2d at 932 n. 11; *United States v. Haldeman, supra*, 559 F.2d at 130 n. 276; *United States v. Conforte, supra*, 457 F.Supp. at 659 n. 13.

**165.** Upon the default, GAC is deemed to have admitted the allegations of the complaint, but the prevailing parties must prove the damages to which they are entitled. *Gallegos v. Franklin, supra*, 89 N.M. at 123, 547 P.2d at 1165.

United remains obligated to supply uranium to the utilities by virtue of the utility contracts it entered into prior to the execution of the 1971 Agreement.

The principles GAC relies on do not apply here. Entry of the default had the effect of establishing as true the allegations of the complaint (*Gallegos v. Franklin, supra,* 89 N.M. 123, 547 P.2d at 1165)—namely that the 1973 Supply Agreement was unenforceable due to antitrust violations, fraud, breach of fiduciary duty, economic coercion and commercial impracticability. Among the averments established by the default was that the purpose or effect of the 1973 Agreement was to restrain trade in and further the monopolization of the uranium market in New Mexico. Acceptance of GAC's contract revival argument would merely substitute one invalid contract with another which would have the same illegal effect. *See Evans v. Ideal Brick and Brikcrete Mfg. Co.,* 287 P.2d 454, 456 (Okla. 1955). The default also established as true the allegation that United's performance of the 1973 Agreement was commercially impracticable. If performance of the 1973 Agreement is commercially impracticable, performance of the 1971 Agreement at the lower prices contained therein would be even more so.

Second, GAC contends that there was no basis for the trial court to hold that GAC was obligated to indemnify United. We disagree. In this instance, the issue of indemnification was a question of liability and not of damages. United pled facts entitling it to indemnification. The default established the truth of those averments. *Gallegos v. Franklin, supra.*

Finally, GAC contends that the remedies awarded to I&M were improper because I&M was not entitled to specific performance of its contract, and because the trial court improperly refused to hear evidence on limitation of liability and equitable adjustment clauses in the I&M contract.

GAC argues that specific performance was not a proper remedy because fabricated nuclear fuel is not a unique good. Section 55–2–716, N.M.S.A. 1978, provides that spe-

cific performance may be decreed "where the goods are unique or in other proper circumstances." Official Comment 1 to Section 55–2–716 states that the intent of this provision is to liberalize the availability of this remedy. Comment 2 makes it clear that the uniqueness of the goods is not "the sole basis of the remedy." A decree of specific performance is proper where the remedy at law, in this case damages, is inadequate. To be adequate, the remedy at law " 'must be as certain, prompt, complete, and efficient to attain the ends of justice as a decree of specific performance.' " *Laclede Gas Company v. Amoco Oil Company,* 522 F.2d 33, 40 (8th Cir. 1975), quoting from *National Marking Mach. Co. v. Triumph Mfg. Co.,* 13 F.2d 6, 9 (8th Cir. 1926).

In this case, there is substantial evidence to support the conclusion that damages are an inadequate remedy. The evidence shows that no seller was willing to make a long-term contract with I&M on any basis other than the market price at the time of delivery. Because fixed price contracts for future delivery were unavailable, there was no way to predict the price I&M might have to pay. Thus, specific performance was a proper remedy, even though the goods involved are not "unique" in the traditional sense of that term. Other courts have decreed specific performance in similar circumstances. *Laclede Gas Company v. Amoco Oil Company, supra,* 522 F.2d at 40 (supply contract for propane); *Eastern Air Lines, Inc. v. Gulf Oil Corp.,* 415 F.Supp. 429, 442–43 (S.D. Fla. 1975) (supply contract for aviation fuel).

The issues concerning the limitation of liability and equitable adjustment clauses are more troubling. The I&M contract contains a clause which limits the seller's liability. Another clause provides for certain adjustments in price for increased costs incurred by the seller as a result of delays caused by the purchaser. The trial court held that by reason of the default, GAC was precluded from offering evidence on either issue. We disagree.

The limitation of liability clause is directly related to the question of damages. A

hearing on its applicability was not precluded by the act of default. *See Kohlenberger, Inc. v. Tyson's Foods, Inc.*, 256 Ark. 584, 510 S.W.2d 555, 565 (1974). We need not consider I&M's various arguments as to the inapplicability of this clause. The time and place for resolving those issues is at a damages hearing in the trial court.

We also hold that the trial court erred in refusing to hear evidence on the question of the applicability of the equitable adjustment clause of the I&M contract. I&M argues that the default established that "the largest component of GAC's claimed increase in cost" was caused by the activities of the cartel, and that GAC therefore had no equitable claim to compel I&M to bear the consequences of GAC's misdeeds. Although the default established that uranium price increases were due to cartel activities, which is a finding we do not disturb, GAC was nevertheless entitled to show that other costs, such as those for separative work, were due to I&M's delays in constructing one of its nuclear reactors, and that it was therefore entitled to price increases under the equitable adjustment clause of the I&M contract.

 The trial court did not make specific findings setting forth any factual or legal basis for precluding evidence with respect to these contractual clauses. A search of the record shows a dearth of argument, briefing, or other means by which we can pinpoint the reasons for that decision. On the record before us, we cannot determine whether these clauses are applicable, or whether, if applied, they would reduce the amount of damages which were awarded. That award will not be disturbed unless on remand the trial court finds that the limitation of liability or equitable adjustment clauses are applicable and would change the result. We are satisfied that the trial court adequately considered the other damage questions GAC raises on appeal. However, the case is remanded to the trial court for the limited purpose of a hearing on the applicability of the limitation of liability and equitable adjustment clauses of the I&M contract.

## VII.
## CONCLUSION

Our exhaustive examination of the record in this extraordinary case convinces us that the trial court properly found that GAC had acted in bad faith throughout the discovery process and that the court did not, in the face of such misconduct, abuse its discretion in entering the sanction of a default judgment.

In discovery, as well as in other aspects of this litigation, GAC's efforts have been marked by an extraordinary lack of diligence that cannot be characterized as accidental, unintentional, or involuntary. In addition to the discovery failures we have extensively outlined, GAC unjustifiably delayed asserting its rights to arbitration, *United Nuclear Corp. v. General Atomic Co., supra*, 93 N.M. 105, 597 P.2d 290, and to the disqualification of United's counsel. The following language of the court in *Pioche Mines Consolidated, Inc. v. Dolman, supra*, 333 F.2d at 260, aptly characterizes the situation here:

> Throughout, appellants' position has been that the litigation is totally without merit. One cannot help wondering why, if this is so, appellants did not promptly answer, press for an early trial, and get a judgment to that effect.

The trial court's conclusion that GAC pursued a persistent policy of delay and resistance is supported by the record; indeed, that conclusion is inescapable.

Therefore, the sanctions order and default judgment is affirmed. The amended final judgment is also affirmed, except to the extent that evidence as to the limitation of liability and equitable adjustment clauses of the I&M contract was excluded. The cause is remanded for the purpose of holding a new hearing on those limited issues.

IT IS SO ORDERED.

SOSA and EASLEY, JJ., concur.